UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| Parents, Families, and Friends of Lesbians and Gays, Inc., et al. | ) ) ) | |
| | ) | Case No. 02:11-cv-04212 |
| Plaintiffs, | ) ) | **SUGGESTIONS IN SUPPORT OF** |
| v. | ) ) | **MOTION FOR PRELIMINARY INJUNCTION** |
| Camdenton R-III School District, et al. | ) ) | |
| Defendants. | ) ) ) | |

Mark Sableman #36276
A. Elizabeth Blackwell #50270
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000
msableman@thompsoncoburn.com

Anthony E. Rothert, # 44827
Grant R. Doty, # 60788
American Civil Liberties Union of Eastern
   Missouri
454 Whittier Street
St. Louis, Missouri 63108
314-652-3114
FAX 314-652-3112
tony@aclu-em.org
grant@aclu-em.org

Joshua A. Block*
James Esseks*
LGBT Project
ACLU Foundation
125 Broad Street, Floor 18
New York, New York 10004
(212) 549-2600
FAX 212-549-2650
jblock@aclu.org
jesseks@aclu.org

* *Pro Hac Vice Motion to Follow*
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

FACTUAL BACKGROUND ..........................................................................................1

ARGUMENT ...................................................................................................................8

    I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim that Camdenton R-III's Web Filtering Violates the First Amendment. .......................9

          A.      Plaintiffs Have Standing to Challenge Camdenton R-III's Unconstitutional Web Filtering.................................................................9

          B.      School Censorship of Internet Resources Must -- At a Minimum -- Be Viewpoint-Neutral and Reasonable. .................................................10

                1.      Under *Pico* and *Pratt,* School Censorship of Library Materials Must Be Viewpoint-Neutral and Based on Legitimate Criteria. ....................................................................10

                2.      Under the Approach of the *ALA* Plurality, a Library's Filtering of Internet Materials Must Be Viewpoint-Neutral and Reasonable in Light of the Traditional Role of Libraries. .......................................................12

                3.      Under *Bradburn* and *Crosby*, a Library's Filtering of Internet Materials Must Be Viewpoint-Neutral and Reasonable in Light of the Traditional Role of Libraries. .......................................................................15

          C.      Camdenton R-III's Web Filtering Is Not Viewpoint-Neutral or Reasonable in Light of the Traditional Role of the School Library..........16

                1.      Camdenton R-III's "Sexuality" Filter Is Not Viewpoint-Neutral ....................................................................17

                2.      Camdenton R-III's "Sexuality" Filter Is Not Reasonable in Light of the Traditional Role of School Libraries.........................................................................24

          D.      Camdenton R-III Cannot Justify Its Decision To Use the Discriminatory URL Blacklist System. ....................................................26

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 2 of 38

II.     Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction ................................................................................................... 30

III.    The Balance of Harms Favors an Injunction ...................................................... 30

IV.    An Injunction Will Serve the Public Interest ..................................................... 30

CONCLUSION ............................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACLU v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004) .................................................................. 14

*ALA*, 2003 WL 145228 (2003) ................................................................................................. 13

*Am. Council of the Blind v. Boorstin*, 644 F. Supp. 811 (D.D.C. 1986) ................................. 13, 29

*Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris*, 463 U.S. 1073 (1983) ................................................................................. 27

*Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ............................... 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) ................................................................................................. 10, 11, 12, 13

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) .................................................... 28

*Boos v. Barry*, 485 U.S. 312 (1988) .......................................................................................... 15

*Borger by Borger v. Bisciglia*, 888 F. Supp. 97 (E.D. Wis. 1995) ............................................ 26

*Bowler v. Town of Hudson*, 514 F. Supp. 2d 168 (D. Mass. 2007) .......................................... 11

*Bradburn v. N. Cent. Reg'l Library Dist.*, 231 P.3d 166 (Wash. 2010) .............................. passim

*Burnham v. Ianni*, 119 F.3d 668 (8th Cir. 1997) ..................................................................... 26

*Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010) ....................................................................... 17

*Child Evangelism Fellowship of N.J. Inc. v. Stafford Tp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004) ....................................................................................... 10, 17

*Counts v. Cedarville Sch. Dist.*, 295 F .Supp. 2d 996 (W.D. Ark. 2003) ............................. 10, 28

*Crosby v. S. Orange County Cmty. Coll. Dist.*, 172 Cal. App. 4th 433 (2009) ............... 10, 15, 16

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981) ......................................... 9

*Doe v. S. Iron R-1 Sch. Dist.*, 453 F. Supp. 2d 1093 (E.D. Mo. 2006) ...................................... 30

*Elrod v. Burns,* 427 U.S. 347 (1976) ....................................................................................... 30

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ......................................... 29

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) ..................................................... 14

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ...................... 17, 19

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ........................................................ 24

Case 2:11-cv-04212-NKL    Document 7-1    Filed 08/15/11    Page 4 of 38

*Mainstream Loudoun v. Bd. of Trustees of the Loudoun County Library*, 2 F. Supp. 2d 783 (E.D.Va. 1998) ........................................................................11

*Marcus v. Iowa Pub. Television,* 97 F.3d 1137 (8th Cir.1996) ..................................30

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)............................15, 17

*Miller v. NW Region Library Bd.*, 348 F. Supp. 2d 563 (M.D.N.C. 2004) ..................................15

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976)........................................10

*Nat'l Endowment for Arts v. Finley*, 524 U.S. 569 (1998).......................................13, 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ..................................14

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ..........................................9, 30

*Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008) ..................................9

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982).......................................................10, 11, 28

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ..................................14

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004) ..................................26

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..................................14

*Searcey v. Crim*, 815 F.2d 1389 (11th Cir. 1987).......................................9

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ..................................29

*United States v. Am. Library Ass'n ("ALA")*, 539 U.S. 194 (2003)....................................passim

*Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.*, 425 U.S. 748 (1976).......................................................9

*Watchtower Bible v. Vill. of Stratton,* 536 U.S. 150 (2002).......................................28

*Wickersham v. City of Columbia, Mo.*, 371 F. Supp. 2d 106 (W.D. Mo. 2005).....................9, 30

## Other Authorities

ALA Policy Statement 53.1.11 ..................................24

Children's Internet Protection Act ("CIPA") ..................................2, 12

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 5 of 38

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| Parents, Families, and Friends of Lesbians and Gays, Inc., et al. | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 2:11-cv-04212 |
| v. | ) ) ) | SUGGESTIONS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| Camdenton R-III School District, et al. | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' SUGGESTIONS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

This matter involves Defendant Camdenton R-III School District's (the "District's") use of Internet filtering software that impermissibly discriminates on the basis of viewpoint. Specifically, the District's Internet filtering software blocks students from accessing websites that are supportive of lesbian, gay, bisexual, and transgender ("LGBT") individuals and their rights while allowing students to access websites that espouse an anti-LGBT viewpoint. Plaintiffs seek injunctive relief, prohibiting the District from continuing to block student access to non-sexual web content with LGBT-supportive viewpoints, while it permits access to web content espousing anti-LGBT viewpoints.

## FACTUAL BACKGROUND

### Defendant Camdenton R-III School District's Internet Filtering System

Defendant Camdenton R-III School District is a public school district that uses Internet filtering software to block student access to selected categories of websites. The District claims

5385654.10

the purpose of its software is to assure compliance with the Children's Internet Protection Act ("CIPA"), which requires that schools receiving federal funds through the E-rate program use filtering software to block websites with visual depictions that are obscene or pornographic. Plaintiffs do not challenge the District's use of Internet filtering software for this purpose.

The District's software, however, is not limited to blocking pornographic or obscene websites. It also blocks hundreds of educational, non-pornographic websites that advocate for LGBT rights and/or provide useful information and advice for LGBT individuals. At the same time, the District's software permits students to access websites that condemn homosexuality or take positions opposing LGBT rights. Thus, the District uses filtering software to censor only websites with an LGBT-supportive viewpoint while allowing access to comparable websites with an anti-LGBT viewpoint.

To understand how the District engages in such viewpoint discrimination, it is necessary to understand how the District's software works. The District custom-built its software using a database of categorized URL addresses from a website called "URLBlacklist.com." URL Blacklist is not a typical commercial Internet filtering company. It is a website with no physical address or phone number. It creates blacklists by collecting and aggregating other lists. URL Blacklist specifically warns that "[t]he blacklist *does* contain sites which are wrongly categorized which is due to the bulk of the entries being collecting using automatic scripts." It also states that "[t]he blacklist does not only contain sites that are considered 'bad' but it also contains many other categories. . . . Being listed does not infer that the site is 'bad'—these are just lists of sites."[1]

The URL Blacklist database sorts websites into approximately 70 different categories of content. Once the database is downloaded, the District selects what categories it wishes to block.

---

[1] http://www.urlblacklist.com.

If the District chooses to block a category, then any website listed in that category will be blocked on school computers.

URL Blacklist uses two categories designed to block vulgar and pornographic content. The "adult" category includes websites "containing adult material such as swearing but not porn." The "porn" category lists websites containing "pornography." These categories appear to generally filter content in a viewpoint-neutral manner.

URL Blacklist also uses a separate category called "sexuality." That category is defined as "[s]ites dedicated to sexuality, possibly including adult material." The "sexuality" category does not capture websites solely based on pornographic content, but, rather, it captures websites "dedicated to sexuality," regardless of whether the websites are sexually explicit.

The "sexuality" category includes some websites that are also included in the "adult" and/or "porn" categories, but it also captures hundreds of websites that qualify for inclusion in neither of those categories. Some of those websites contain explicit sexual content. Others, however, are educational websites that are not sexually explicit, contain no "adult" material, and are addressed entirely to religious, legal, political, personal, and social issues relating to sexuality. A true and correct copy of the "sexuality" blacklist, sent to the American Civil Liberties Union Foundation ("ACLU") by the District, is attached hereto as Exhibit A-5.

The "sexuality" blacklist is not consistent as to LGBT-related content. It does not include websites that discuss sexual orientation and gender identity from a point of view that does not express support for LGBT people or advocate for their equal treatment. For example, the "sexuality" category does not include numerous websites that condemn homosexuality, oppose protections for LGBT people, or encourage LGBT people to attempt to change their sexual orientation through so-called reparative therapy.

Camdenton R-III can block pornographic and sexually explicit content without using the discriminatory "sexuality" filter. To the extent the "sexuality" category includes websites that are also categorized as "adult" or "porn," the District could unblock the "sexuality" category and still block the "adult" and "porn" sites by using the "adult" and "porn" filters. To the extent the "sexuality" category includes sexually explicit websites that are not categorized as "adult" or "porn," the District could block those sites individually. The District could also use a better, more reputable Internet filtering service that distinguishes websites with sexually explicit content from websites that discuss religious, legal, political, and social issues relating to sexuality. The District has chosen none of these options.

Each of the Plaintiffs has informational, non-sexually explicit websites that are included in URL Blacklist's "sexuality" category. URL Blacklist's "sexuality" category includes www.pflag.org, the website for Plaintiff Parents, Families, & Friends of Lesbians and Gays, Inc. ("PFLAG"), along with the websites of a number of PFLAG's affiliates. Exhibit A-5 ("sexuality" blacklist). PFLAG is a national non-profit organization that promotes the health and well-being of LGBT persons, their families and friends. Its website provides information about PFLAG chapters and resources, provides links for LGBT persons and families and friends of LGBT persons, and offers advice aimed at keeping families together. PFLAG's websites do not contain pornography or sexually explicit content. More detailed information about PFLAG and its websites can be found in Paragraphs 1 and 33-37 of the Complaint and in the Declaration of Jody M. Huckaby, PFLAG's Executive Director, attached hereto as Exhibit B.

URL Blacklist's "sexuality" category also includes dignityusa.org, the website for Plaintiff DignityUSA. Exhibit A-5 ("sexuality" blacklist). DignityUSA is a national lay movement of LGBT Catholics that advocates for change in the Catholic Church's teachings on

homosexuality. Its website provides information regarding the organization and its ministries, answers frequently asked questions regarding Catholicism and homosexuality, and provides resources for those visiting the site, including a Young Adult Caucus for gay and lesbian youth on its blog. DignityUSA's website does not contain pornography or sexually explicit content. More detailed information about DignityUSA and its websites can be found in Paragraphs 2 and 38-39 of the Complaint and in the Declaration of Marianne Duddy-Burke, Executive Director of DignityUSA, attached hereto as Exhibit C.

URL Blacklist's "sexuality" category also includes www.matthewshepard.org and www.MatthewsPlace.com, Exhibit A-5 ("sexuality" blacklist), websites maintained by Plaintiff Matthew Shepard Foundation, which is an organization that encourage respect for human dignity and difference by raising awareness, opening dialogues, and promoting positive change. MatthewsPlace.com is an online community and resource center for LGBT and allied youth that provides resources about LGBT youth-friendly shelters, outreach centers and empowerment programs across the country. More detailed information about the Matthew Shepard Foundation and its websites can be found in Paragraphs 3 and 40-43 of the Complaint and in the Declaration of its Executive Director, Jason Marsden, attached hereto as Exhibit D. Neither of the Matthew Shepard Foundation's websites contains pornography or sexually explicit content.

URL Blacklist's "sexuality" category also includes www.campuspride.net, one of two web addresses for the website for Plaintiff Campus Pride, Inc. ("Campus Pride"). Exhibit A-5 ("sexuality" blacklist). Campus Pride is a national nonprofit organization for student leaders and campus groups working to create a safer college environment for LGBT students. Campus Pride's website provides information about Campus Pride events and conferences, newsletters, a blog, and a discussion board. Additionally, Campus Pride maintains three other websites with

resources for LGBT youth: www.Stophate.org, www.Lambda10.org, and www.CampusClimateIndex.org. The "sexuality" category blocks all three of those websites, along with www.campuspride.net, Exhibit A-5 ("sexuality" blacklist), even though none of them contains pornography or sexually explicit content. More detailed information about Campus Pride and its websites can be found in Paragraphs 4 and 44-45 of the Complaint and in the Declaration of Shane Windmeyer, Campus Pride's Executive Director, attached hereto as Exhibit E.

In addition to Plaintiffs' websites, the District's filtering software blocks access to hundreds of other LGBT educational and advocacy websites, a number which are described in detail in Paragraph 46, Subparagraphs a-oo of the Complaint.

While URL Blacklist's "sexuality" category blocks Plaintiffs' websites and other websites that support LGBT rights, it allows access to numerous websites that condemn homosexuality, oppose protections for LGBT people, or encourage LGBT people to attempt to change their sexual orientation through so-called reparative therapy. Those websites are described in detail in Paragraph 50, Subparagraphs a-k of the Complaint and include, but are not limited to, the websites for the Christian Coalition (www.cc.org), the National Organization for Marriage (www.nationformarriage.org), the Family Research Council (www.frc.org), and Exodus International (www.exodusinternational.org).

Thus, because of the District's use of URL Blacklist's "sexuality" filter, students in the Camdenton R-III School District are permitted to access websites with an anti-LGBT viewpoint but are prohibited from accessing websites that are supportive of LGBT people and/or provide information and advice for LGBT individuals.

**The District's Refusal to Unblock the Viewpoint-Discriminatory "Sexuality" Filter or, Alternatively, to Change to a Different, Viewpoint-Neutral Filtering Service.**

During last school year, the ACLU of Eastern Missouri submitted a public records request to the District asking what categories of content were being blocked on the District's software. In response, the District informed the ACLU of Eastern Missouri that one of the categories it blocked was "sexuality." Exhibit A-1 (Letter of May 19, 2011 from T. Hadfield to M. Hill).[2]

After receiving the District's response, the ACLU and the ACLU of Eastern Missouri requested that the District deactivate the "sexuality" filter and restore students' access to websites containing LGBT-supportive content and resources. Alternatively, they suggested that the District use a different, viewpoint-neutral screening filter that did not discriminate against non-sexual LGBT material. Exhibit A-2 (Letter of May 24, 2011 from A. Rothert to T. Hadfield).

Initially, the District denied that its filtering system relies on URL Blacklist. Exhibit A-3 (Letter of May 26, 2011 from T. Mickes to A. Rothert). Upon further inquiry, Exhibit A-4 (Letter of May 31, 2011 from A. Rothert to T. Mickes), the District acknowledged that it did, in fact, "utilize[] the URL Blacklist filtering system as a base for devising a custom filtering system for the District." Exhibit A-5 (Letter of June 6, 2011 from B. Helfirch to A. Rothert). The District then agreed to unblock four websites that the ACLU and the ACLU of Eastern Missouri had mentioned in their letters to the District: gsanetwork.org, glsen.org, dayofsilence.org, and thetrevorproject.org. *Id.* The District, however, stated that it "will not deactivate the 'sexuality' filter from the District's network." *Id.*

---

[2] In contrast, some of the content categories not blocked by the District are: astrology, childcare, cleaning, clothing, culinary, ecommerce, entertainment, games, gardening, home repair, jewelry, job search, online games, pets, shopping, sports, and vacation.

Classes at Camdenton R-III School District start on August 18, 2011. Unless the District unblocks the "sexuality" filter or, alternatively, changes to a viewpoint-neutral filtering service, students in the District will be blocked from accessing the websites of Plaintiffs and many other organizations that provide useful information for students in general and LGBT students in particular based solely on the LGBT-supportive viewpoints those websites express. The District has indicated its unwillingness to agree to either of those alternatives. In fact, recently, on August 12, 2011, the District reaffirmed that it would refuse to make any additional changes to its discriminatory filtering software. Exhibit F (Article from Lake News Online). Consequently, absent a court order, Plaintiffs' websites will be censored on the basis of their viewpoints.

## ARGUMENT

As explained below, the URL Blacklist filter for "sexuality" is different than the filtering systems previously considered by other courts. Previous challenges to filtering software have involved viewpoint-neutral filtering software that was designed to target pornography. But the "sexuality" filter used by Camdenton R-III is unprecedented in two key respects: (a) the filter is not viewpoint-neutral, and (b) the filter does not target only pornography. No court has upheld a public school or library's use of filtering software with these two critical features. This Court should issue a preliminary injunction to prevent the irreparable harm that Plaintiffs will suffer each day their websites are blocked by the District's viewpoint-based censorship.

The Eighth Circuit has instructed that courts should consider four factors in determining whether to issue a preliminary injunction:

> (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the interest of the public.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *accord Wickersham v. City of Columbia, Mo.*, 371 F. Supp. 2d 106, 1076 (W.D. Mo. 2005). "In a First Amendment case …, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008).

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that Camdenton R-III's Web Filtering Violates the First Amendment.

The first factor to consider on a motion for preliminary injunction is whether the movants have a "fair chance of prevailing" on the merits of their claims. This standard applies "where a preliminary injunction is sought to enjoin something other than [. . .] a state statute." *Planned Parenthood v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008). The "fair chance of prevailing" standard is less "rigorous" than the standard applied "where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." *Id.* Because the injunction requested here does not involve a state statute, a fair chance of success on Plaintiffs' constitutional claims will satisfy this prong of the preliminary-injunction test.

### A.    Plaintiffs Have Standing to Challenge Camdenton R-III's Unconstitutional Web Filtering.

"Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.*, 425 U.S. 748, 756 (1976) (footnote omitted). By blocking access to their websites, Camdenton R-III has interfered with Plaintiffs' ability to communicate their messages to students at Camdenton R-III. Plaintiffs have standing to challenge this interference with their free speech rights under the First Amendment. *See Searcey v. Crim*, 815 F.2d 1389 (11th Cir. 1987) (upholding preliminary injunction in favor of peace activist group that sought to communicate with public school students through school career fair and bulletin boards); *Child Evangelism Fellowship of N.J.*

*Inc. v. Stafford Tp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004) (ruling in favor of community organization that sought to communicate with public school students through program in which teachers distributed flyers to students at end of class).

**B.      School Censorship of Internet Resources Must -- At a Minimum -- Be Viewpoint-Neutral and Reasonable.**

Although the Supreme Court has not definitively resolved what standard of scrutiny applies to school censorship of Internet websites, under any possible standard of scrutiny such censorship must -- at a minimum -- satisfy the bedrock requirements of reasonableness and viewpoint neutrality. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) (plurality); *United States v. Am. Library Ass'n ("ALA")*, 539 U.S. 194 (2003) (plurality); *Bradburn v. N. Cent. Reg'l Library Dist.*, 231 P.3d 166 (Wash. 2010); *Crosby v. S. Orange County Cmty. Coll. Dist.*, 172 Cal. App. 4th 433 (2009).

**1.      Under *Pico* and *Pratt*, School Censorship of Library Materials Must Be Viewpoint-Neutral and Based on Legitimate Criteria.**

It is well-established that the First Amendment prohibits public schools from censoring school library resources in a manner that discriminates against disfavored viewpoints. *See Pico*, 457 U.S. at 868 (plurality); *accord Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 776 (8th Cir. 1982); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 581-82 (6th Cir. 1976); *Counts v. Cedarville Sch. Dist.*, 295 F .Supp. 2d 996, 1002-05 (W.D. Ark. 2003). The Supreme Court in *Pico* explained that school officials "rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner." *Pico*, 457 U.S. at 871 (plurality). School officials may therefore make content-based decisions based on legitimate criteria such as "educational suitability," or "appropriateness to age and grade level," but they may not remove otherwise

appropriate books based on "disagreement with constitutionally protected ideas in those books." *Id.* at 875.

First Amendment concerns are heightened in the context of a school library because a school library is "the principal locus" of students' right to receive information and "prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868. Thus, the wide leeway of school officials in determining which materials should be included in a school curriculum does not extend "beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." *Id.* at 869.[3]

A school's censorship of Internet websites in a school library is subject to at least the same constitutional restraints as a school's censorship of physical library resources in *Pico*. In this context, "the Internet is simply another method for making information available in a school or library" and "a technological extension of the book stack." *ALA*, 539 U.S. at 207 (plurality) (internal quotation marks and citations omitted). Blocking a website on a school library computer is analogous to removing a book from a library shelf or clipping a page out of a library encyclopedia. *See id.* at 237 (Souter, J., dissenting); *Mainstream Loudoun v. Bd. of Trustees of the Loudoun County Library*, 2 F. Supp. 2d 783, 794-95 (E.D.Va. 1998); *Bowler v. Town of Hudson*, 514 F. Supp. 2d 168, 180 (D. Mass. 2007). As with the removal of school library

---

[3] Although *Pico* was a plurality decision, the Eighth Circuit reached the same conclusion in *Pratt*, which is binding precedent in this Circuit. In *Pratt*, the Eighth Circuit held that a school board could not censor student access to a film adaption of Shirley Jackson's story "The Lottery" and an accompanying "trailer film" discussing the story because members of the school board "objected to the ideas expressed in them" or because they "considered the films' ideological and religious themes to be offensive." *Pratt*, 670 F.2d at 777. By banning the films, the school had impermissibly "used its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered." *Id.* at 779.

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 16 of 38

books, schools have discretion to filter websites based on legitimate educational criteria but may not censor websites in a manner that is based on the viewpoints or ideas those websites contain.

2. **Under the Approach of the *ALA* Plurality, a Library's Filtering of Internet Materials Must Be Viewpoint-Neutral and Reasonable in Light of the Traditional Role of Libraries.**

Besides *Pico*, the only other Supreme Court decision discussing the censorship of library materials is *American Library Association*. A fractured Supreme Court in *ALA* rejected a facial challenge to the Children's Internet Protection Act ("CIPA"), 114 Stat. 2763A-335, which requires public schools and libraries receiving certain federal funds to use filtering software to block access to pornographic websites. A plurality opinion joined by four Justices concluded that Internet access at public libraries is not a traditional public forum, and thus the law was not subject to heightened judicial scrutiny. *ALA*, 539 U.S. at 205-06 (plurality). Instead, the plurality reasoned that the purpose of a library is "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality," and that libraries have wide discretion to make content-based decisions in determining which materials meet those criteria. *Id.* at 206. The plurality concluded that in light of a library's "traditional role in identifying suitable and worthwhile material" and the fact that "[m]ost libraries already exclude pornography from their print collections," it was "entirely reasonable" for libraries to block categories of content categorized as "pornography" without reviewing each website individually. *Id.* at 208.

The reasoning of the *ALA* plurality is fully consistent with the Supreme Court's earlier decision in *Pico*. A public librarian's discretion to make content-based judgments when selecting "material of requisite and appropriate quality for educational and informational purposes," *id.* at 211, is analogous to the discretion of a school official to remove books based on legitimate criteria such as "educational suitability," or "appropriateness to age and grade level," *Pico*, 547 U.S. at 871 (plurality). Just as in *Pico*, that discretion to make content-based decisions

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 17 of 38

in applying legitimate selection criteria does not also empower school or public librarians to censor otherwise appropriate materials through viewpoint discrimination. *See ALA*, 539 U.S. at 236 (Souter, J., dissenting) (noting without contradiction that a library's practice of "excluding books because their authors are Democrats or their critiques of organized Christianity are unsympathetic" would be something that "even the plurality would consider to be illegitimate"); *see also Am. Council of the Blind v. Boorstin*, 644 F. Supp. 811, 816 (D.D.C. 1986) (holding that Librarian of Congress impermissibly removed braille version of magazine that had "consistently met the selection criteria established by the Library of Congress" because of political pressure from member of Congress).[4]

Thus, although the *ALA* plurality upheld the constitutionality of reasonable and viewpoint-neutral web filtering, nothing in *ALA* supports the constitutionality of a viewpoint-based web filter. Unlike the removal decision in *Pico*, none of the filtering practices considered in *ALA* discriminated on the basis of viewpoint. As the Solicitor General explained to the Supreme Court, "the commercial filtering products used by public libraries draw distinctions based on whether the material falls into a category such as 'Pornography,' not on the basis of any viewpoint about sexuality." Br. of Solicitor General in *ALA*, 2003 WL 145228, at *31 (2003)

---

[4] The distinction between legitimate content-based selection criteria and illegitimate viewpoint discrimination is also reflected in the subsidized-speech cases cited in the plurality opinion. For example, the Court in *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569 (1998), reaffirmed that "even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas." *Id.* at 587 (internal quotation marks and citations omitted). The National Endowment for Arts may therefore use content-based criteria such as artistic merit when funding private speech but cannot use criteria that are "utilized as a tool for invidious viewpoint discrimination" or that "in practice, would effectively preclude or punish the expression of particular views." *Finley*, 524 U.S. at 582-83. Similarly, in *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666 (1998), the Supreme Court held that a public broadcaster can use editorial discretion to make content-based distinctions when deciding which candidate to allow to participate in a televised debate, but the broadcaster "cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views." *Id.* at 676; *see also id.* at 682. In each of these cases, "[t]he Court recognized that it was essential to the functioning and traditional missions of the organizations involved in *American Library Association*, *Forbes*, and *Finley* to allow them to make value-based, and thus content-based -- but not, importantly, viewpoint-based-decisions." *ACLU v. Mineta*, 319 F. Supp. 2d 69, 85 (D.D.C. 2004).

(citation omitted); *see also id* at \*12 (noting that "there is no allegation of viewpoint discrimination here"). The plaintiffs in *ALA* argued that those viewpoint-neutral filters for pornography accidentally "over blocked" non-pornographic websites, but there was no allegation that the filtering software treated websites about sexuality differently based on the viewpoints they expressed. *See ACLU v. Mineta*, 319 F. Supp. 2d 69, 86 (D.D.C. 2004) (explaining that, in *ALA*, "[t]he blocking of protected material was an unintended side effect of the application of the filter" and that "[t]hough content-based, the restriction was viewpoint-neutral").

Extending *ALA* to sanction a viewpoint-based filtering system would be a dramatic and unprecedented restriction of speech. The Supreme Court has warned that viewpoint discrimination is the most "egregious" type of speech restriction because "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995); *accord Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 62 (1983) (Brennan, J., dissenting) (stating that "[v]iewpoint discrimination is censorship in its purest form"). The government thus bears a much heavier burden when justifying viewpoint discrimination. The Supreme Court has even stated that a compelling governmental interest that justifies content-discrimination may not be enough to justify discrimination on the basis of viewpoint. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112-13 (2001) ("We have said that a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling,' and therefore may justify content-based discrimination. However, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." (citation omitted)).[5]

---

[5] *See also R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992) (even when speech may be criminalized as obscene or unprotected "fighting words," government still may not discriminate on basis of viewpoint);

In short, *ALA* "does not stand for the proposition that no constitutional protections apply to Internet computers at public libraries." *Miller v. NW Region Library Bd.*, 348 F. Supp. 2d 563, 569 (M.D.N.C. 2004). Web filtering must still satisfy the minimum requirements of reasonableness and viewpoint neutrality that apply to other library removal decisions.

3. **Under *Bradburn* and *Crosby*, a Library's Filtering of Internet Materials Must Be Viewpoint-Neutral and Reasonable in Light of the Traditional Role of Libraries.**

In the time since *ALA*, appellate courts in California and Washington have considered the constitutionality of library policies restricting Internet access. Both courts expressly adopted the reasoning of the *ALA* plurality while at the same time reaffirming that such policies must be reasonable and viewpoint-neutral.

The Washington Supreme Court in *Bradburn* considered an issue left open in *ALA*: whether a library must unblock the filter for pornography upon request. The library in *Bradburn* would unblock individual websites if the sites were accidentally blocked by the pornography filter, but the library refused to disable the entire pornography filter for individual users upon request. The *Bradburn* court endorsed the reasoning of the *ALA* plurality and held that the Washington Constitution "is not violated by a public library's Internet filtering policy if it is reasonable when measured in light of the library's mission and policies, and is viewpoint neutral." *Bradburn*, 231 P.3d at 180. The court held that the library's pornography filter "is viewpoint neutral because it makes no distinctions based on the perspective of the speaker." *Id.* (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). The court also reasoned that the pornography filter was reasonable in light of the library's "mission is to

---

*id.* at 430 (Stevens, J., dissenting) ("[W]e have implicitly distinguished between restrictions on expression based on subject matter and restrictions based on viewpoint, indicating that the latter are particularly pernicious."); *Finley*, 524 U.S. at 587 (allowing NEA to make content-based decisions when awarding grants but not to discriminate on the basis of viewpoint); *Boos v. Barry*, 485 U.S. 312, 319 (1988) (distinguishing between discrimination based on content and discrimination based on viewpoint).

promote reading and lifelong learning." *Id.* In light of that traditional mission, the court concluded that a public library "has traditionally had the authority . . . to legitimately decline to include adult-oriented material such as pornography in its collection. This same discretion continues to exist with respect to Internet materials." *Id.* at 181.

The California appellate court applied the same standard when it considered the constitutionality of a library policy restricting Internet access in *Crosby*. The plaintiff challenged a state college's policy of limiting "computer use to educational and employment purposes." The court adopted the reasoning of the *ALA* plurality and held that the college's restriction was constitutional because the restriction was "reasonable and not an effort to suppress expression contrary to the views of school officials." *Crosby*, 172 Cal. App. 4th at 437; *accord id.* at 443 (concluding that the restriction "does not represent a public official's effort to silence opposing viewpoints").

Although neither *Bradburn* or *Crosby* is binding on this Court, they reflect a consensus that restrictions on library Internet access must meet the basic requirements of reasonableness and viewpoint-neutrality. This Court should apply the same requirements when evaluating Camdenton R-III's filtering practices.

### C. Camdenton R-III's Web Filtering Is Not Viewpoint-Neutral or Reasonable in Light of the Traditional Role of the School Library.

As explained above, the URL Blacklist filter for "sexuality" is different than the filtering systems previously considered by other courts. Unlike other filters, the "sexuality" filter (a) is not viewpoint-neutral, and (b) does not target only pornography. No court has upheld a public school or library's use of filtering software with these two critical features.

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 21 of 38

### 1. Camdenton R-III's "Sexuality" Filter Is Not Viewpoint-Neutral

"[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers for Vincent*, 466 U.S. at 804; *accord Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). *Bradburn*, 231 P.3d at 180. Viewpoint neutrality means that "if government permits the discussion of a topic from [one] perspective, it may not shut out speech that discusses the same topic from [a different] perspective." *Child Evangelism Fellowship of N.J.*, 386 F.3d at 528; *cf. Byrne v. Rutledge*, 623 F.3d 46, 56-57 (2d Cir. 2010) (explaining that Vermont had engaged in "facially impermissible viewpoint discrimination" in its policy for issuing vanity license plates because "[w]hatever its stated intent, Vermont's ban on religious messages in practice operates not to restrict speech to certain subjects but instead to distinguish between those who seek to express secular and religious views on the same subjects").

The blacklist of "sexuality" websites used by Camdenton R-III systematically discriminates against supportive LGBT websites on the basis of viewpoint. This viewpoint discrimination is different than the unintentional and viewpoint-neutral overblocking at issue in *ALA.* As explained above, in *ALA*, "the commercial filtering products used by public libraries dr[e]w distinctions based on whether the material f[ell] into a category such as 'Pornography,' not on the basis of any viewpoint about sexuality." Br. of Solicitor General in *ALA*, 2003 WL 145228, at *31(citation omitted); *see also Bradburn*, 231 P.3d at 180 (stating that library's pornography filter "is viewpoint neutral because it makes no distinctions based on the perspective of the speaker"). Here, in contrast, Plaintiffs are not challenging the District's use of viewpoint-neutral filters designed to block pornography. Instead, Plaintiffs are challenging the use of the "sexuality" filter, which does not purport to target only pornographic content. Websites that express a particular "viewpoint about sexuality" are placed in the sexuality

category regardless of whether they are pornographic, while websites that express an opposing "viewpoint about sexuality" are left off the "sexuality" blacklist. Camdenton R-III's filtering thus engages in precisely the sort of viewpoint discrimination that the Solicitor General in *ALA* conceded would be unconstitutional.

Viewpoint Discrimination Against PFLAG. The censorship of Plaintiffs' websites illustrates the invidious viewpoint discrimination inherent in Camdenton R-III's decision to block URL Blacklist's "sexuality" category. As discussed above, the "sexuality" category blocks websites for PFLAG, which supports LGBT persons, their families and friends. PFLAG's websites provide information about PFLAG chapters and resources, provide links for LGBT persons and for families and friends of LGBT persons, and offer advice aimed at keeping families together. Ex. B (PFLAG Decl.). Such advice includes information for young people looking for supportive resources and guidance on how to talk to a family member about their sexual orientation and/or gender identity; resources for LGBT students on how they can claim their federal civil rights if they have experienced bullying, harassment and/or discrimination; and resources offering ways that school community members can take action to build safer schools. *Id.*

While URL Blacklist's "sexuality" category blocks PFLAG's website, which supports LGBT families, it does not block the website for the National Organization for Marriage (www.nationformarriage.org), which opposes same sex marriage and includes a page that "lays out the social scientific reasons why marriage between one man and one woman is best for children and society."[6] The "sexuality" category also does not block the website for the American Family Association (www.afa.net), which describes that organization's efforts to

---

[6] http://www.nationformarriage.org/site/c.omL2KeN0LzH/b.5075687/apps/s/content.asp?ct=4509235

defeat gay marriage initiatives and to combat what it refers to as "the homosexual agenda."[7]  Nor does it block the website for Parents and Friends of Ex-Gays & Gays (PFOX), which claims to be a "national non-profit organization that supports families and educates the public on sexual orientation & the ex-gay community" and asserts that "[e]ach year thousands of men and women with unwanted same-sex attractions make the personal decision to leave homosexuality . . . ."[8]

This viewpoint discrimination is the mirror image of the unconstitutional viewpoint discrimination that took place in *Lamb's Chapel*.  The public school in *Lamb's Chapel* allowed its facilities to be used by outside organizations for films and lectures but refused to allow a Christian group to show a film series from James Dobson (the founder of Focus on the Family) that discussed family values from a Christian perspective.  The Supreme Court held that the exclusion constituted viewpoint discrimination because the subject matter of family and child-rearing "is not one that the District has placed off limits to any and all speakers."  *Lamb's Chapel*, 508 U.S. at 393.  Rather, "all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint."  *Id.*

At Camdenton R-III, the roles are reversed but the viewpoint discrimination remains the same.  Students may generally access viewpoints about "family and childrearing" from Focus on the Family and other anti-gay organizations such National Organization for Marriage, Family Research Council, and the Ruth Institute, whose websites preach that families must be limited to marriage between a man and a woman.  But students may not access viewpoints about "family and childrearing" from PFLAG and similar organizations such as Families Like Ours, Family Equality Council, PFLAG and COLAGE, which discuss families and child-rearing from the

---

[7] http://www.afa.net/Detail.aspx?id=31
[8] http://pfox.org/ex-gay-q-a.html

perspective of families with LGBT parents and LGBT children.  *See* Paragraph 46,

Subparagraphs a-oo of the Complaint.

      <u>Viewpoint discrimination against Dignity USA.</u>  As demonstrated by the blocking of

DignityUSA, the URL Blacklist database even discriminates between different religious

organizations based on those organizations' positions on homosexuality and LGBT people.

Students may generally access religiously oriented websites, including websites that condemn

homosexuality as a sin, but religious websites are censored if the group preaches acceptance of

LGBT people from a religious perspective.  For example, the "sexuality" category blocks

websites for DignityUSA, Ex. A-5 ("sexuality" blacklist), which advocates for change in the

Catholic Church's teachings on homosexuality and provides support for LGBT Catholics, Ex. C

(Decl. of Dignity USA), but it does not block the website for the Knights of Columbus

(www.kofc.org), which states that "[t]he [Catholic] Church must condemn homosexual acts

because they are contrary to God's plan expressed in natural law and divine revelation."[9]

Similarly, the "sexuality" category does not block the website for the Christian Coalition

(cc.org), which lists "Protecting the Defense of Marriage Act" as one of its top agenda items for

2011, and states that it "will aggressively oppose any efforts to overturn the Defense of Marriage

Act."[10]  Nor does the "sexuality" category block the website for Exodus International

(www.exodusinternational.org), which describes itself as the "world's largest ministry to

individuals and families impacted by homosexuality."[11]  Its website states:  "Exodus upholds

heterosexuality as God's creative intent for humanity, and subsequently views homosexual

expression as outside of God's will….Exodus upholds redemption for the homosexual person as

the process whereby sin's power is broken, and the individual is freed to know and experience

---

[9] http://kofc.org/un/en/columbia/detail/255760.html
[10] http://www.cc.org/2011_legislative_agenda
[11] http://exodusinternational.org/about-us/

their true identity, as discovered in Christ and His Church. That process includes the freedom to grow into heterosexuality."[12]

If Dignity USA condemned homosexuality instead of supporting LGBT people, it apparently would be placed in URL Blacklist's category for "religion." The websites for the Knights of Columbus, the Christian Coalition, and Exodus International are categorized under "religion," as are numerous other websites that condemn homosexuality or oppose gay marriage from a religious perspective, including the websites for the American Family Association (www.afa.net) and the Family Research Council (www.frc.org). Each of these websites categorized by URL Blacklist as "religion" is accessible to students at Camdenton R-III.

Yet, the website for Dignity USA, which "envisions and works for a time when Gay, Lesbian, Bisexual and Transgender Catholics are affirmed and experience dignity through the integration of their spirituality with their sexuality, and as beloved persons of God participate fully in all aspects of life within the Church and Society"[13] is placed in the "sexuality" category and blocked from students. Ex. A-5 ("sexuality" blacklist).

Other religious websites that preach acceptance and love of LGBT people are similarly removed from the "religion" category and placed in the "sexuality" category simply because of their LGBT-supportive viewpoint, including the websites for Affirmation (www.affirmation.org), an organization of gay and lesbian Mormons who seek understanding and acceptance of gays and lesbians as full and equal members of society and church; Claiming the Blessing (www.claimingtheblessing.org), an unincorporated coalition of Episcopal organizations and individuals advocating for full inclusion of all the baptized in all sacraments of the church; Evangelicals Concerned (www.ecwr.org), a nationwide ministry that encourages and

---

[12] http://exodusinternational.org/about-us/
[13] http://dignityusa.org/

Case 2:11-cv-04212-NKL   Document 7-1   Filed 08/15/11   Page 26 of 38

affirms lesbian, gay, bisexual and transgender Christians in their faith; and Catholic Lesbians (www.cclonline.org), an online support and spiritual community for women who seek to integrate their lesbian and Catholic identity in their lives.  Ex. A-5 ("sexuality" blacklist).

Viewpoint discrimination against Matthew Shepard Foundation and Campus Pride.  The "sexuality" category also discriminates against pro-LGBT websites aimed at young people.  It blocks websites maintained by Matthew Shepard Foundation, including www.MatthewsPlace.com, which is an online community and resource center for LGBT and allied youth that provides articles and links on coming out, talking to friends and family, emergency hotlines, local and national services and centers, faith and spirituality, tips on healthy living, youth blogs, interviews, and topical online chats.  Ex. A-5 ("sexuality" blacklist); Ex. D (Decl. of Matthew Shepard Foundation).  URL Blacklist's "sexuality category" also blocks websites maintained by Campus Pride, which provide resources to help LGBT youth find LGBT-friendly colleges; share valuable research on LGBT college campus issues; list activities and events to teach leadership skills and awareness for LGBT and allied youth; provide information on scholarships that Campus Pride offers for LGBT and allied youth; list LGBT-friendly college fairs; provide resources for LGBT and allied youth to feel supported, safe, and welcome on campus; and provide resources and training opportunities regarding bias and hate crime prevention on campus.  Ex. A-5 ("sexuality" blacklist); Ex. E (Decl. of Campus Pride).

On the other hand, the "sexuality" category does not block the website maintained by Day of Dialogue (www.dayofdialogue.com), which asks young people, "As a high school or college student, do you wish your classmates could hear more of the story – like the truth about God's deep love for us and what the Bible really says about His redemptive design for marriage and sexuality?  Wouldn't it be nice if a deeper and freer conversation could happen when

controversial sexual topics are brought up in your school?"[14]  Ex. A-5 ("sexuality" blacklist).   It also states, "So God designed us male and female, and intended marriage between a man and a woman to reflect His image…"[15]  Day of Dialogue's website includes anti-LGBT pieces written by Jeff Johnston, who is described as "a gender and homosexuality analyst for Focus on the Family."[16]  The "sexuality" category also does not block the website for the National Association for Research & Therapy of Homosexuality, Ex. A-5 ("sexuality" blacklist), which links to a document stating that "homosexuality is not a healthy, natural alternative to heterosexuality."

Moreover, while LGBT students are blocked from accessing Campus Pride's information about LGBT-friendly colleges, students can freely access other college guides.  For example, the "sexuality" filter does not prevent students from accessing Hillel's guide to Jewish life on campus (www.hillel.org), or a guide for historically black colleges (www.blackcollegesearch.com), or a survey of top Christian colleges (www.topchristiancolleges.org).  Only college guides for LGBT students are off limits.

These examples of viewpoint discrimination are not isolated instances.  The long list of websites blocked by the "sexuality" filter shows an unmistakable pattern of websites being blocked solely because they are supportive of LGBT people while comparable websites with anti-LGBT viewpoints remain accessible.  Further examples can be found in Paragraph 46, Subparagraphs a-oo and Paragraph 50, Subparagraphs a-k of the Complaint.

---

[14] http://www.dayofdialogue.com/
[15] http://www.dayofdialogue.com/2011/01/13/gods-design-for-sexuality/
[16] http://www.dayofdialogue.com/2011/01/13/gods-design-for-sexuality/

### 2. Camdenton R-III's "Sexuality" Filter Is Not Reasonable in Light of the Traditional Role of School Libraries.

Camdenton R-III's decision to select URL Blacklist and use the discriminatory URL Blacklist filter for "sexuality" is not reasonable in light of Camdenton R-III's educational mission in general and the role of the school library in particular. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 543 (2001) ("Where the government uses or attempts to regulate a particular medium, [courts] have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations.").

When the Supreme Court in *ALA* upheld the facial constitutionality of a statute requiring libraries to filter pornographic web content, the plurality noted that the filtering did not distort the usual functioning of the library "because public libraries have traditionally excluded pornographic material from their other collections." *ALA*, 539 U.S. at 212 (plurality). Similarly, in *Bradburn*, the Washington Supreme Court reasoned that a public library "has traditionally had the authority . . . to legitimately decline to include adult-oriented material such as pornography in its collection. This same discretion continues to exist with respect to Internet materials." *Bradburn*, 231 P.3d at 817.

There is no similar tradition of school libraries censoring particular viewpoints or excluding materials that provide support to LGBT people. To the contrary, Article II of the American Library Association's Library Bill of Rights states that "[l]ibraries should provide materials and information presenting all points of view on current and historical issues." Similarly, ALA Policy Statement 53.1.11 provides that library collections should include "materials and resources that reflect a diversity of political, economic, religious, social, minority, and sexual issues," and ALA Policy Statement 53.1.15 provides that "librarians have an

obligation to resist efforts that systematically exclude materials dealing with any subject matter, including sex, gender identity or expression, or sexual orientation."[17]

The District asserts that it provides Internet access in order to fulfill the educational mission of the school. Yet the school allows free access to topics with only a tenuous connection at most to educational research, such as astrology, entertainment, games, jewelry, online games, pets, shopping, sports, and vacation. At the same time, the District's "sexuality" filter blocks access to important resources that have a far closer connection to student learning and personal development. Indeed, the topics of minority groups and changing social institutions are critical components of the Camdenton R-III school curriculum at all levels.[18] The social studies department at Camdenton High School is charged with the responsibility for helping students "succeed in a culturally diverse workplace" and "develop tolerance for other beliefs, values and attitudes." http://camdentonschools.schoolwires.net/2144203111292777/site/default.asp. Far from furthering the educational mission of the school library, the web filtering at Camdenton R-

---

[17] http://www.ala.org/ala/aboutala/governance/policymanual/updatedpolicymanual/section2.pdf.

[18] Under curricular standards set by the Missouri Department of Education, students in grades K though 8 must be able to discuss: constitutional principles of majority rule and minority rights; respect for the rights of others and treating others fairly; how individual rights are protected; and how the rights and responsibilities of individuals relate to events in US history and everyday life. *See* http://dese.mo.gov/divimprove/curriculum/GLE/documents/cur-ss-gle-0907.pdf. Similarly, high school students must study: "the evolution of American democracy, its ideas, institutions and political processes," including the "struggle for civil rights," "the changing character of American society and culture" in "arts and literature, education and philosophy, religion and values, and science and technology," "major social institutions" such as "family, education, religion, economy and government" and "how they fulfill human needs," "the causes, consequences and possible resolutions of cultural conflicts," the "[e]ffect of laws and events on relationships," the "effect of personal and group experiences on perceptions," and the "relationships of the individual and groups to institutions and cultural traditions." *See* http://dese.mo.gov/divimprove/curriculum/GLE/documents/cur-ss-cle-0907.pdf.

III directly undermines the District's educational goals by systematically excluding LGBT resources.[19]

### D. Camdenton R-III Cannot Justify Its Decision To Use the Discriminatory URL Blacklist System.

When a public school chooses to restrict Internet library resources it must select a reasonable and viewpoint-neutral method of doing so. Instead of purchasing a filtering system from a professional company that does not engage in viewpoint discrimination, Camdenton R-III made the deliberate choices to download the database from URL Blacklist and block all websites categorized by URL Blacklist as "sexuality." Camdenton R-III cannot demonstrate that its decisions to select URL Blacklist and enable the "sexuality" filter were reasonable methods of complying with CIPA and cannot demonstrate that it had a sufficiently compelling reason to justify viewpoint discrimination.

It is no defense for Camdenton R-III to argue that the viewpoint-discriminatory categories in its web-filtering software are being created by URL Blacklist and not directly by the school district. The First Amendment does not allow public schools to use any private rating or filtering system that is assembled by a third party without indicia of reliability or viewpoint neutrality. For example, when students in *Borger by Borger v. Bisciglia*, 888 F. Supp. 97 (E.D. Wis. 1995), challenged a school district's decision to ban all movies rated "R" by the Motion Picture Association of America ("MPAA"), the court required the district to "establish[], through literature on the MPAA, that relying on the ratings is a reasonable way of determining which movies are more likely to contain harsh language, nudity, and inappropriate material for high

---

[19] *Cf. Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) ("Since the purpose of the [display] case was the dissemination of information about the history department, the suppression of exactly that type of information was simply not reasonable."); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004) ("Considering the purpose of the [Adopt a Highway] program . . . there is simply no rationale for excluding the diverse array of groups from the program that the regulation permits the State to bar from participation.").

school students." *Id.* at 100-01. Similarly, in this case, the District has the burden of establishing that URL Blacklist is a reasonable and viewpoint-neutral method of filtering sexually explicit content. If the school district selects a filtering system that engages in viewpoint discrimination, the district is responsible for justifying that choice. *Cf. Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1089 (1983) (holding that when government employer selects private annuity plans to offer to its employees, the government is "legally responsible for the discriminatory terms on which annuities are offered by the companies").

In this case, instead of purchasing software from a commercial filtering company, Camdenton R-III has chosen to use a filtering system that falls far below professional standards. As discussed above, URL Blacklist is not a typical commercial Internet filtering company. It is a website with no physical address or phone number, and it creates its blacklists by collecting and aggregating other lists. URL Blacklist does not purport to categorize websites according to their educational content or the pedagogical needs of students. Moreover, URL Blacklist specifically warns that "[t]he blacklist *does* contain sites which are wrongly categorized which is due to the bulk of the entries being collecting using automatic scripts." It also states that "[t]he blacklist does not only contain sites that are considered 'bad' but it also contains many other categories. . . . Being listed does not infer that the site is 'bad'—these are just lists of sites." URL Blacklist's "sexuality" category captures websites in a manner that is not viewpoint-neutral by blocking websites that are supportive of LGBT rights but not those that oppose LGBT rights.

Professional filtering companies do not engage in the same viewpoint-discrimination against LGBT websites by grouping LGBT-supportive websites together with sexually explicit content. Better, more reputable Internet filtering services are able to distinguish websites with

sexually explicit content from websites that discuss religious, legal, political, and social issues relating to sexuality. They are able to screen websites in a viewpoint-neutral manner. Camdenton R-III has the option of using such services.

It is also no defense for Camdenton R-III to unblock individual websites upon request. The URL Blacklist database is revised and updated on a continuing basis, and, as a result, new pages and new content will likely be blacklisted and blocked in the future. Moreover, requiring Plaintiffs and other organizations with pro-LGBT websites to make requests with the District for their websites to be unblocked places a burden on Plaintiffs' speech that is not placed on anti-LGBT websites. "First Amendment freedoms would be of little value if speakers had to obtain permission of their audiences before advancing particular viewpoints." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 80 (1983) (Rehnquist, J., concurring); *see also Watchtower Bible v. Vill. of Stratton,* 536 U.S. 150, 166 (2002) (requiring a permit -- even one granted without cost or waiting period -- as a prior condition on the exercise of the right to speak imposes a burden on speech). Moreover, requiring students to request special access to Plaintiffs' websites sends a stigmatizing message that the websites are somehow different or less acceptable than comparable websites that condemn homosexuality. *See Pratt*, 670 F.2d at 779 (by restricting access to films, the school had impermissibly "used its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered"); *Counts*, 295 F .Supp. 2d at 999 (requiring student to affirmatively request access to Harry Potter book sends a message that it is "a 'bad' book" that students should not read).

To be sure, the plurality in *ALA* stated that, even though the "pornography" filters mistakenly blocked non-pornographic content, there are no constitutional concerns if library patrons can request that the filter be turned off. But the intentional and avoidable viewpoint

discrimination adopted by Camdenton R-III is very different than the unavoidable over-blocking at issue in *ALA*. Unlike the pornography filters at issue in *ALA*, the "sexuality" filter does not target only pornographic content; rather, it operates in a manner that blocks content supportive of LGBT people regardless of whether the content is sexually explicit. Moreover, at the time *ALA* was decided, there was no alternative filtering technology that could efficiently block pornographic websites without over-blocking the protected content. *See ALA*, 539 U.S. at 209 (Breyer, J., concurring in judgment) ("[N]o one has presented any clearly superior or better fitting alternatives."); *id.* at 207 n.3 (plurality). In light of these technological limitations, it was "reasonable" for libraries to use filtering software that engaged in unavoidable over-blocking. *Id.* at 208. Unlike the libraries in *ALA*, Camdenton R-III has readily available alternatives that would allow it to filter out sexually explicit content without posing the same First Amendment problems.

Moreover, a mere desire to reduce costs cannot justify the use of a filtering system that engages in invidious viewpoint discrimination. *Cf. Boorstin*, 644 F. Supp. at 816 (Librarian of Congress cannot respond to budget cutbacks by removing library items in a viewpoint-discriminatory manner); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 135-36 (1992) (government may not discriminate on the basis of content in order to recoup cost or raise revenue); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (government "may legitimately attempt to limit its expenditures" but "may not accomplish such a purpose by invidious distinctions between classes of its citizens"). Even if using a viewpoint-neutral filter is more expensive than using a viewpoint-discriminatory one, Camdenton R-III must select a filtering system that allows the District to comply with its constitutional obligations.

## II.    Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

Plaintiffs will suffer irreparable harm if an injunction is not issued.  Absent an injunction, students will be prevented from accessing Plaintiffs' websites that are supportive of LGBT rights and individuals and/or provide useful information and advice for LGBT individuals, while, at the same time, students are given access to websites that take anti-LGBT positions.  This discrimination against Plaintiffs' protected free speech constitutes irreparable harm.  It is well-settled law that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion).  Because Plaintiffs have established they are likely to succeed on the merits of their First Amendment claim, they have also established irreparable harm as the result of the deprivation. *See Marcus v. Iowa Pub. Television,* 97 F.3d 1137, 1140-41 (8th Cir.1996).

## III.    The Balance of Harms Favors an Injunction

"The balance of equities … generally favors the constitutionally-protected freedom of expression." *Nixon*, 545 F.3d at 690.  Although it is presumed that Plaintiffs will suffer irreparable harm absent an injunction, there is no harm to Defendants if an injunction issues.

## IV.    An Injunction Will Serve the Public Interest

"It is always in the public interest to protect constitutional rights." *Nixon*, 545 F.3d at 689; *accord Wickersham* 371 F. Supp. 2d at 1076 (explaining that "[t]he public has an interest in preventing constitutional violations, particularly ones involving speech").  The public interest thus supports an injunction that is necessary to prevent a government entity from violating the Constitution. *Doe v. S. Iron R-1 Sch. Dist.*, 453 F. Supp. 2d 1093, 1103 (E.D. Mo. 2006). Because Plaintiffs have demonstrated the likelihood that they will succeed on the merits, the public interest is served by preventing the continuation of likely unconstitutional censorship of Plaintiffs' speech.

# CONCLUSION

The District's Internet filtering software discriminates against websites with a LGBT-supportive viewpoint while allowing students access to websites that take anti-LGBT positions. Because the Supreme Court has held that viewpoint-based discrimination violates the free speech clause of the U.S. Constitution, Plaintiffs are likely to succeed on the merits of this action. The loss of their First Amendment freedom constitutes irreparably injury to Plaintiffs, while Defendants will not be harmed if the Court issued an injunction barring the District from violating Plaintiffs' First Amendment rights. Moreover, protecting Plaintiffs' constitutional rights serves the public interest. Accordingly, this Court should issue a preliminary injunction to prevent the District from continuing to use Internet filtering software that blocks access to LGBT-supportive web content while permitting access to anti-LGBT web content.

Respectfully Submitted,

THOMPSON COBURN LLP


By_____/s/ A. Elizabeth Blackwell_____
     Mark Sableman #36276
     A. Elizabeth Blackwell #50270

     One U.S. Bank Plaza
     St. Louis, Missouri 63101
     314-552-6000
     FAX 314-552-7000
     msableman@thompsoncoburn.com
     eblackwell@thompsoncoburn.com
     Anthony E. Rothert, # 44827
     Grant R. Doty, # 60788
     American Civil Liberties Union of Eastern Missouri

     454 Whittier Street
     St. Louis, Missouri 63108
     314-652-3114
     FAX 314-652-3112

tony@aclu-em.org
grant@aclu-em.org

Joshua A. Block*
James Esseks*
LGBT Project
ACLU Foundation
125 Broad Street, Floor 18
New York, New York  10004
(212) 549-2600
FAX 212-549-2650

jblock@aclu.org
jesseks@aclu.org

*Pro Hac Vice Motion to Follow*

*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2011, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, and I hereby certify that this document has been

served, along with the Summons and Complaint, on the following non CM/ECF participants:

Camdenton R-III School District
Tim Hadfield, Superintendent
119 Service Rd.
P.O. Box 1409
Camdenton, Missouri  65020-1409

Tim Hadfield
38 Galahad Lane
Camdenton, Missouri  65020-3824


_____/s/ A. Elizabeth Blackwell_____