UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| **PARENTS, FAMILIES, AND FRIENDS OF LESBIANS AND GAYS, INC.**, et al.<br><br>Plaintiffs,<br><br>v.<br><br>**CAMDENTON R-III SCHOOL DISTRICT**, et al.<br><br>Defendants. | **CASE NO. 2:11-CV-04212**<br><br>THE HONORABLE NANNETTE K. LAUGHREY |

**BRIEF OF *AMICI CURIAE*
ALLIANCE DEFENSE FUND & MISSOURI FAMILY POLICY COUNCIL
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

MICHAEL WHITEHEAD
Missouri Bar No. 24997
WHITEHEAD LAW FIRM, LLC
City Center Square
1100 Main Street, Suite 2600
Kansas City, Missouri 64105-5194
Phone: (816) 876–2600
Facsimile: (816) 221–8763
Mike@TheWhiteheadFirm.Com

DAVID A. CORTMAN*
Georgia Bar No. 188810
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Rd., N.E., Suite D-600
Lawrenceville, Georgia 30043
Phone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@telladf.org

JEREMY D. TEDESCO*
Arizona Bar No. 023497
ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona 85260
Phone: (480) 444–0020
Facsimile: (490) 444–0028
jtedesco@telladf.org

TRAVIS C. BARHAM*
Arizona Bar No.: 024867
ALLIANCE DEFENSE FUND
12 Public Square
Columbia, Tennessee 38401
Phone: (931) 490–0591
Facsimile: (931) 490–7989
tbarham@telladf.org

\* *Pro hac vice* motions concurrently filed.

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 1

ARGUMENT ..................................................................................................................... 5

I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIMS................ 5

    A.  THE ORGANIZATIONS LACK STANDING TO CHALLENGE THE INTERNET FILTERS. ............. 6

        1.  AS THE DISTRICT'S INTERNET ACCESS IS NOT A FORUM, THE ORGANIZATIONS HAVE NOT SHOWN AN INJURY-IN-FACT. .............................................................. 6

        2.  THE ORGANIZATIONS—WHICH HAVE NO CONNECTION WITH THE DISTRICT—HAVE NOT SHOWN THAT ITS INTERNET FILTER INJURES THEM IN ANY WAY........................ 7

    B.  THIS COURT SHOULD DEFER TO THE DISTRICT'S DECISION TO EMPLOY THE "SEXUALITY" FILTER AS BOTH AN EDUCATIONAL AND LIBRARY-RELATED DECISION...... 8

    C.  PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF SHOWING THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS SOLELY TO SILENCE THEIR VIEWS............................ 10

        1.  AS THE DISTRICT'S INTERNET FILTERS ARE NOT A FORUM, PLAINTIFFS RELY ON AN INAPPLICABLE LEGAL FRAMEWORK AND IGNORE THE APPLICABLE ONE. ................. 10

        2.  PLAINTIFFS HAVE NOT SHOWN THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS PRIMARILY TO SILENCE EXPRESSION. ........................................................ 11

        3.  NONE OF PLAINTIFFS' COMPLAINTS ABOUT THE MECHANICS OF THE DISTRICT'S INTERNET FILTERS HAVE CONSTITUTIONAL SIGNIFICANCE. .................................... 12

II. THIS COURT SHOULD NOT ISSUE A PRELIMINARY INJUNCTION THAT WILL EXPOSE SCHOOL CHILDREN TO SEXUALLY INAPPROPRIATE MATERIALS........................................................ 14

CONCLUSION................................................................................................................. 14

# TABLE OF AUTHORITIES

**CASES**

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
    458 U.S. 176 (1982) .................................................................................................. 8

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ................................................................................... 6, 8, 9, 11

*Bradburn v. N. Cent. Reg'l Library Dist.*,
    231 P.3d 166 (Wash. 2010) ..................................................................................... 2

*Bystrom ex rel. Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*,
    822 F.2d 747 (8th Cir. 1987) ............................................................................ 13, 14

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*,
    386 F.3d 514 (3d Cir. 2004) .................................................................................... 6

*Christian Legal Soc'y v. Martinez*,
    130 S. Ct. 2971 (2010) ............................................................................................ 8

*Heffron v. Int'l Soc'y for Krishna Consciousness*,
    452 U.S. 640 (1981) ................................................................................................ 5

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ................................................................................................ 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 7

*Perry Educ. Ass'n v. Perry Local Educators Ass'n*,
    460 U.S. 37 (1983) ................................................................................................ 10

*Pratt v. Indep. Sch. Dist. No. 831*,
    670 F.2d 771 (8th Cir. 1982) ......................................................................... 6, 8, 9, 11

*Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*,
    457 F.2d 289 (2d Cir. 1972) .......................................................................... 6, 9, 11, 12, 13

*Schanou v. Lancaster Cnty. Sch. Dist. No. 160*,
    62 F.3d 1040 (8th Cir. 1995) ................................................................................ 7, 8

*Searcy v. Crim*,
    815 F.2d 1389 (11th Cir. 1987) ............................................................................... 6

*Tinker v. Des Moines Sch. Dist.*,
    393 U.S. 503 (1969) ................................................................................................ 5

*United States v. Am. Library Ass'n (ALA)*,
    539 U.S. 194 (2003) ............................................................................... 6, 9, 10, 13, 14

*Va. State Bd. of Pharm. v. Va. Citizens Consumers Council*,
    425 U.S. 748 (1976) ............................................................................................... 5

**STATUTES**

20 U.S.C. § 9134 ............................................................................................................. 1, 2

V.A.M.S. § 573.040 ............................................................................................................ 2

INTRODUCTION

While opining at length on the alleged deficiencies of the internet filtering software that Camdenton R-III School District ("District") selected, Plaintiffs overlook two critical legal questions that ultimately torpedo their First Amendment claims:

1. Do national organizations have standing to challenge the District's internet filters when they have not been excluded from any forums and have no ties to the District?

2. Does the First Amendment empower national organizations and one student to override the educational decisions of the District's real policymakers, the local school board?

The answer to both questions—according to the Supreme Court and the Eight Circuit—is a resounding "no." The out-of-state organizations ("Organizations") have not established the prerequisite for any constitutional claim, an injury-in-fact, and thus lack standing to proceed. Furthermore, the Organizations and Jane Doe fail to establish the essential elements of their First Amendment claims: (1) that the District intended to suppress ideas it disfavored by utilizing the "sexuality" filter, and (2) that this was the "decisive factor" in its decision. The District has legitimate, even compelling, interests in protecting children from inappropriate sexual materials, and this Court should defer to its decision to take this responsibility seriously and to the methods it selected to do so. Hence, Plaintiffs should not receive a preliminary injunction, and the case should be dismissed.

FACTUAL BACKGROUND

Stripped of Plaintiffs' grandstanding, the facts of this case are quite simple, unremarkable, and unobjectionable. Especially after Congress passed the Children's Internet Protection Act (CIPA), the District has an obligation to protect its students from internet materials that are "harmful to minors." 20 U.S.C. § 9134(f)(1). This term encompasses expression that might not be considered pornographic, obscene, or explicit for adults as it is repeatedly defined in relation

to what is suitable for minors. *Id.* § 9134(f)(7)(B) .[1]  State law also punishes those who furnish minors with material that is "pornographic for minors," a term that is substantively equivalent to CIPA's "harmful to minors."  V.A.M.S. § 573.040.  Thus, the District selected internet filtering software from URL Blacklist ("Blacklist") and chose to activate several of Blacklist's filters.  One of them—the "sexuality" filter—blocks "[s]ites dedicated to sexuality, *possibly including adult material*."  (Am. Compl. (Doc. 24) ("Comp.") ¶ 21 (emphasis added).)  And like the relevant statutory terms, this filter encompasses materials that might not be pornographic or explicit for adults.  (*Id.* ¶ 22.)  And all was well until the Organizations selected the District as the latest battleground in their national campaign to eliminate this internet filter (and many others).[2]

Furthermore, Plaintiffs are simply wrong that the "sexuality" filter is redundant of other filters.  (Pls.' MPI Br. (Doc. 7-1) at 4).)  The Blacklist "sexuality" filter currently blocks access to over 8,200 unique websites and URLs.  Of these sites, over 7,800 of them would **not** be blocked by the "adult" or "porn" filters used by Blacklist to block pornographic and other inappropriate materials.[3]  These 7,800 sites, including many that contain sexually explicit materials, would be accessible to Camdenton students if the "sexuality" filter is removed.

---

[1] CIPA defines "harmful to minors" as follows:
The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that—
(i)  taken as a whole and *with respect to minors*, appeals to a prurient interest in nudity, sex, or excretion;
(ii)  depicts, describes, or represents, in a patently offensive way *with respect to what is suitable for minors*, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals;
(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value *as to minors*.
20 U.S.C. § 9134(f)(7)(B) (emphasis added).

[2] *See* ACLU, *Don't Filter Me: Content Filtering in Schools*, http://www.aclu.org/dont-filter-me-web-content-filtering-schools (last visited Aug. 29, 2011); ACLU, *ACLU Demands That Two Public School Districts in Little Rock Stop Censoring LGBT Websites*, http://www.aclu.org/free-speech-lgbt-rights/aclu-demands-two-public-school-districts-little-rock-stop-censoring-lgbt-web (last visited Aug. 29, 2011) (threatening litigation against FortiGuard filtering software); ACLU, *ACLU "Don't Filter Me" Initiative Finds Schools in Four More States Unconstitutionally Censoring LGBT Websites*, http://www.aclu.org/lgbt-rights/aclu-dont-filter-me-initiative-finds-schools-four-more-states-unconstitutionally-censori (last visited Aug. 29, 2011) (threatening litigation against filters from Blue Coat, Websense, Lightspeed); *see also Bradburn v. N. Cent. Reg'l Library Dist.*, 231 P.3d 166 (Wash. 2010) (ACLU challenging library's use of the "FortiGuard Web Filtering Service").

[3] Blacklist provides a downloadable list of the websites and URLs blocked by each of their filters. *See* http://urlblacklist.com/?sec=download. A Microsoft Excel algorithm was used to compare the lists of sites blocked by the "sexuality," "adult," and "porn" filters to identify the sites that are blocked solely by the "sexuality" filter.

Blacklist's URL search tool, *see* http://urlblacklist.com/?sec=search, shows whether specific sites are blocked and confirms that disabling the "sexuality" filter would unblock numerous pornographic and/or sexually inappropriate websites. For example, gayguynyc.com provides access to innumerable pornographic video clips. Gaysubmit.com provides access to numerous pornographic pictures. Los-angeles-gay.com and san-francisco-gay.com display several pictures of nude men, some showing their buttocks and others showing them holding their genitalia. Bimarried.com provides access to a how-to guide for anal sex entitled "Tops and Bottoms, an unmedical, how-to guide from 2 men just like you." *See* http://bimarried.com/ bottom.htm. The guide contains graphic descriptions of sexual acts. Fagart.com provides access to several nude pictures of a man, two of which show his buttocks and one of which shows his buttocks and scrotum. *See* http://fagart.com/tattoo.html. Gayteenforum.org provides access to numerous discussion boards containing highly inappropriate discussions about numerous sexual topics and acts. *See, e.g.*, http://www.gayteenforum.org/viewtopic.php?f=3&t=37698. Butch-femme.net provides access to an article titled "Black Lingerie" that contains sexually explicit descriptions of sexual encounters. *See* http://butch-femme.net/butchfemmenetwork_ 023.htm. Krakow4gay.com advises visitors to its website that in Poland the "age of consent for gay sex is 15 years," *see* http://krakow4gay.com/viewItem,2,, 27.html, and recommends several gay sex clubs, one of which is described as follows: "For men only. Places with darkroom, cabins and cinema (blue movies). Entrance fee (Fri-Sat 15 pln, Sun – Thu 9 pln; discount for student under 26). Buy condoms before you go!" *See* http:/krakow4gay.com/viewItem, 2,,10.html. Bluetruth.org is a website dedicated to sex, including articles on orgasms, erogenous zones, and orgasmic massage. Brassboys.co.uk advertises gay male escorts and gay male masseurs and contains a picture of a man wearing a thong. Barebacksexinsf.com contains several full frontal

nude pictures of a man. Voyeurevents.com is a website for an organization that hosts sex parties and claims that a third of its members enjoy sex in public while another third enjoy having others watch while they have sex with their partners. The website also contains numerous photos of the group's past events, including several photos of nude women and women in thongs. Wetdreamforum.com is a discussion forum on the subject of wet dreams, masturbation, and pornography. The discussions include vivid descriptions of orgasms, summaries of the explicit nature of the dreams, and descriptions of sexual acts. Tsroadmap.com provides advice on becoming transgendered and on "sex work," including prostitution, pornography, and exotic dancing. Trashique.com provides advice on how to get a "faux-gina" and links to a sex toy shop where a "faux-gina" can be purchased.

Disabling the "sexuality" filter will allow students at District schools access to each of the sixteen websites listed above. Worse, these sites only scratch the surface of the kinds of inappropriate materials that the "sexuality" filter prevents students from accessing. Once again, that filter blocks close to 8,000 websites, many of which likely have sexual content similar to that found on the sites highlighted above. Hence, it is irresponsible—even reckless—for Plaintiffs to seek an injunction ordering the disabling of this filter.

Last, despite Plaintiffs' allegations, the record is simply bereft of any evidence of viewpoint discrimination. They claim that "the District uses filtering software to censor only websites with an LGBT-supportive viewpoint." (MPI Br. at 2.) The filter's description—"[s]ites dedicated to sexuality, possibly including adult material"—lacks the supposed bias. (Comp. ¶ 20.) The full "sexuality" blacklist includes literally hundreds of sites, featuring a wide range of materials and perspectives, showing that it is hardly the targeted tool of suppression that they claim. (*See* Pls.' MPI Ex. A-1 (Doc. 7-3).) Attempting to manufacture evidence by cherry-

picking this list only underscores their desperation.  (MPI Br. at 4–6.)  In fact, Plaintiffs do not even allege what the Supreme Court requires them to prove:  that the District, its school board members, or its superintendent selected Blacklist or the "sexuality" filter because of a desire to suppress ideas they disliked.  (*See infra* Part I.C.)  Rather, as the District's June 6, 2011 letter to the ACLU states, the District activated the "sexuality" filter "[i]n order to Comply with the Children's Internet Protection Act, Board Policy, and for the well-being of our students."  (*See* Pls.' MPI Ex. A-5 (Doc. 7-7).)  Further, the fact that the District voluntarily unblocked various pro-LGBT sites belies any claim of discriminatory intent.  (Compl. ¶¶ 48, 62.)

Ultimately, the state of Missouri has given the District broad discretion in educating the children entrusted to its care.  It has exercised that discretion to protect those children from inappropriate sexual materials, a duty that is not only moral but also legislatively-imposed.  Plaintiffs should not be empowered to second guess those judgments.

## ARGUMENT

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIMS.

The Organizations' claims rest on their First Amendment right to communicate with the District's schoolchildren.  (MPI Br. at 9 (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumers Council*, 425 U.S. 748, 756 (1976)).  Yet this foundation is faulty because "the First Amendment does not guarantee the right to communicate one's views at all times and places or any manner than may be desired."  *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981).  Even Jane Doe's claims must be evaluated "in light of the special characteristics of the school environment," *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969).  Here, the Organizations have not identified an injury-in-fact, and all Plaintiffs have not pierced the deference afforded the District's pedagogical decisions or satisfied their burden of proof.  Hence, their First Amendment claims lack merit, they are not entitled to relief, and the case should be dismissed.

## A. THE ORGANIZATIONS LACK STANDING TO CHALLENGE THE INTERNET FILTERS.

### 1. AS THE DISTRICT'S INTERNET ACCESS IS NOT A FORUM, THE ORGANIZATIONS HAVE NOT SHOWN AN INJURY-IN-FACT.

The Organizations' cursory standing argument erroneously assumes that the District excluded them from a speech forum by blocking their sites. (MPI Br. at 9.) But this assumption collapses because forum analysis does not govern libraries, whether at schools or elsewhere.[4]

In 2003, when considering a challenge to CIPA's mandated internet filters, the Supreme Court concluded that the principles of "forum analysis and heightened judicial scrutiny are incompatible . . . with the discretion that public libraries must have to fulfill their traditional missions." *United States v. Am. Library Ass'n (ALA)*, 539 U.S. 194, 205 (2003); *id.* at 215–16 (Breyer, J. concurring) ("[T]he plurality finds the "public forum" doctrine inapplicable. . . . I agree. . . ."). It repeatedly emphasized that a library—whether by collecting books or providing internet access (for the two are constitutionally equivalent[5])—"facilitates research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality"; it does not open a forum for private expression. *ALA*, 539 U.S. at 206; *accord id.* at 209 n.4, 213 n.7. Simply put, whether viewed through a pedagogical or library lens, forum doctrine does not govern this case.[6]

Because the District's internet access does not constitute a forum, the Organizations have no First Amendment right to demand access to it. So the fact that the "sexuality" filter blocks their websites cannot constitute a legally cognizable injury. Yet one of the fundamental, "irre-

---

[4] Hence, the cases Plaintiffs cite do not govern because they apply forum analysis. *See Searcy v. Crim*, 815 F.2d 1389, 1393–94 (11th Cir. 1987) (assuming that bulletin boards were nonpublic forums); *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 526 (3d Cir. 2004) (finding that flyer posting, flyer distribution, and tabling forums were limited public forums).

[5] *ALA*, 539 U.S. at 207 ("The Internet is simply another method for making information available in a school or library. It is no more than a technological extension of the book stack." (internal citations and quotations omitted)).

[6] The Supreme Court and Eighth Circuit similarly declined to apply forum doctrine when students challenged the removal of a film from the school library, considering instead only whether officials acted to suppress disfavored ideas. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–72 (1982); *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 776 (8th Cir. 1982); *see also Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*, 457 F.2d 289, 291–92 (2d Cir. 1972) (similarly not utilizing forum analysis in assessing challenge to library contents).

ducible" Article III prerequisites for any § 1983 lawsuit is an injury-in-fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). And as the Organizations failed to carry their burden of establishing standing, they cannot succeed on their First Amendment arguments. *Id.* at 561.

### 2. THE ORGANIZATIONS—WHICH HAVE NO CONNECTION WITH THE DISTRICT—HAVE NOT SHOWN THAT ITS INTERNET FILTER INJURES THEM IN ANY WAY.

Not only have the Organizations failed to identify an injury-in-fact, but they have also failed to connect themselves sufficiently with the challenged filtering practices to demonstrate standing. In *Schanou v. Lancaster Cnty. Sch. Dist. No. 160*, 62 F.3d 1040, 1041–42 (8th Cir. 1995), a father sought both an injunction and damages due to Bible distribution at his son's school that he alleged was unconstitutional. However, once his only son graduated from another high school, his injunctive claims were moot. *Id.* at 1043. He lacked standing to press his damages claim because the challenged policy did not "directly affect[] or threaten[] to directly affect any of [his] children." *Id.* at 1044. As the father "completely failed to demonstrate how the maintenance of [the challenged] policy continued to injure or even threatened to injure, [his son] or himself," he lacked Article III standing. Similarly, organizations may have associational standing if, *inter alia*, they show that one of their members has standing. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Like parents, they must demonstrate a connection to the controversy by identifying at least one member who has standing in his own right.

Such a connection is wholly lacking here for the Organizations. Each of them is a national entity, but none have any direct connection with the District. (Compl. ¶¶ 1–4.) They never identify a single member—whether student, parent, or teacher—harmed or even threatened with harm by the "sexuality" filter. If these Organizations were to have standing even though the "sexuality" filter has not affected them, then literally every other entity anywhere on the planet whose website is blocked by any of Blacklists' filters similarly would have standing. Suddenly,

7

the District would constantly be forced to defend decisions that are solely within its own purview. (*See infra* Part I.B.)  The scope of such exposure highlights the absurdity of the Organizations' standing claims.  If it is "logically impossible for a parent to assert the unconstitutional infringement of a parental interest when the alleged unconstitutional policy or conduct in no way directly affects or threatens to directly affect his or her children," then a national entity whose members have no connection to the District cannot have standing to challenge District policy.  *Schanou*, 62 F.3d at 1046.

### B. THIS COURT SHOULD DEFER TO THE DISTRICT'S DECISION TO EMPLOY THE "SEXUALITY" FILTER AS BOTH AN EDUCATIONAL AND LIBRARY-RELATED DECISION.

The Supreme Court often cautions federal judges "to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2988 (2010) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982), citing other cases)).  Yet in this case, Plaintiffs—some national organizations and one student—attempt to force the District to adopt internet filters of their choosing, substituting their judgment for the judgment of the duly elected District officials.  In reality, the District's decision to employ the "sexuality" filter is entitled to two layers of deference, that accorded to both educators and librarians.

First, the Supreme Court "has long recognized that local school boards have broad discretion in the management of school affairs." *Pico*, 457 U.S. at 863.  The Eighth Circuit wholeheartedly agrees. *Pratt*, 670 F.2d at 775 ("Local authorities are the principal policymakers for the public schools.  Thus, school boards are accorded comprehensive powers and substantial discretion to discharge the important tasks entrusted to them.").  Not only are these boards empowered to manage their schools in accord with local values, *Pico*, 457 U.S. at 865; *Pratt*, 670 F.2d at 775, but they "rightly possess significant discretion to determine the content of their school

libraries."[7] *Pico*, 457 U.S. at 870; *see also Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*, 457 F.2d 289, 291–92 (2d Cir. 1972). They determine not just the curriculum, but also the "educational tools to be used." *Pratt*, 670 F.2d at 775. As a school's internet access is just a "technological extension of the book stack," this discretion extends to what materials they allow students to access via the internet. *ALA*, 539 U.S. at 207. Thus, courts should defer to school boards if they block or remove materials that they find to be "pervasively vulgar," educationally unsuitable, or "psychologically or intellectually inappropriate for the age group" or to contain "offensive language," *Pico*, 457 U.S. at 871; *id.* at 880 (Blackmun, J. concurring), or violent and sexual content. *Pratt*, 670 F.2d at 776 n.6.

Second, the Supreme Court has ruled that librarians' decisions regarding what materials to offer should receive deference. *ALA*, 539 U.S. at 204 ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."). This discretion extends even to content-based determinations, *id.* at 205 ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."), allowing them to exclude sexually inappropriate materials. *Id.* at 208, 212. After all, they have a legitimate, even compelling, interest in protecting children from inappropriate and harmful sexual content. *Id.* at 215 (Kennedy, J. concurring); *id.* at 218 (Breyer, J. concurring).

Here the District has done nothing more than exercise its discretion. It employs the "sexuality" filter to block "[s]ites dedicated to sexuality, *possibly including adult material*." (Compl. ¶ 21 (emphasis added).) This plainly falls within the various categories of materials the law allows the District to block. Plaintiffs do not approve of this decision, and they expend barrels of

---

[7]   Plaintiffs erroneously claim that the District's discretion in selecting library materials is quite limited by quoting portions of *Pico* that address a different issue: whether school boards have *carte blanche* discretion. (MPI Br. at 10–11; MPI Supp. Br. (Doc. 31) at 3–4.) However, though a school board does not have "absolute discretion," it still has "significant discretion to determine the content of their school libraries." *Pico*, 457 U.S. at 869–70.

9

ink objecting to how the "sexuality" filter works (MPI Br. at 2), complaining about which sites get blocked (*id.* at 4–6), proposing alternate filtering methods (*id.* at 4, 26–29),[8] and demanding that the District justify its decisions to their satisfaction (*id.* at 26). But ultimately, Plaintiffs do not get to decide or second guess how the District should filter its internet service. It is a matter for the District to decide, and a decision to which this Court should defer. Hence, Plaintiffs are unlikely to succeed on their First Amendment claims and are not entitled to injunctive relief, and the case should be dismissed.

### C. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF SHOWING THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS SOLELY TO SILENCE THEIR VIEWS.

Not only do Plaintiffs fail to establish standing, and not only do they entirely ignore the deference accorded to the District's internet filtering decisions, but they also fail to do what they must to receive a preliminary injunction: demonstrate that the District violated the applicable First Amendment standards by utilizing the "sexuality" filter.

#### 1. AS THE DISTRICT'S INTERNET FILTERS ARE NOT A FORUM, PLAINTIFFS RELY ON AN INAPPLICABLE LEGAL FRAMEWORK AND IGNORE THE APPLICABLE ONE.

Throughout their brief, Plaintiffs maintain that the District's internet filters "must—at a minimum—satisfy the bedrock requirements of reasonableness and viewpoint neutrality." (MPI Br. at 10; *see also id.* at 12–25.) In so doing, they presume that forum analysis governs and rely on the standards applicable to nonpublic forums. *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 46 (1983). However, neither the Supreme Court, nor the Eighth Circuit, nor the Second Circuit, utilizes the forum doctrine when addressing challenges to a library's contents or internet access, and the Supreme Court has explicitly stated that it does not apply. *See* Part I.A.1. Hence, Plaintiffs erroneously rely on a completely inapplicable legal framework.

---

[8] The Supreme Court already dismissed one of Plaintiff's alternatives—manual blocking—as impractical. *ALA*, 539 U.S. at 208. Their other alternative—utilizing other software—is disingenuous, given their national campaign targeting these other filtering services with litigation. *See supra* note 2 and accompanying text.

Conversely, Plaintiffs also ignore the legal framework that does apply here. The Supreme Court has long stated that school districts violate the First Amendment if (1) they "*intended* by their removal decision to deny [students] access to ideas with which [the board] disagreed" and (2) "if this intent was the decisive factor in [their] decision." *Pico*, 457 U.S. at 871; *id.* at 879–80 (Blackmun, J. concurring) (agreeing with this "narrow principle"). So the school board cannot exercise its considerable discretion in a "narrowly partisan or religious manner." *Id.* at 870. And the Eighth and Second Circuits utilize a similar analysis. *Pratt*, 670 F.2d at 776 ("[A] cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed."); *Presidents Council*, 457 F.2d at 292 ("Here, patently we have no religious establishment or free exercise question, and neither do we have the banning of the teaching of any theory or doctrine.").

### 2. PLAINTIFFS HAVE NOT SHOWN THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS PRIMARILY TO SILENCE EXPRESSION.

Plaintiffs do not even begin to satisfy the governing legal standard, and this reality becomes particularly vivid when contrasted against past cases challenging decisions to remove materials from libraries. For example, the *Pico* Court looked at the reasons school officials gave in their affidavits for removing the books. *Pico*, 457 U.S. at 872–73. But even this was not decisive by itself, *id.* at 874, for the Court also looked at whether the district had (and followed) established procedures for reviewing controversial materials. *Id.* at 874–75. Similarly, the Eighth Circuit carefully scrutinized the repeated public outcry against the contested film, the district's procedures in reviewing complaints, how the district responded to that complaint procedure, and how the district gave no reasons for its decision. *Pratt*, 670 F.2d at 777–78.

However, here the record is bereft of any even remotely analogous facts. Plaintiffs do not allege that the District's "sexuality" filter sparked any public controversy whatsoever, nor do

11

they identify deficiencies in the District's review process. They identify no facts showing that the District selected this "sexuality" filter out of a desire to suppress certain viewpoints, let alone that such a desire was the decisive factor in its thinking. Indeed, Plaintiffs never even discuss the intra-District discussion of whether to use the "sexuality" filter. And the District's willingness to unblock certain sites shows that it has no desire to suppress ideas. (Compl. ¶ 62.)[9]

The record here demonstrates that the District had a responsibility to protect its schoolchildren from harmful, sexually inappropriate materials on the internet. So it utilized a "sexuality" filter that does just that: blocks "[s]ites dedicated to sexuality, *possibly including adult material*." (Compl. ¶ 21 (emphasis added).) Plainly, the District's desire was not to suppress certain viewpoints, but to protect children from age-inappropriate sexually explicit material. And problems arose only because a group of distant organizations and one student disagreed with the District and decided to make this their *cause celeb*. Put simply, this does not establish a First Amendment violation.

### 3. NONE OF PLAINTIFFS' COMPLAINTS ABOUT THE MECHANICS OF THE DISTRICT'S INTERNET FILTERS HAVE CONSTITUTIONAL SIGNIFICANCE.

Unable to show that the District utilizes the "sexuality" filter for the primary purpose of suppressing ideas, Plaintiffs instead raise a litany of incidental objections to how the filter works. But these complaints focus on the "wisdom or the efficacy of the determinations of the [District]," and this Court cannot allow Plaintiffs to substitute their judgment for the District's. *Presidents Council*, 457 F.2d at 291. Also the Supreme Court and Eighth Circuit already determined that these objections have no constitutional merit, especially in the context of the public schools.

---

[9] The student Plaintiff complains that the "sexuality" filter prohibits her from accessing "information that is supportive of LGBT students." (Compl. ¶ 5.) But this is simply not true. The District has already unblocked several sites that are supportive of LGBT students, which she can readily access. Given the lack of any evidence that the District sought to suppress pro-LGBT views, she had no First Amendment right to compel the District to grant her access to the sites it unblocked, let alone to compel the District to grant her access to every website that presents a pro-LGBT perspective.

12

For instance, the Supreme Court already declared that a filter's "overblocking" did not create a constitutional problem. *ALA*, 539 U.S. at 208–09. And it did so when focusing only on adults and only in the context of the public library. *Id.* Here, the District has significantly more leeway, as the issue is internet access in a school for minors. After all, children's right to access sexually-related materials is limited. *Bystrom ex rel. Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 751 (8th Cir. 1987). And the District has a "legitimate, and even compelling," interest in protecting students from "material inappropriate for minors," *ALA*, 539 U.S. at 215 (Kennedy, J. concurring), and from "obscenity, child pornography, and, in respect to access by minors, material that is comparably harmful." *Id.* at 218–19 (Breyer, J. concurring). These terms are inherently broader than "pornography." *See, e.g.*, *Bystrom*, 822 F.2d at 751 (upholding restrictions on materials "obscene as to minors" under the First Amendment). Besides, nothing requires a school to allow students to access material simply because it does not technically qualify as pornographic or obscene. *Presidents Council*, 457 F.2d at 292–93 ("The public school library obviously does not have to become the repository, at public expense, for books which are deemed by the proper authorities to be without merit . . . simply because they are not obscene within the statute.").

Second, Plaintiffs allege that the District should not use the "sexuality" filter and instead manually block sites featuring inappropriate sexual content. (MPI Br. at 4.) However, the Supreme Court does not require public libraries to make "individualized judgments" about websites. *ALA*, 539 U.S. at 208. Given the vast, rapidly changing body of material on the internet, it is impractical to insist that libraries assess sites on a case-by-case basis. *Id.* If that is true for libraries serving adults, it is all the more so for schools serving minors.

Last, Plaintiffs wax eloquent about the burden on students who want specific sites un-

blocked. (MPI Br. at 26–29; MPI Supp. Br. at 4–7.) However, adults have much more freedom to access explicit materials, *Bystrom*, 822 F.2d at 751, and forcing them to request access to specific sites raises no constitutional problems. *ALA*, 539 U.S. at 209. Plaintiffs give no constitutionally significant reason that any different rule applies to minors.

II. **THIS COURT SHOULD NOT ISSUE A PRELIMINARY INJUNCTION THAT WILL EXPOSE SCHOOL CHILDREN TO SEXUALLY INAPPROPRIATE MATERIALS.**

Plaintiffs' arguments regarding the last three preliminary injunction factors—irreparable harm, the balance of harms, and the public interests—collapse with the demise of their First Amendment claims. As they have not established standing or a First Amendment violation, they have not shown that they will be irreparably harmed without an injunction. However, any injunction restricting the District's internet filters would create an irreparable harm, not for those distant organizations, but for thousands of local schoolchildren. Even if this Court simply enjoined the "sexuality" filter, those students would be exposed to harmful, sexually inappropriate, and even pornographic materials from the many pornographic and sexually explicit websites discussed *supra*. Recklessly running the risk that children would access this material hardly serves the District's interest in maintaining a healthy educational environment. In fact, it serves no public interest whatsoever, yet another reason that Plaintiffs' motion should be denied and the case should be dismissed.

## CONCLUSION

Plaintiffs neither demonstrated the constitutionally-required injury-in-fact nor showed that the District's internet filters—including the "sexuality" filter—violates the First Amendment. They have not shown that the District selected these filters for the primary purpose of suppressing ideas, and thus their claims fail. The District's filters serve purposes that even Supreme Court justices recognize as legitimate and compelling: protecting children from harmful, sexually inappropriate materials on the internet. Hence, *amici curiae* respectfully request that this

Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted, this the 9th day of September, 2011.

*/s/ Michael Whitehead*
MICHAEL WHITEHEAD
Missouri Bar No. 024997
WHITEHEAD LAW FIRM, LLC
City Center Square
1100 Main Street, Suite 2600
Kansas City, Missouri 64105-5194
Phone: (816) 876–2600
Facsimile: (816) 221–8763
Mike@TheWhiteheadFirm.Com

JEREMY D. TEDESCO*
Arizona Bar No. 023497
ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona 85260
Phone: (480) 444–0020
Facsimile: (480) 444–0028
jtedesco@telladf.org

DAVID A. CORTMAN*
Georgia Bar No. 188810
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Rd., N.E., Suite D-600
Lawrenceville, Georgia 30043
Phone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@telladf.org

TRAVIS C. BARHAM*
Arizona Bar No.: 024867
ALLIANCE DEFENSE FUND
12 Public Square
Columbia, Tennessee 38401
Phone: (931) 490–0591
Facsimile: (931) 490–7989
tbarham@telladf.org

* *Pro hac vice* motions concurrently filed.