UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| **PARENTS, FAMILIES, AND FRIENDS OF LESBIANS AND GAYS, INC.**, et al.<br><br>Plaintiffs,<br><br>v.<br><br>**CAMDENTON R-III SCHOOL DISTRICT**, et al.<br><br>Defendants. | **CASE NO. 2:11-CV-04212**<br><br>**THE HONORABLE NANNETTE K. LAUGHREY** |

**SURREPLY SUGGESTIONS OF *AMICI CURIAE*
ALLIANCE DEFENSE FUND & MISSOURI FAMILY POLICY COUNCIL
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

MICHAEL WHITEHEAD
Missouri Bar No. 24997
WHITEHEAD LAW FIRM, LLC
City Center Square
1100 Main Street, Suite 2600
Kansas City, Missouri 64105-5194
Phone: (816) 876–2600
Facsimile: (816) 221–8763
Mike@TheWhiteheadFirm.Com

JEREMY D. TEDESCO
Arizona Bar No. 023497
ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona 85260
Phone: (480) 444–0020
Facsimile: (490) 444–0028
jtedesco@telladf.org

DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Arizona Bar No. 024867
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Rd., N.E., Suite D-600
Lawrenceville, Georgia 30043
Phone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@telladf.org
tbarham@telladf.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 1

    I.   PLAINTIFFS' FIRST AMENDMENT CLAIMS REMAIN FATALLY FLAWED. .............................. 1

        A.  ESPECIALLY SINCE THE DISTRICT'S INTERNET ACCESS IS NOT A FORUM, PLAINTIFFS CANNOT DEMONSTRATE THE INJURY-IN-FACT NECESSARY FOR STANDING. .................... 1

        B.  PLAINTIFFS IMPROPERLY WANT TO SUBSTITUTE THEIR CURRICULAR JUDGMENT FOR THE DISTRICT'S, NOT JUST REGARDING WHICH FILTERS TO USE, BUT ALSO REGARDING WHICH SYSTEM THE DISTRICT SHOULD PURCHASE. ......................................................... 3

        C.  PLAINTIFFS STILL HAVE NOT SATISFIED THE LEGAL STANDARDS THAT GOVERN THEIR FIRST AMENDMENT CLAIMS. ........................................................................................ 5

            1.  PLAINTIFFS HAVE NOT SHOWN THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS PRIMARILY TO SILENCE EXPRESSION. ........................................................... 5

            2.  PLAINTIFFS CONTINUE TO RELY ON AN INAPPLICABLE LEGAL FRAMEWORK, BUT THEY DO NOT HAVE ANY REAL EVIDENCE EVEN UNDER THIS ANALYSIS. ................... 7

    II.  A PRELIMINARY INJUNCTION WOULD EXPOSE SCHOOL CHILDREN TO A WIDE ARRAY OF SEXUALLY INAPPROPRIATE MATERIALS AND SHOULD NOT BE GRANTED. ............................ 10

CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

**CASES**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ................................................................................... 2, 4, 5, 6, 7, 10

*Christian Legal Soc'y v. Martinez*,
    130 S. Ct. 2971 (2010) ................................................................................................ 5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) .................................................................................................... 2

*Hagans v. Lavine*,
    415 U.S. 528 (1974) .................................................................................................... 2

*Int'l Soc'y for Krishna Consciousness v. Lee*,
    505 U.S. 672 (1992) .................................................................................................... 2

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................... 3

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .................................................................................................... 2

*Pratt v. Indep. Sch. Dist. No 831*,
    670 F.2d 771 (8th Cir. 1982) ........................................................................... 2, 4, 5, 6, 10

*Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*,
    457 F.2d 289 (2d Cir. 1972) ............................................................................... 2, 4, 6

*United States v. Am. Library Ass'n*,
    539 U.S. 194 (2003) ........................................................................................... 1, 5, 6, 7

**STATUTES**

20 U.S.C § 9134(f)(1) ............................................................................................................ 5

## INTRODUCTION

Since they filed their preliminary injunction motion and accompanying brief, Plaintiffs have filed two more overlength briefs, complete with new declarations, articles, press releases, and other documents.[1] Yet despite this additional thirty-seven pages of briefing and 105 pages of new supporting documents, four things remain unchanged:

1. Plaintiffs do not have standing.

2. Plaintiffs want to substitute their own educational preferences for those of the District's real policymakers (the local school board), only now on a grander level.

3. Plaintiffs cannot satisfy the legal standard that governs their First Amendment claims.

4. Plaintiffs have no actual evidence to support their erroneous arguments based on inapplicable legal tests.

Each of these realities fatally undermines Plaintiffs' claims, such that this case should be dismissed. Collectively, they abundantly demonstrate why Plaintiffs are not likely to prevail on the merits and why this Court should not grant a preliminary injunction that would expose Missouri school children to a wide array of sexually inappropriate websites.

## ARGUMENT

**I. PLAINTIFFS' FIRST AMENDMENT CLAIMS REMAIN FATALLY FLAWED.**

**A. ESPECIALLY SINCE THE DISTRICT'S INTERNET ACCESS IS NOT A FORUM, PLAINTIFFS CANNOT DEMONSTRATE THE INJURY-IN-FACT NECESSARY FOR STANDING.**

Plaintiffs' entire standing argument rests on the assumption that they have the right to demand that schoolchildren be allowed to access their websites from school computers. However, the Supreme Court has repeatedly ruled that internet access at a library is not a forum for private expression. *United States v. Am. Library Ass'n (ALA)*, 539 U.S. 194, 205–06, 209 n.4, 213 n.7 (2003); *id.* at 215–16 (Breyer, J. concurring) ("[T]he plurality finds the 'public forum'

---

[1] *See* Pls.' Mot. for Leave to File Over-Length Suggestions in Opp'n to Defs.' Mot. to Dismiss (Doc. 48); Pls.' Mot. for Leave to File Over-Length Reply Suggestions in Supp. of Pls.' Mot. for Prelim. Inj. (Doc. 52).

1
Case 2:11-cv-04212-NKL   Document 60   Filed 10/18/11   Page 4 of 15

doctrine inapplicable. . . . I agree. . . ."). Like the Eighth and Second Circuits, it has also declined to apply forum analysis in other library cases. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–72 (1982); *Pratt v. Indep. Sch. Dist. No 831*, 670 F.2d 771, 776 (8th Cir. 1982); *Presidents Council, Dist. 25 v. Cmty. Sch. Bd. No. 25*, 457 F.2d 289, 291–92 (2d Cir. 1972). Thus, the District's "sexuality" filter—which simply limits the District's own speech—has not excluded Plaintiffs from any forum, and thus, Plaintiffs have not satisfied the injury-in-fact requirement for standing.

The Organizational Plaintiffs attempt to plug the holes in their standing by relying on a variety of inapplicable cases. (Pls.' Suggestions in Opp. to Defs.' Mot. to Dismiss ("MTD Resp. Br.") (Doc. 50) at 9.[2]) Yet, even on Plaintiffs' description, these cases simply held that the challenged programs were not "designated public forums." (*Id.*) Here, the District's internet access is not just not a designated public forum; the entire forum analysis does not apply. In addition, none of the controlling cases Plaintiffs cite addresses standing at all. *See generally Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998). Hence, Plaintiffs' reliance on these cases to bolster their standing claims is entirely inappropriate. *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").

Furthermore, the District's recent conduct further illustrates that none of the Plaintiffs has suffered any injury. Not only does the "sexuality" filter not block all LGBT websites (including Plaintiff Campus Pride's site), but the District unblocked even more on request, whether those requests came from its anonymous request system or from the ACLU. (Hadfield Aff. (Doc. 35-

---

[2] Citations to the briefs are to the page number in the footer of each page, not the page number in the ECF stamp.

1) ¶¶ 10–15; Cowen Aff. (Doc. 35-2) ¶¶ 14–17.) Despite the District's voluntary—and unnecessary—cooperation on every specific site the ACLU listed, Plaintiffs filed this lawsuit seeking to deactivate the entire "sexuality" filter. There is no evidence (1) that the District would not unblock the Organizational Plaintiffs' websites for they never asked,[3] (2) that Plaintiff Doe ever wanted to access any of the Organizational Plaintiffs' websites, or (3) that the District would have prohibited her from doing so had she availed herself of the anonymous request system. (Defs.' Suggestions in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' MPI Resp. Br.") (Doc. 35) at 5–6.) In short, as there is no evidence that any Plaintiff was injured, Plaintiffs have wholly failed to carry their burden of establishing standing.[4] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Hence, the case should be dismissed and the preliminary injunction motion denied.

### B. PLAINTIFFS IMPROPERLY WANT TO SUBSTITUTE THEIR CURRICULAR JUDGMENT FOR THE DISTRICT'S, NOT JUST REGARDING WHICH FILTERS TO USE, BUT ALSO REGARDING WHICH SYSTEM THE DISTRICT SHOULD PURCHASE.

At the outset of this lawsuit, the issue was quite narrow: Can the District utilize its "sexuality" filter to prevent schoolchildren from accessing hosts of sexually inappropriate websites? Plaintiffs painstakingly noted that they were not challenging other URL Blacklist filters that the District utilized. (*See* First Am. Compl. ("Compl.") (Doc. 24) ¶ 27.) Indeed, the alleged problems with the "sexuality filter" dominate the Complaint (*id.* ¶¶ 30–58) and the primary cause of action (*id.* ¶ 77). On reply, rather than focusing on this filter, Plaintiffs shift to attack the District's decision to use the entire URL Blacklist system. (*See, e.g.*, Pls.' MPI Reply Br. (Doc. 54) at 1–2, 6–14.)

This tactical shift only magnifies one of Plaintiffs' primary errors—trying to substitute their educational preferences for those of the duly elected District decision-makers, the local

---
[3] *See generally* Huckaby Decl. (Doc. 9-7); Duddy-Burke Decl. (Doc. 9-8); Marsden Dec. (Doc. 9-9); Windmeyer Decl. (Doc. 9-10).
[4] Plaintiffs concede they do not have associational standing. (Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' MPI Reply Br.") (Doc. 54) at 5 n.2.)

3

school board.  The Supreme Court and Eighth Circuit could not be clearer on this point.  Local school boards "are the principal policymakers for the public schools," and they "are accorded comprehensive powers and substantial discretion to discharge the important tasks entrusted to them." *Pratt*, 670 F.2d at 775; *see also Pico*, 457 U.S. at 863.  This discretion includes managing their schools in accord with local values, *Pico*, 457 U.S. at 865; *Pratt*, 670 F.2d at 775, and "determin[ing] the content of their school libraries." *Pico*, 457 U.S. at 870; *see also Presidents Council*, 457 F.2d at 291–92.  In short, the District has discretion over curricular matters like which filters it uses to protect students from inappropriate sexual websites and which overall system it selects to accomplish this congressionally mandated obligation.

Plaintiffs attempt to cloud the issue by transferring the curricular discretion from its rightful owners (*i.e.*, the District school board) to employees (*i.e.*, school librarians and teachers).  (Pls.' MPI Reply Br. (Doc. 54) at 11–12.)  Not only is this legally erroneous (as it is the school board that sets the policies that its employees implement), but it is logically backwards.  Deference is accorded the District in this context precisely so that it does not have the burden of justifying its policies to every interloper.[5]  Plaintiffs—who bear the burden of proof—have not produced any evidence that Camdenton teachers or librarians object to the "sexuality" filter or any legal authority that hints that such objections (if they were to exist) should trump the District's discretion.

Plaintiffs next attempt to substitute their judgment for the District's by opining at length on the comparative merits of competing filtering software.  (*See, e.g.*, *id.* at 1–2, 9–14, 18–19.)  According to them, because one software designer who sells a competing system[6] and one New

---

[5]  Hence, it is Plaintiffs who have mastered the circular argument, insisting that this Court should not defer to the District because the District will not admit to viewpoint discrimination.  (Pls.' MPI Reply Br. (Doc. 54) at 11.)

[6]  Not only is Hinkle's testimony undermined because of his obvious conflict of interest (Hinkle Decl. (Doc. 54-1) ¶¶ 1–3), but he also attempts—as a non-lawyer—to render a legal opinion on which sites are explicit.  (*Id.* ¶ 12a.) And this ignores the fact that the "sexuality" filter blocks more than just explicit sites, as the District can choose to do.  *See Pico*, 457 U.S. at 871 (noting that a school board can prohibit materials it deems "pervasively vulgar," educationally unsuitable, "psychologically or intellectually inappropriate"); *id.* at 880 (Blackmun, J. concurring)

York City librarian disapprove of URL Blacklist,[7] the use of URL Blacklist violates the First Amendment. (*Id.* (relying on Hinkle Decl. (Doc. 54-1), Stripling Decl. (Doc. 54-14)).) However, the Supreme Court and Eighth Circuit have already determined who gets to select the filtering software for Camdenton R-III School District, and it is not out-of-state organizations, one student, a competing software designer, or an out-of-state librarian. It is the District's school board. *Pratt*, 670 F.2d at 775; *see also Pico*, 457 U.S. at 863, 870.

Just recently, the Supreme Court cautioned federal courts "to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2988 (2010). Here the District chose to block "[s]ites dedicated to sexuality, possibly including adult material" (Compl. (Doc. 24) ¶ 21), a decision both Congress and the courts authorized. *See* 20 U.S.C § 9134(f)(1); *Pico*, 457 U.S. at 871; *id.* at 880 (Blackmun, J. concurring); *Pratt*, 670 F.2d at 776 n.6. Neither Plaintiffs, nor a software designer, nor an out-of-state librarian, can second-guess the District's curricular decisions. This Court should defer to the District, and this case should be dismissed and the injunction denied.

### C. PLAINTIFFS STILL HAVE NOT SATISFIED THE LEGAL STANDARDS THAT GOVERN THEIR FIRST AMENDMENT CLAIMS.

#### 1. PLAINTIFFS HAVE NOT SHOWN THAT THE DISTRICT EMPLOYED ITS INTERNET FILTERS PRIMARILY TO SILENCE EXPRESSION.

Lost in Plaintiffs' twenty-page reply is the simple legal standard that has governed these cases for nearly twenty years. When it comes to filtering internet access (*i.e.*, "the technological

---

(same); *Pratt*, 670 F.2d at 776 n.6 (same for violent or sexual content).

[7] Not only does Stripling's opinion not trump the District's, but she also opines on topics far afield from her profession. As a non-lawyer, she is not qualified to determine whether the District has complied with Supreme Court decisions (Stripling Decl. (Doc. 54-2) at 4), constitutional principles (*id.* at 12), or international law (*id.* at 7–8). Nor can she explain how declarations from private organizations (*e.g.*, *The Library Bill of Rights*, *The Freedom to Read*) or general proclamations from international bodies (*e.g.*, the United Nation's *Universal Declaration of Human Rights*) impact the First Amendment issue before this Court. (*Id.* at 5–11.) And her preferences about unblocking sites on request are irrelevant since the District already allows anonymous requests (Hadfield Decl. (Doc. 35-1) ¶¶ 10–12; Cowen Decl. (Doc. 35-2) ¶¶ 14–16) and the Supreme Court has already approved the practice. *ALA*, 539 U.S. at 209.

extension of the [library] book stack," *ALA*, 539 U.S. at 207), school districts may violate the First Amendment only if (1) they "intended by their removal decision to deny [students] access to ideas with which [the board] disagreed," and (2) "if this intent was the decisive factor in [their] decision." *Pico*, 457 U.S. at 871; *id*. at 879–80 (Blackmun, J. concurring) (agreeing with this "narrow principle"); *accord Pratt*, 670 F.2d at 776; *Presidents Council*, 457 F.2d at 292.

The record here clearly indicates that the District did not even get close to this forbidden territory. Its "sexuality" filter does not target viewpoints, but simply screens out "[s]ites dedicated to sexuality, possibly including adult material." (Compl. (Doc. 24) ¶ 20.) With this filter in place, some LGBT websites remained unblocked, and others were unblocked on request (both from anonymous individuals and the ACLU).[8] (Hadfield Decl. (Doc. 35-1) ¶¶ 9–14; Cowen Decl. (Doc. 35-2) ¶¶ 11, 14–18; Compl. (Doc. 24) ¶¶ 48, 62.) Both the District and *Amici* have identified numerous sexually inappropriate websites that the "sexuality" filter blocks. (*See* Defs.' MPI Resp. Br. (Doc. 50) at 2, 7–8; *Amici* Br. (Doc. 45) at 3–4.) All of this amply confirms what the District told the ACLU: that it activated the "sexuality" filter "[i]n order to comply with the Children's Internet Protection Act, Board Policy, and for the well-being of our students." (Pls.' MPI Ex. A-5 (Doc. 7-7).)

Unlike *Pico*, there is no evidence here that the District violated its own procedures in selecting URL Blacklist or in activating the "sexuality" filter. *Pico*, 457 U.S. at 874–75. Unlike *Pratt*, there is no evidence that the District acted to satisfy any passing public outcry, even if it had to violate procedures and ignore advice to do so. *Pratt*, 670 F.2d at 777–78. Plaintiffs can point to no controversy surrounding this filtering software until they created one by demanding that the "sexuality" filter be deactivated, which would expose Camdenton children to sexually

---

[8] Plaintiffs' distaste for unblocking sites on request does not change the Supreme Court's blessing of the system. *ALA*, 539 U.S. at 209. Neither school prayer nor *Miranda* rights cases change this (Pls.' MPI Reply Br. (Doc. 54) at 16–17), particularly when children have less freedom to access sexual materials than adults. (*Amici* Br. (Doc. 45) at 13–14.)

6

inappropriate websites. (*See* Defs.' MPI Resp. Br. (Doc. 35) at 2, 7–8; *Amici* Br. (Doc. 45) at 3–4.) Plaintiffs try to conjure such evidence by attacking *Amici*, quoting individual parents, and impugning community groups. (Pls.' MPI Reply Br. (Doc. 54) at 7.) Yet none of this deluge of book excerpts and press releases explains why the District activated the sexuality filter, which is the only relevant constitutional consideration. The opinions and statements of outside organizations cannot be attributed to the District, and they reacted not to the "sexuality" filter, but to the Plaintiffs' intermeddling lawsuit. Camdenton citizens do not have to give up their constitutional right to hold elected officials accountable to protect their children from inappropriate materials, and District officials do not have to capitulate to every ACLU demand letter to demonstrate the purity of their motives. (*Id.*) So not only are the press releases and stray remarks constitutionally irrelevant, but they also do not demonstrate what the Supreme Court requires in order for Plaintiffs to win: that the "decisive factor" in the District's decision to employ the "sexuality" filter was to "deny [students] access to ideas with which [it] disagreed." *Pico*, 457 U.S. at 871.

### 2. PLAINTIFFS CONTINUE TO RELY ON AN INAPPLICABLE LEGAL FRAMEWORK, BUT THEY DO NOT HAVE ANY REAL EVIDENCE EVEN UNDER THIS ANALYSIS.

Plaintiffs expend a great deal of ink on their viewpoint discrimination and reasonableness arguments, as if the District's internet access were a type of forum. (Pls.' MPI Reply Br. (Doc. 54) at 3–17.) Yet, this entire analysis misses the constitutional boat because "forum analysis and heightened judicial scrutiny are incompatible . . . with the discretion that public [and school] libraries must have to fulfill their traditional missions." *ALA*, 539 U.S. at 205. After all, the District's internet access represents the District's speech, and it deserves deference on such curricular matters. Hence, it does not have to prove that the "sexuality" filter is reasonable, and Plaintiffs' disparate impact viewpoint discrimination theory is entirely misplaced. The only relevant questions are (1) whether the District used the "sexuality" filter to screen children from disfavored

ideas and (2) whether this was its primary goal, neither of which is true. (*Supra* Part I.C.1.)

Furthermore, even under their own analysis, Plaintiffs are woefully short on evidence and ignore critical facts. For example, they repeatedly insist that URL Blacklist was "designed" to suppress viewpoints (*see, e.g.*, Pls.' MPI Reply (Doc. 54) at 3–6), but repetition does not shape reality. They maintain that little, if anything, is known about the URL Blacklist creators (*see, e.g.*, *id.* at 2 n.1), yet they spend pages attributing invidious motives to them as if they had windows into their souls (*id.* at 3–6), even speculating on what they might do in the future (*id.* at 11). They do so in the face of evidence that the "sexuality" filter does not block all LGBT sites and that the District goes the extra mile to accommodate unblocking requests. (Hadfield Decl. (Doc. 35-1) ¶¶ 10–15; Cowen Decl. (Doc. 35-2) ¶¶ 16–18.) This conjuring of motives continues when Plaintiffs rely on an article allegedly linking filtering companies and Christian organizations. (Pls.' MPI Reply Br. Ex. 3 (Doc. 54-7).) As the article does not mention URL Blacklist at all, it is entirely irrelevant, especially as Plaintiffs' own arguments presume that times have changed in the last decade.[9] (Pls.' MPI Reply Br. (Doc. 54) at 12–13 (arguing that "most" (or at least five) filtering companies are superior to URL Blacklist).) Put simply, speculation—in either instance—is not evidence of discrimination.

Furthermore, Plaintiffs erroneously insist—often via far-fetched analogies—that they only want to allow students to access informational sites, not the sexually inappropriate ones that would be unblocked if the "sexuality" filter were deactivated. (*See* Pls.' MPI Reply Br. (Doc. 54) at 3–4, 11, 13.) But even the websites the ACLU demanded be unblocked (Compl. (Doc. 24) ¶¶ 48, 62) recommend books for children[10] that graphically describe explicit sexual encounters.[11]

---

[9]   The article also maintains that decisions about what types of sexual information children should be allowed to access should remain with local school officials (Pls.' MPI Reply Br. Ex. 3 (Doc. 54-7) at 24), that parents should be allowed to review logs of the websites their children visit (*id.* at 25–26), and that school officials should maintain "hands-on . . . supervision and monitoring" of children's internet access (*id.* at 25–26). This contradicts Plaintiffs efforts to make decisions for the District and to insist that children's internet access be free of accountability.

[10]  *See* GSA Network, *Recommended Books for LGBTQ Youth*, http://www.gsanetwork.org/resources/posters-movies-and-more/recommended-books; The Trevor Project, *Books and Films for LGBTQ Youth*,

| Title | Endorser | Description |
|---|---|---|
| *Reflections of a Rock Lobster* | • GLSEN<br>• The Trevor Project[12] | • First graders have serial homosexual encounters in elementary school restrooms. (Ex. 1 at 3.)<br>• Five and six year old boys play "sex therapist." (Ex. 1 at 3.) |
| *Queer 13* | • GLSEN<br>• The Trevor Project[13] | • Several vivid descriptions of masturbating. (Ex. 1 at 6–8, 14–15.)<br>• A thirteen-year-old has a graphic, violent homosexual encounter with an adult in a high school restroom. (Ex. 1 at 9–11.)<br>• A twelve-year-old describes his sexual relationship with his cousin. (Ex. 1 at 12–13.)<br>• Vivid descriptions of sexualized public restroom experiences. (Ex. 1 at 8.) |
| *Revolutionary Voices* | • GLSEN<br>• The Trevor Project<br>• GSA Network[14] | • Two men are pictured having anal sex as Boy Scouts watch. (Ex. 1 at 19.)<br>• A S/M "sex worker" describes how he entered the "industry," praising it as a liberating endeavor. (Ex. 1 at 20–22.)<br>• A man fantasizes in a poem about mutilating himself to become a woman. (Ex. 1 at 18.) |
| *Passages of Pride* | • GLSEN<br>• The Trevor Project[15] | • A fifteen-year-old has multiple homosexual rendezvous with an older man, describing the masturbation and oral sex that resulted. (Ex. 1 at 26–28.)<br>• A teenage girl describes having sex with her forty-four-year-old teacher. (Ex. 1 at 29.)<br>• Five-year-old boys fondle each others' genitals. (Ex. 1 at 25.) |
| *In Your Face* | • GLSEN[16] | • A sixteen-year-old meets a twenty-five-year-old at a LGBT youth group and they have sex weeks later. (Ex. 1 at 32–33.)<br>• A sixteen-year-old describes serial sexual relationships with adult men, including one session involving "five hours of foreplay." (Ex. 1 at 34.) |
| *Growing Up Gay/Growing Up Lesbian* | • GLSEN<br>• The Trevor Project<br>• GSA Network[17] | • A homosexual priest describes explicitly his sexual encounter at the age of ten with another boy. (Ex. 1 at 37–41.)<br>• A man recalls his sexual experiences at twelve years old and having anal sex with a much older man at fifteen. (Ex. 1 at 42–43.) |
| *The Full Spectrum* | • GLSEN<br>• The Trevor Project[18] | • Five- and six-year-old girls engage in sex games and French kissing. (Ex. 1 at 46–47.) |

http://www.thetrevorproject.org/sites/default/files/ComprehensiveBookandFilmList.pdf; GLSEN, *Book Link*, http://www.glsen.org/cgi-bin/iowa/all/booklink/index.html?state=tools&type=educator. (All last visited Sept. 1, 2011.)

[11] *See generally* Jim Hoft, *Breaking: Obama's "Safe Schools Czar" is Promoting Child Porn in the Classroom—Kevin Jennings and the GLSEN Reading List*, http://www.thegatewaypundit.com/2009/12/breaking-obamas-safe-schools-czar-is-promoting-porn-in-the-classroom-kevin-jennings-and-the-glsen-reading-list/ (Dec. 4, 2009) (discussing, excerpting, and linking to the GLSEN recommended reading list for children).

[12] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/1593.html.
[13] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/2156.html
[14] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/1473.html.
[15] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/1831.html.
[16] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/news/record/1294.html.
[17] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/2161.html.
[18] *See supra* note 10; http://www.glsen.org/cgi-bin/iowa/all/booklink/record/1933.html.

In fact, GLSEN's recommended books contain explicit and sexual themes so frequently that it includes a disclaimer with many of its summaries:

> All BookLink items are reviewed by GLSEN staff for quality and appropriateness of content. However, some titles for adolescent readers contain mature themes. We recommend that adults selecting books for youth review content for suitability.[19]

Any sane school board can determine both that children should not be exposed to these explicit accounts, and any filter that blocks "[s]ites dedicated to sexuality, possibly including adult material" would naturally block these sites that Plaintiffs claim are innocuous. (Compl. (Doc. 24) ¶ 21.)

## II.  A PRELIMINARY INJUNCTION WOULD EXPOSE SCHOOL CHILDREN TO A WIDE ARRAY OF SEXUALLY INAPPROPRIATE MATERIALS AND SHOULD NOT BE GRANTED.

The District and *Amici* have amply illustrated the consequences of disabling the "sexuality" filter and the flood of inappropriate websites students could then access. (*See* Defs.' MPI Resp. (Doc. 35) at 2, 7–8; *Amici* Br. (Doc. 45) at 3–4.) Given Plaintiffs' spurious claims that the websites they want unblocked are innocuous, the District—empowered to govern according to local values, *Pico*, 457 U.S. at 865; *Pratt*, 670 F.2d at 775—does not have to adopt their software recommendations. This Court should defer to that decision, particularly when Plaintiffs have failed to demonstrate any valid constitutional defects in the system.

## CONCLUSION

After seventy-five pages of briefing, Plaintiffs have never shown what it takes to obtain a preliminary injunction: that the District employed the "sexuality" filter to suppress viewpoints and that this was the decisive goal in its decision. The blizzard of erroneous legal arguments and irrelevant evidence should not distract this Court from the simple facts: the District utilized the "sexuality" filter to protect children from inappropriate sexual websites, and this decision is entitled to substantial deference. The case should be dismissed and the injunction denied.

---

[19]  *See, e.g.*, http://www.glsen.org/cgi-bin/iowa/all/booklink/record/1593.html.

Respectfully submitted, this the 18th day of October, 2011.

| | |
|---|---|
| */s/ Michael Whitehead* | */s/ David A. Cortman* |
| MICHAEL WHITEHEAD | DAVID A. CORTMAN |
| Missouri Bar No. 024997 | Georgia Bar No. 188810 |
| WHITEHEAD LAW FIRM, LLC | TRAVIS C. BARHAM |
| City Center Square | Arizona Bar No. 024867 |
| 1100 Main Street, Suite 2600 | ALLIANCE DEFENSE FUND |
| Kansas City, Missouri 64105-5194 | 1000 Hurricane Shoals Rd., N.E., Suite D-600 |
| Phone: (816) 876–2600 | Lawrenceville, Georgia 30043 |
| Facsimile: (816) 221–8763 | Phone: (770) 339–0774 |
| Mike@TheWhiteheadFirm.Com | Facsimile: (770) 339–6744 |
| | dcortman@telladf.org |
| JEREMY D. TEDESCO | tbarham@telladf.org |
| Arizona Bar No. 023497 | |
| ALLIANCE DEFENSE FUND | |
| 15100 North 90th Street | |
| Scottsdale, Arizona 85260 | |
| Phone: (480) 444–0020 | |
| Facsimile: (480) 444–0028 | |
| jtedesco@telladf.org | |

# CERTIFICATE OF SERVICE

I hereby certify that, on October 18, 2011, I electronically filed the foregoing brief of *amici curiae* and its accompanying exhibit with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to Counsel for Defendants and for Plaintiffs.

*/s/ David A. Cortman*
DAVID A. CORTMAN
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Rd., N.E., Suite D-600
Lawrenceville, GA 30043
Phone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@telladf.org

*Attorney for Amici Curiae*