1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                  CENTRAL DIVISION

3

    PARENTS, FAMILIES, AND       )
4   FRIENDS OF LESBIANS AND      )
    GAYS, INC., et al.,         )  No. 11-04212-CV-C-NKL
5                        )  October 27, 2011
            Plaintiffs,    )  Jefferson City, Missouri
6                        )  CIVIL
        V.                )
7                        )
    CAMDENTON R-III SCHOOL       )
8   DISTRICT, et al.,          )

9           Defendants.

10

11

12

                     * REDACTED *
13     TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

14

15

         BEFORE THE HONORABLE NANETTE K. LAUGHREY
16          UNITED STATES DISTRICT JUDGE

17

      Proceedings recorded by electronic stenography
18        Transcript produced by computer

19

20

21

22

23

24

25

             Kathleen M. Wirt, RDR, CRR
            United States Court Reporter
   400 E. 9th Street, Suite 7452 * Kansas City, MO 64106

1

APPEARANCES

For Plaintiffs:          MR. JEFFREY FINK
                         MS. ALLISON MANGER
                         Thompson Coburn, LLP
                         One US Bank Plaza, Suite 2700
                         St. Louis, MO 63101-1686

                         MR. JOSHUA BLOCK
                         MS. LESLIE COOPER
                         ACLU Foundation
                         125 Broad Street, 18th Floor
                         New York, NY 10004

                         MR. ANTHONY ROTHERT
                         ACLU of Eastern Missouri
                         454 Whittier Street
                         St. Louis, MO 63108

For Defendants:          MR. THOMAS A. MICKES
                         MS. ELIZABETH A. HELFRICH
                         Mickes Goldman O'Toole, LLC
                         555 Maryville University Drive
                         Suite 240
                         St. Louis, MO 63141

1                           I N D E X

2    PLAINTIFFS' WITNESSES:

3        BARBARA STRIPLING
             Direct Examination by Ms. Manger        7
4            Cross-examination by Mr. Mickes         12

5        DAVID HINKLE
             Direct Examination by Mr. Fink          19
6            Cross-examination by Mr. Mickes         53

7        TIMOTHY HADFIELD
             Direct Examination by Mr. Block         63
8            Cross-examination by Mr. Mickes         78

9
     DEFENSE WITNESSES:
10
         RANDAL COWEN
11           Direct Examination by Mr. Mickes        85
             Cross-examination by Mr. Block          104
12           Redirect Examination by Mr. Mickes      109
             Recross-examination by Mr. Block        109
13
         TIMOTHY HADFIELD
14           Direct Examination by Mr. Mickes        112
             Cross-examination by Mr. Block          121
15           Redirect Examination by Mr. Mickes      124
             Further Redirect by Mr. Mickes          127
16
     Argument by counsel                             129
17

18                           - - -

19                       E X H I B I T S

20   PLAINTIFFS' EXHIBITS               OFFERED    ADMITTED

21   P1 - Barbara Stripling resume        9          9

22   P2 - Stripling declaration           9          9

23   P5 - URLBlacklist.com website        24         25

24   P13 - URLBlacklist.com Whois         27         27

25   P14 - Hadfield affidavit             83         83

| | | | |
|---|---|---|---|
| 1 | P18 - 5/24/11 Rothert letter | 122 | 122 |
| 2 | P19 - 5/26/11 Mickes letter | 123 | 123 |
| 3 | P21 - 5/6/11 Helfrich letter | 32 | 33 |
| 4 | P22 - Huckaby declaration | 84 | 84 |
| 5 | P23 - Duddy-Burke declaration | 84 | 84 |
| 6 | P24 - Marsden declaration | 84 | 84 |
| 7 | P25 - Windmeyer declaration | 84 | 84 |
| 8 | P30 - news article | 83 | 83 |
| 9 | P33 - CD excerpt | 69 | 70 |
| 10 | P34 - CD transcript | 69 | 70 |
| 11 | P47 - ODP website | 40 | 40 |
| 12 | P48 - ODP Society from website | 41 | 41 |
| 13 | P49 - ODP Society from website | 42 | 42 |
| 14 | P50 - ODP editorial guidelines | 39 | 39 |
| 15 | P51 - website categorization | 36 | 36 |
| 16 | P52 - website analysis | 50 | 50 |
| 17 | P53 - effectiveness spreadsheet | 52 | 52 |
| 18 | P54 - dmoz.org spreadsheet | 44 | |
| 19 | P58 - declaration of Jane Doe | 84 | 84 |
| 20 | | | |
| 21 | DEFENSE EXHIBITS | | |
| 22 | D1 - screen shots | 102 | 102 |
| 23 | D2 - 5/19/11 Hadfield letter | 114 | 114 |
| 24 | D3 - 6/6/11 Helfrich letter | 115 | 115 |
| 25 | D4 - EHB policy | 117 | 117 |

1   D5 - EHB-AP policy                    118        118

2   D6 - IIAC-R policy                    119        119

3   D7 - examples of open websites         99         99

4                        *   *   *   *   *
5                          *   *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    OCTOBER 27, 2011

2                        - - -

3         THE COURT:  Good morning, everyone.

4         MR. MICKES:  Good morning.

5         THE COURT:  This is the matter of Parents, Families,

6 etc., versus Camdenton School District, Case No. 11-4212.

7         I'd like the parties to introduce themselves.  First

8 for the plaintiff.

9         MR. ROTHERT:  Your Honor, Anthony Rothert for the

10 plaintiffs.

11        MR. BLOCK:  Joshua Block for the plaintiffs.

12        MS. COOPER:  Leslie Cooper for plaintiffs.

13        MS. MANGER:  Allison Manger for the plaintiffs.

14        MR. FINK:  Jeff Fink for the plaintiffs.

15        THE COURT:  And for defendants?

16        MR. MICKES:  Tom Mickes for Camdenton School

17 District; my colleague, Betsy Kruse, for the school district;

18 and our client, Tom Hadfield.

19        THE COURT:  Welcome all.  I have set aside three

20 hours for the hearing.  How long does plaintiff expect?

21        MR. ROTHERT:  Our direct evidence is about one hour

22 and ten minutes, and we'd like to have 15 minutes to 20 minutes

23 for argument if time permits.

24        THE COURT:  Absolutely.

25        MR. MICKES:  Your Honor, on direct evidence we have

1  two short witnesses.  I would expect less than an hour.

2          THE COURT:  All right.  Good.  It sounds like we can

3  get it done in the time we have.  I will permit plaintiff to

4  begin.

5          MR. ROTHERT:  Your Honor, we would like to exclude

6  any witnesses.

7          THE COURT:  And there was no opposition by the

8  defendants, so you may go ahead and exclude your witnesses.

9  And you may call your first witness.

10          MS. MANGER:  Your Honor, plaintiffs call Dr. Barbara

11  Stripling.

12                          - - -

13                  BARBARA STRIPLING,

14   being first duly sworn by the courtroom deputy, testified as

15  follows:

16                          - - -

17                  DIRECT EXAMINATION

18   By Ms. Manger:

19  Q.      Good morning, Dr. Stripling.

20  A.      Good morning.

21  Q.      Please state your name for the record.

22  A.      Barbara K. Stripling.

23  Q.      Dr. Stripling, what is your professional background?

24  A.      I have been a school librarian for over 35 years.  I

25  spent 20 years as a practicing librarian in Fayetteville,

1  Arkansas; and then I've been a District Director of Libraries

2  in Tennessee; and now in New York City, I'm Director of School

3  Library Services in New York City.

4   Q.     Do you have experience dealing with internet filtering

5  in the context of school libraries?

6   A.     Yes, in a couple of contexts.  First of all, certainly

7  in my position now, I have to provide guidance to individual

8  librarians and structures so that individual librarians can

9  deal with the internet and with the way that it is implemented

10 in their schools.

11         I also have a responsibility district wide because

12 it's important for me to have a relationship with the

13 instructional technology people who maintain the filtering

14 system.  And we look at the categories of the criteria that are

15 used.  And I work hard to make sure that it is implemented in

16 an equitable way and that students have the most access

17 possible.

18  Q.     Dr. Stripling, I'm showing you what's been marked as

19 Plaintiffs' Exhibit P1.  Do you recognize this document?

20  A.     Yes.  It's my resume.

21  Q.     Did you draft this document?

22  A.     I did.

23  Q.     And is Exhibit P1 a true and correct copy of your

24 current resume?

25  A.     Yes, it is.

1          MS. MANGER:  Your Honor, plaintiffs move that

2    Exhibit P1 be admitted into evidence.

3          MR. MICKES:  No objection.

4          THE COURT:  It's admitted.

5          (Plaintiffs' Exhibit P1 was admitted into evidence.)

6    BY MS. MANGER:

7    Q.    Dr. Stripling, I'm showing you what's been marked as

8    Exhibit P2.  Do you recognize this document?

9    A.    Yes, I do.  It's the opinion I wrote.

10   Q.    And did you draft this document?

11   A.    I did.

12   Q.    Is this a true and accurate copy of your declaration?

13   A.    Yes.

14   Q.    And is the information in this declaration true and

15   correct to the best of your knowledge?

16   A.    Yes.

17          MS. MANGER:  Your Honor, plaintiffs move that

18   Exhibit P2 be admitted into evidence.

19          THE COURT:  Any objection?

20          MR. MICKES:  No objection.

21          THE COURT:  I'm sorry?

22          MR. MICKES:  No objection, Your Honor.

23          THE COURT:  All right.  Thank you.  It's admitted.

24          (Plaintiffs' Exhibit P2 was admitted into evidence.)

25   BY MS. MANGER:

1   Q.      Dr. Stripling, what were you asked to do in this case?

2   A.      I was asked to render an opinion about URL Blacklist in

3   comparison to professional library standards.

4   Q.      What did you conclude?

5   A.      I concluded that URL Blacklist does not comply with

6   professional standards in librarianship.  There are several

7   issues that actually are very much in conflict with the way

8   that we maintain professional standards.

9           First of all, it's important anytime a collection is

10  developed to have criteria, very clear criteria for the

11  materials that we make available to students.  And those

12  include things like accuracy and free from bias, age

13  appropriateness, and being up to date.  I could find no clear

14  criteria in URL Blacklist for the way that websites were

15  categorized.

16          And a second piece that's really important in

17  evaluating material is the credibility, the authority of the

18  source.  It's important to be able to look at the, who created

19  the material and determine if that person has actual

20  credibility and authority.  I could find no people behind URL

21  Blacklist, nor could I find the qualifications of whoever, the

22  people who were making the judgments.

23          And the third piece that I found that did not comply

24  with professional standards was that it's very important for

25  librarians to maintain a neutral viewpoint stance, that it is

1  our responsibility to seek and make available materials on all

2  viewpoints, not just one side of an issue or one or two sides

3  of an issue, and I found that URL Blacklist was not value

4  neutral, was not viewpoint neutral.

5  Q.     Dr. Stripling, in the course of your work in this case,

6  did you consider the district's claim that it has a policy by

7  which students can anonymously request that specific websites

8  be unblocked on an individual basis?

9  A.     Yes, I was asked -- I did know that, uh-huh.

10  Q.     Did you reach any conclusions?

11  A.     In my opinion, that's not a viable solution for

12  students.  In the first place, you can't know what you don't

13  know.  Students don't know what sites are available if they're

14  blocked.  So a student seeking information on anything, if it's

15  not there and they have no access to it, they have no way of

16  knowing what they might ask to be unblocked.

17         The second piece, and this is actually maybe more

18  troubling to me, is the stigmatizing effect that it has when

19  someone has to ask for access to information that he has every

20  right to have access to.  I think that even if it's anonymous

21  that still the student feels stigmatized, that he's less than

22  worthy, and the information that he's seeking is less than

23  worthy.

24         And the third piece that I think shows that this is

25  not a solution is that there's actually a subtle nonexplicit,

but an effect on the whole school community.  I think that all
students need to confront various ideas and develop the skills
to evaluate different perspectives.  If they never have the
opportunity to see alternative viewpoints, they're not going to
develop the evaluation skills that they need for the rest of
their lives.

MS. MANGER:  Your Honor, no further questions at
this time.

THE COURT:  Cross-examination?

- - -

CROSS-EXAMINATION

By Mr. Mickes:

Q.    Dr. Stripling, your testimony, I believe, dealt with
concerns that you had about the URL Blacklist system?

A.    Yes.

Q.    And during the course of your preparation for this
case, did you have an opportunity to examine the filtering
system at Camdenton School District?

A.    I looked at URL Blacklist.

Q.    Okay.  But did you make any attempt to determine what
kind of filtering system was used at Camdenton?

A.    I have no access, no.

Q.    Have you been to Camdenton School District?

A.    No, I have not.

Q.    Have you talked to the technology director?

1  A.      No, I have not.

2  Q.      Would it surprise you, Dr. Stripling, to know that the

3  Camdenton School District uses a custom filtering system and

4  that URL is merely a backup to that?  You didn't know that?

5  A.      I think I did know that.  But it wouldn't surprise me,

6  no.

7  Q.      What was the nature of the district-created customized

8  filtering network?

9  A.      I'm sorry, what is the question?

10 Q.      Yes.  I asked you how -- if you knew, how the

11 customized filtering system at Camdenton School District, how

12 it operated.

13 A.      No.

14 Q.      Okay.  So you don't have any idea how that worked?

15 A.      No, I was asked to look at URL Blacklist.

16 Q.      So your observation was based on URL Blacklist?

17 A.      Yes.

18 Q.      And if that wasn't the entire program that the school

19 district used, then your testimony would be somewhat

20 questionable?

21 A.      No, I don't think so.

22 Q.      So you can testify about a program, a customized

23 program that you've never seen and you don't know how it

24 operates?

25 A.      Well, it is important anytime that you have a filtering

1  system that there be a structure in place that provides the

2  basic foundation of good collection development.  And when

3  materials are overcategorized or categorize -- miscategorized,

4  then every time that a district downloaded all of the URL

5  Blacklist categories, they would have to change each individual

6  piece of the, each individual website.

7           Now, websites change daily, and so I would suspect,

8  don't know, but would suspect that those are not assessed daily

9  in order to counter all of the negative effects of URL

10 Blacklist.

11  Q.     When you stated, testified that you would assume that

12 it wasn't assessed daily, you don't know that for a fact, do

13 you?

14  A.     No.

15  Q.     And --

16  A.     I do know that there are thousands, hundreds of

17 thousands of websites, and it is not humanly possible to assess

18 them daily.

19  Q.     Exactly.  Exactly.

20  A.     And so if something is miscategorized on the front end,

21 then you have a very difficult problem that you can't overcome

22 by human power to assess the websites.  You have to have a good

23 structure in the first place.

24  Q.     And you don't know what the structure was at Camdenton,

25 do you?

1  A.      I know the structure of URL Blacklist.

2  Q.      But you don't know the structure at Camdenton School

3  District.

4  A.      No, I know the structure of URL Blacklist, yes.

5  Q.      But my representation to you, and we'll present

6  testimony that that's not the system that's used at Camdenton.

7  Okay.  Now, you also testified --

8          THE COURT:  Let me clarify because maybe I've really

9  missed something.  You don't use URL Blacklist at all?

10          MR. MICKES:  We --

11          THE COURT:  Because we could save a lot of time

12  here.

13          MR. MICKES:  Yeah.  We use a system, Your Honor,

14  that was developed by the school district back in 2010.  It's a

15  customized system.

16          THE COURT:  Does it have anything to do with URL

17  Blacklist?  If not, let's talk about --

18          MR. MICKES:  It does this way, Your Honor.  They

19  have their own customized blacklist and whitelist, things that

20  are perfectly fine and anybody can have them and things that

21  are not.  If they're on either one of those customized lists,

22  they never see URL.  The only way URL would ever come into play

23  was that if it wasn't on the customized whitelist, it wasn't on

24  the customized blacklist, then it would go through the system.

25  The customized system is --

1          THE COURT:  We'll get to that.  I just want to know,

2  I'm confused and it seems to me you're saying there is some

3  component of URL Blacklist --

4          MR. MICKES:  There is some component to it, Your

5  Honor.

6          THE COURT:  That's relevant to Camdenton School

7  District.

8          MR. MICKES:  Yes, there is.

9          THE COURT:  All right.  Go ahead.

10  BY MR. MICKES:

11  Q.     And finally, Dr. Stripling, you talked about the

12  stigmatizing effect --

13  A.     Uh-huh.

14  Q.     -- that this would have.  And are you aware of the way

15  that students and faculty can unblock a site at Camdenton

16  School District?

17  A.     I understand that it's anonymous.

18  Q.     Have you looked at the policy?

19  A.     No.

20  Q.     Have you looked at the computer structure to see how

21  that works?

22  A.     No.

23  Q.     Okay.  And are you aware that the student doesn't have

24  to give a name?

25  A.     That's what anonymous means, right.

1    Q.      Well, sometimes anonymous means using a different name.

2    It doesn't necessarily mean no name.

3    A.      Okay.

4    Q.      Are you aware that students can give a name or give a

5    symbol?

6    A.      Okay.

7    Q.      But you're not aware of that?

8    A.      No.

9    Q.      And are you aware that the student, if a student wants

10   to unblock a site and he hits, he or she hits that site, the

11   directions of how to do that will pop up immediately; are you

12   aware of that?

13   A.      Okay.  That still doesn't address the problems that I

14   have.

15   Q.      Are you aware of that?

16   A.      No.

17   Q.      And secondly, are you aware that there's an alternative

18   that they could make a request to the superintendent to have a

19   site unblocked and with an appeal to the board?  Are you aware

20   of that?

21   A.      In my -- would you like my opinion?

22   Q.      I would like an answer to the question --

23   A.      I do have an opinion.

24   Q.      -- and then you can give me an opinion, if you want.

25   A.      I'm not aware.

1  Q.    And are you aware of how many sites that have been

2  unblocked by the district's unblocking system since 2004?

3  A.    No.

4  Q.    And are you aware of the number of --

5        THE COURT:  Are we going to go through the evidence

6  that you're going to put on later?

7        MR. MICKES:  Well, what I'm trying to do, Your

8  Honor, is this witness, expert witness has offered lots of

9  opinions that had nothing to do with Camdenton.

10        THE COURT:  She has talked about Blacklist.  I'm not

11  going to take it for any more than what she's talked about, but

12  I will hold you to your share of the time if what you're doing

13  is giving me a prelude of what the evidence is going to be.

14        MR. MICKES:  I apologize, Your Honor.  I was just

15  trying to establish that the witness doesn't have the practical

16  knowledge.  That was it.

17        THE COURT:  About this.  I understand now.

18  BY MR. MICKES:

19  Q.    So in conclusion, Dr. Stripling, you have not examined

20  the Camdenton system to see what role, if any, URL Blacklist

21  plays in that.

22  A.    I have not examined Camdenton School District.

23  Q.    And you have not examined the means of unblocking

24  sites.

25  A.    I have stated my opinion about the stigmatizing effect

1   of having to ask for a site that you have every right to have

2   access to that information, having to ask to have that

3   unblocked.

4    Q.     But have you checked at Camdenton to see their method

5   for unblocking?

6    A.     But by its very nature, having to request that it be

7   unblocked is a stigmatizing thing for young people.

8    Q.     So what you're saying is that all sites should be

9   unblocked, then; otherwise it would be stigmatizing to ask for

10   a block to be unblocked?

11   A.     Well, I'm not going to go down that road.  I wouldn't

12   say everything.

13          MR. MICKES:  Thank you very much.

14          THE COURT:  Redirect?

15          MS. MANGER:  No, Your Honor.

16          THE COURT:  All right.  Thank you very much.  You

17   may step down.  And you may call your next witness.

18                        - - -

19                   DAVID HINKLE,

20   being first duly sworn by the courtroom deputy, testified as

21   follows:

22                        - - -

23                 DIRECT EXAMINATION

24   By Mr. Fink:

25   Q.     Would you please state your name?

1  A.      David Hinkle.

2  Q.      And Mr. Hinkle, where do you live?

3  A.      I live in Davenport, Iowa.

4  Q.      What do you do for a living?

5  A.      I'm a software developer for a company called

6  CIPAFilter.

7  Q.      How long have you been a software developer?

8  A.      I've been a software developer for 16 years.

9  Q.      What kinds of software do you develop?

10  A.      I develop filtering software, internet filtering

11  software for schools.

12  Q.      You say you work for a company called CIPAFilter; is

13  that correct?

14  A.      Yes, I do.

15  Q.      What is the formal name of the company?

16  A.      Formal name of the company is DerbyTech, Incorporated.

17  Q.      Where is CIPAFilter located?

18  A.      CIPAFilter is located in East Moline, Illinois.

19  Q.      How long have you worked for CIPAFilter?

20  A.      I've worked for CIPAFilter for over ten years.

21  Q.      Can you briefly summarize, what's the business of

22  CIPAFilter, what does it do?

23  A.      CIPAFilter is an internet filtering device.  We sell

24  these devices to schools and libraries.  The devices are used

25  to block sexually explicit content and to keep students on

1  task.

2  Q.     Were you involved in developing the CIPAFilter?

3  A.     Yes, I pitched the original idea of CIPAFilter to the

4  owner of the company.

5  Q.     Who developed the CIPAFilter?

6  A.     I did.

7  Q.     When was the CIPAFilter developed?

8  A.     CIPAFilter was developed in 1999.

9  Q.     Just to back up for the benefit of the judge, CIPA, is

10  that spelled C-I-P-A?

11  A.     Yes, it is.

12  Q.     Is it an acronym?

13  A.     Yes, it is.

14  Q.     And the name CIPA, where does that come from?

15  A.     It comes from the Child Internet Protection Act that

16  the CIPAFilter was designed to enforce.

17  Q.     Why did you develop the CIPAFilter?

18  A.     I developed the CIPAFilter because at the time the CIPA

19  law was passed, there were no secular filters on the market

20  that I was aware of.  All of the filtering devices and software

21  were designed for a niche or religious market.

22  Q.     And who are CIPAFilter's customers?

23  A.     CIPAFilter's customers are primarily K through 12

24  institutions.

25  Q.     School districts?

1   A.      Yes.

2   Q.      Where are these school districts located?

3   A.      These school districts are located all around the

4   country.

5   Q.      About how many school districts use the CIPAFilter?

6   A.      About a thousand schools.

7   Q.      Let me ask you next about how internet filtering, in

8   general how it works.  Can you explain to the judge how

9   internet filtering works?

10  A.      In general, there's two ways internet filtering is

11  performed.  The first is with a blacklist, and the second is

12  with some sort of realtime assessment.

13          Blacklist-based filtering is the idea of evaluating

14  large numbers of websites and cataloging them by category so

15  that school administrators can later determine what categories

16  to turn on and off.

17          Realtime assessment is the evaluation of internet

18  traffic as it's accessed by the students to determine whether

19  it appears to be inappropriate.

20  Q.      So there's basically two types of approaches to

21  internet filtering; is that correct?

22  A.      Yes, sir.

23  Q.      One you mentioned is realtime assessment, and that's

24  looking at websites as they're accessed to determine whether

25  they contain bad content?

1   A.      Yes, sir.

2   Q.      And the other you mentioned was blacklist; is that

3   correct?

4   A.      Yes.

5   Q.      Does the blacklist use categories of websites?

6   A.      Yes, it does.

7   Q.      And how are websites categorized in a blacklist system,

8   what's the process?

9   A.      The best process to categorize websites for a blacklist

10  is to have real humans look at the websites and determine what

11  category they should belong to according to a written policy.

12  Q.      So is it ultimately a human being who decides how to

13  categorize each particular website?

14  A.      That's the best way to do it.

15  Q.      Is that the way blacklists typically work?

16  A.      Yes.

17  Q.      And you discussed your company and your internet

18  filter, the CIPAFilter.  Are there other reputable and

19  effective internet filtering products that are available to

20  school districts?

21  A.      Yes, there are.

22  Q.      And the CIPAFilter, about how much does that cost for a

23  school district to use?

24  A.      CIPAFilter costs about $1600 for a small school

25  district to buy, and about $600 a year.

1  Q.      Are you familiar with the prices that your competitors

2  charge for their filters?

3  A.      They're competitive with us.

4  Q.      Let's talk about URL Blacklist for a little bit.  First

5  of all, are you familiar with URL Blacklist?

6  A.      Yes, I am.

7  Q.      Can you explain what URL Blacklist is?

8  A.      URL Blacklist is a group of categories that are

9  publicly available on the internet.  They can be downloaded for

10  free, and the author asks for a donation if you're planning on

11  using them consistently.

12  Q.      So is URL Blacklist, is that one of these blacklists

13  that we've been talking about?

14  A.      Yes, it is.

15  Q.      Where is URL Blacklist found?

16  A.      URL Blacklist is found at URLBlacklist.com.

17  Q.      Mr. Hinkle, I've handed you what we've marked as

18  Exhibit P5.  Can you identify what that document is?

19  A.      This document is a copy of the URLBlacklist.com

20  website.

21  Q.      And is Exhibit P5, does that contain the web pages

22  found at URLBlacklist.com?

23  A.      Yes, it does.

24          MR. FINK:  Your Honor, I move for the admission of

25  Exhibit P5.

1          THE COURT:  Any objection?

2          MR. MICKES:  No objection.

3          THE COURT:  P5 is admitted.

4        (Plaintiffs' Exhibit P5 was admitted into evidence.)

5   BY MR. FINK:

6   Q.      From these web pages in Exhibit P5, were you able to

7   determine who operates URL Blacklist?

8   A.      No, I was not.

9   Q.      Can you tell where URL Blacklist is even operated from?

10  A.      No, you cannot.

11  Q.      Is there any office location for URL Blacklist?

12  A.      No, there is not.

13  Q.      How about a phone number?

14  A.      No phone number is available.

15  Q.      Let me contrast that.  Was CIPAFilter -- I assume you

16  have a web page, CIPAFilter.com?

17  A.      Yes, we do.

18  Q.      If I go to your web page, can I find an office

19  location?

20  A.      Yes, you can.

21  Q.      Can I find a phone number where I can get ahold of you?

22  A.      Yes, absolutely.

23  Q.      Have you done any internet research to find out, figure

24  out who exactly operates URL Blacklist?

25  A.      Yes, I have.

1  Q.      What did you do?

2  A.      I accessed the internet name database through a Whois

3  search to determine who has registered URLBlacklist.com and who

4  is responsible for the domain name.

5  Q.      You mentioned Whois.  What is Whois?

6  A.      Whois is an interface to the back-end database that's

7  used to control internet domain names.  Every domain name such

8  as URLBlacklist.com has to be registered with central

9  authorities in order to be available on the internet, and the

10 Whois search gives us access to that data.

11 Q.      So Whois will tell you who the owner of a domain name

12 is?

13 A.      Yes, sir.

14 Q.      Mr. Hinkle, is Whois a reliable source to go to find

15 out, if you wanted to find out who owns a domain name?

16 A.      Yes, absolutely.  It is the only place to go to find

17 out who owns a domain name.

18 Q.      And I've handed you what we've marked as Exhibit P13.

19 Can you identify what that is for us?

20 A.      This is the Whois lookup of the domain

21 URLBlacklist.com.

22 Q.      And what did you learn about URL Blacklist from Whois?

23 A.      I learned that the URLBlacklist.com website is

24 registered to a pseudonym under the name of Dr. Guardian and

25 this person lives in the United Kingdom.

1  Q.      And is this so-called Dr. Guardian, is he or she

2  identified on page 3 of Exhibit P13?

3  A.      By his pseudonym, yes.

4  Q.      And the address given for Dr. Guardian is what?

5  A.      49 Lipizzaner Fields/Whiteley; ZIP Code, PO15 7BH;

6  city, Fareham; country, United Kingdom.

7  Q.      Did you do any research to see what kind of address

8  that is?

9  A.      Yes, I put it into Google maps and looked at the

10 resulting map.

11 Q.      What did it appear to be?

12 A.      It appeared to be a residential address.

13 Q.      Let's go back to Exhibit P5, if we could.

14         MR. FINK:  Let me step back.  Your Honor, I would

15 move for the admission of Exhibit P13.

16         MR. MICKES:  No objection.

17         THE COURT:  It's admitted.

18         (Plaintiffs' Exhibit P13 was admitted into evidence.)

19 BY MR. FINK:

20 Q.      Let's go back to Exhibit P5 if we could.  This is the

21 web pages for URLBlacklist.com.  I want to look at the home

22 page, and right at the top in the upper left-hand corner

23 there's a section that says about.  Do you see that?

24 A.      Yes, I do.

25 Q.      And right under that, does it say, quote, "This is a

1  commercial managed URL Blacklist service.  The bulk of the

2  entries are downloaded from various free sites."  Do you see

3  that?

4  A.     Yes, I do.

5  Q.     What do you understand those statements to mean?

6  A.     I understand the statement to mean that the author

7  collates various free listings for use in his product.

8          THE COURT:  Say it again.  I don't understand it.

9          THE WITNESS:  I understand it to mean that the

10  author is actually going out to other services that have

11  various listings of websites and putting them together to make

12  his listing of websites.

13  BY MR. FINK:

14  Q.     So is it your understanding that URL Blacklist compiles

15  its blacklist from other blacklists?

16  A.     That's my understanding, yes.

17  Q.     And there's reference in URL Blacklist on the home page

18  here that this blacklist is downloaded from various free sites.

19  Does the URL Blacklist site identify any of these various free

20  sites?

21  A.     It does identify one.  It identifies a site called

22  dmoz.org.

23  Q.     Dmoz.org, does that relay a blacklist?

24  A.     No, dmoz.org is not a blacklist.  It's a collection of

25  the most useful informational websites on the internet.

1 Q.    So other than dmoz.org, does URLBlacklist.com identify

2 any of the free sites from which it draws upon to get its

3 blacklist?

4 A.    No, it does not.

5 Q.    So is it fair to say that for all we know, the free

6 sites that URL Blacklist draws upon could be operated by

7 organizations opposed to gay rights?

8 A.    Yes.

9      MR. MICKES:  I'm going to object to that, Your

10 Honor, it's pure speculation.

11      THE COURT:  All right.  He answered it.  It is pure

12 speculation, and I will treat it as such.

13 BY MR. FINK:

14 Q.    It's fair to say we have no idea where URL Blacklist

15 gets its blacklist from; is that correct?

16 A.    Yes, absolutely.

17 Q.    Does URL Blacklist have categories of websites?

18 A.    Yes, it does.

19 Q.    And are those categories listed on the URLBlacklist.com

20 website?

21 A.    Yes, they are.

22 Q.    Do we see that in Exhibit P5?

23 A.    Looks like page 5 the list of categories start.

24 Q.    That's the fifth page of Exhibit P5?

25 A.    Yes.

1  Q.      Actually sixth page, isn't it, if you count them.  And

2  the title of the page where the categories, is that at the

3  bottom, it says URLBlacklist.com equals download, is that the

4  right page you're talking about?

5  A.      Yes, sir.

6  Q.      That's where the categories begin?

7  A.      Yes, sir.

8  Q.      And does it carry over to the next two pages?

9  A.      Yes, sir.

10  Q.      And so there's a listing of the categories and a

11  description of what each category is supposed to contain?

12  A.      Absolutely.

13  Q.      And in one of the categories on there, we look at the

14  third page of the categories, there's one called sexuality.  Do

15  you see that?

16  A.      Yes, I do.

17  Q.      And a description for sexuality is, quote, "Sites

18  dedicated to sexuality, possibly including adult material."  Do

19  you see that?

20  A.      Yes, I do.

21  Q.      Is it common for filtering companies to have a category

22  that, quote, possibly includes adult material?

23  A.      No, that's not common.  Generally categories either

24  include adult material or they do not.

25  Q.      In your opinion does it make sense to categorize

1  websites that contain adult material with websites that don't
2  contain adult material?

3   A.     No, that doesn't make sense.  Our customers want to
4  block sexually explicit material by allowing as much
5  informational resources as possible.  Mixing those two types of
6  material together creates a situation where you can't possibly
7  serve the customer.

8   Q.     Is it your understanding that the Camdenton School
9  District uses URL Blacklist in its internet filtering?

10  A.     Yes, that is my understanding.

11  Q.     Mr. Hinkle, I've handed you what's been marked as
12  Exhibit P21, and I want to focus first on the cover letter in
13  Exhibit P21.  Does that appear to be a letter dated June 6,
14  2011?

15  A.     Yes, it does.

16  Q.     And it appears to be from the Mickes Goldman O'Toole
17  law firm?

18  A.     Yes, it does.

19  Q.     And that's the attorneys for the defendants, correct?

20  A.     That is my understanding.

21  Q.     If we look at the second page of this letter, Exhibit
22  P21, at the top, paragraph 2, do you see where it says, quote,
23  "The district's network administrator customized and maintains
24  the district's filtering system based upon the automated
25  download service from http://URLBlacklist.com," end quote.  Do

1    you see that?

2    A.      Yes, I do.

3    Q.      What do you understand that to mean?

4    A.      I understand that to mean that the network

5    administrator has installed a piece of software on his network

6    that allows them to install the URL Blacklist blacklists into

7    their network and use that to do filtering.

8    Q.      And how does a school district use URL Blacklist if it

9    so chooses?

10   A.      URL Blacklist is just a blacklist, basically a

11   categorization of websites.  So in addition to the blacklist,

12   you need software to implement the blacklist and some sort of

13   server service.  The most common software to use is SquidGuard

14   or DansGuardian.  The software is installed and inside a proxy

15   server called squid and allows administrators to turn various

16   categories on and off as you control the flow of information on

17   the network.

18   Q.      Let's talk a little bit more about the sexuality

19   category in URL Blacklist.  Have you seen a download of the

20   websites that are categorized as, quote, sexuality in URL

21   Blacklist?

22   A.      Yes, I have.

23   Q.      In fact, is that listing included in Exhibit P21?

24   A.      I believe so.

25          MR. FINK:  Your Honor, I would offer into evidence

1  Exhibit P21.

2          MR. MICKES:  No objection.

3          THE COURT:  It's admitted.

4          (Plaintiffs' Exhibit P21 was admitted into evidence.)

5  BY MR. FINK:

6  Q.      Now, have you seen in the Amended Complaint how the

7  plaintiffs have listed approximately 41 websites that are

8  supportive of LGBT people, lesbians, gays, bisexuals, and

9  transgender?  Have you seen the listing?

10  A.      Yes, I have.

11  Q.      Have you checked to see whether those 41 websites that

12  are supportive of LGBT people are included in the sexuality

13  category and URL Blacklist?

14  A.      Yes, I have.

15  Q.      And what did you discover?

16  A.      I discovered that all 41 of those websites are included

17  in the sexuality category of URL Blacklist.

18  Q.      So if the school district blocks any websites that are

19  categorized as sexuality by URL Blacklist, is it fair to say

20  that those 41 websites would not be accessible at the school

21  district unless they are specifically removed by the network

22  administrator?

23  A.      Yes, that's absolutely true.

24  Q.      Did you check whether CIPAFilter, your product, blocks

25  any of these 41 websites that are supportive of LGBT people?

1    A.      Yes, I did.

2    Q.      And what did you discover?

3    A.      CIPAFilter does not block any of these websites.

4    Q.      And did you check how some of your competitors

5    categorize these 41 websites?

6    A.      Yes, I did.  I checked competitors M86, Lightspeed,

7    Netsweeper, and Blue Coat, and none of these competitors block

8    any of the websites in the list of 41 pro-LGBT websites.

9    Q.      Mr. Hinkle, I've handed you what we've marked as

10   Exhibit P51.  Can you identify what that is for us?

11   A.      Yes, sir.  It's my evaluation of the 41 pro-LGBT

12   websites.

13   Q.      And these are the 41 sites listed in paragraph 47 of

14   the Amended Complaint?

15   A.      Yes, sir, I believe so.

16   Q.      And the first column, that's how URL Blacklist

17   categorizes each of these sites?

18   A.      Yes, sir.

19   Q.      And how does URL Blacklist categorize each one?

20   A.      URL Blacklist categorizes all of these websites as

21   sexuality.

22   Q.      And then the next three internet filters that you have

23   on this chart are Lightspeed, Blue Coat, and M86; is that

24   correct?

25   A.      Yes, sir.

1  Q.      You mentioned that you also looked at Netsweeper.  Is

2  there a problem in looking at Netsweeper?

3  A.      We had some problems using Netsweeper's publicly

4  available data.

5  Q.      What was the problem with using Netsweeper.

6  A.      When we would put the websites into Netsweeper

7  sometimes it would change the results that are reported back.

8  That was not the case with these 41 websites, however.  These

9  41 websites were never blocked by Netsweeper.

10  Q.      And so looking at the other internet filters on Exhibit

11  51 -- Lightspeed, Blue Coat, and M86 -- do any of these

12  categorize any of the 41 supportive sites as, quote, sexuality?

13  A.      No, they do not.

14  Q.      Do any of them categorize them as adult sites?

15  A.      No, they do not.

16  Q.      Let's look at Lightspeed.  The first website there that

17  we've had to look at was affirmation.org, and Lightspeed

18  classified that as, quote, G, family, religion.  Do you know

19  what G means?

20  A.      Lightspeed uses a rating system like movies, so G means

21  for general audiences.

22  Q.      So the Lightspeed internet filter categorized

23  affirmation.org and gave it a rating of G?

24  A.      Yes, sir.

25  Q.      Just like a G movie.

1  A.      Yes, sir.

2  Q.      And it also gave a G rating to several of the other

3  websites; is that correct?

4  A.      Yes, sir.

5  Q.      And there are a few, to be fair, where it gave a PG

6  rating.  Is that similar to a PG rating of a movie?

7  A.      Yes, sir.

8  Q.      Does Lightspeed also use ratings like R and X?

9  A.      Yes, it does.

10 Q.      And did it give an R or X to any of these 41 supportive

11 websites?

12 A.      No, it does not.

13         MR. FINK:  Your Honor, I offer into evidence Exhibit

14 P51.

15         MR. MICKES:  No objection.

16         THE COURT:  It's admitted.

17     (Plaintiffs' Exhibit P51 was admitted into evidence.)

18 BY MR. FINK:

19 Q.      And you're also familiar in the Complaint that there

20 have been listed a number of websites that are considered anti

21 or nonsupportive of LGBT people, have you seen those?

22 A.      Yes, I have.

23 Q.      Those lists.  And do you see how URL Blacklist

24 generally categorizes those websites?

25 A.      Yes, I did.

1    Q.      Can you tell us how?

2    A.      Generally categorizes those websites as religion.

3    Q.      Do they categorize any of those as sexuality?

4    A.      No, sir, it did not.

5    Q.      Let's go back to Exhibit 5.  P5, I'm sorry.  This was

6    the URLBlacklist.com website, and I would like to direct your

7    attention to the frequently asked questions section, which is,

8    starts on the fourth page of the exhibit.

9            I'd like to look at question No. 9.  Can you see

10   there that the frequently asked question is, quote, "What steps

11   do you take to discover new sites?"  Do you see that?

12   A.      Yes, sir, I do.

13   Q.      And then within the answer, do you see there's a

14   reference to dmoz.org?

15   A.      Yes, sir, I do.

16   Q.      And is that, that dmoz.org, is that what you were

17   talking about earlier?

18   A.      Yes, sir, it was.

19   Q.      Can you explain to the judge what exactly DMOZ is?

20   A.      Dmoz.org is a public internet infrastructure project

21   that started in 1999.  It was organized by Netscape at that

22   time, which was one of the biggest internet browsers.

23           It's basically a well-organized volunteer effort to

24   locate the best and most useful internet resources as far as

25   websites go.  This is a very highly respected piece of

1  infrastructure in the internet community, even though it's not

2  known very well outside of the field.  But all of the major

3  search engines use dmoz.org in order to assist in their search

4  compilations.  It's generally regarded as a very high quality

5  source of information.

6  Q.    Is DMOZ, is that a catalog of websites?

7  A.    Yes, sir, it is.

8  Q.    Who categorizes the websites at dmoz.org?

9  A.    Various volunteers categorize the websites according to

10  written policies.

11  Q.    Does DMOZ have criteria for selecting sites to include

12  in dmoz.org?

13  A.    Yes, sir.

14  Q.    Mr. Hinkle, I've handed you what's been marked as

15  Exhibit P50.  Can you identify what that is for us?

16  A.    Yes, sir.  This is the, DMOZ's written site selection

17  criteria.

18  Q.    And then on the first page, there's a section that says

19  sites to include.  Do you see that?

20  A.    Yes, sir.

21  Q.    And right there in the first paragraph it says, quote,

22  "The ODP's goal" -- and can you tell us what ODP is?

23  A.    The open directory project.  It's a nickname for DMOZ.

24  Q.    It says, quote, "The ODP's goal is twofold:  To create

25  the most comprehensive and definitive directory of the web, and

1  to create a high quality, content-rich resource that the

2  general public considers useful and indispensable.  In short,

3  editors should select quality sites and lots of them."  Is that

4  what it says?

5  A.    Yes, sir, it is.

6  Q.    Is that consistent with your understanding of how DMOZ

7  operates?

8  A.    Yes, sir, it is.

9        MR. FINK:  Your Honor, I offer into evidence Exhibit

10 P50.

11       MR. MICKES:  No objection.

12       THE COURT:  It's admitted.

13      (Plaintiffs' Exhibit P50 was admitted into evidence.)

14 BY MR. FINK:

15 Q.    I think you may have mentioned before, but just to be

16 clear, is DMOZ intended to be used to clarify which websites

17 should be blocked or not blocked?

18 A.    Absolutely not.

19 Q.    Now, DMOZ has several different categories of websites;

20 is that correct?

21 A.    Yes, sir.

22 Q.    Mr. Hinkle, I've handed you what's been marked as

23 Exhibit P47.  Can you identify what that is for us?

24 A.    Yes, sir, it's a copy of DMOZ's top-level categories.

25 Q.    So this shows the top-level categories at DMOZ?

1   A.      Yes, sir.

2   Q.      And then you can click on these categories and you go

3   into what, subcategories?

4   A.      Yes, sir.

5           MR. FINK:  Your Honor, I would offer into evidence

6   Exhibit P47.

7           MR. MICKES:  No objection.

8           THE COURT:  It's admitted.

9           (Plaintiffs' Exhibit P47 was admitted into evidence.)

10  BY MR. FINK:

11  Q.      In the top-level categories at DMOZ as shown in P47 is

12  something called society; is that correct?

13  A.      Yes, sir.

14  Q.      So I take it if you click on society, it will take you

15  down to the subcategories within the category society?

16  A.      Yes, sir.

17  Q.      Mr. Hinkle, I've handed you what's been marked as

18  Exhibit P48.  Can you identify what that is for us?

19  A.      Yes, sir.  It's a listing of the subcategories within

20  society.

21  Q.      Okay.  So then within the category society, we see one

22  of the categories is sexuality.  Is that correct?

23  A.      Yes, sir.

24  Q.      And that's shown in the right column?

25  A.      Yes, sir.

1    Q.      And then in the category society, there's a separate

2    category called gay, lesbian, and bisexual; do you see that?

3    A.      Yes, sir.

4    Q.      So DMOZ, does it lump gay, lesbian, and bisexual, that

5    subcategory, with the sexuality category?

6    A.      No, sir, it does not.

7                MR. FINK:  Your Honor, I offer Exhibit P48.

8                MR. MICKES:  No objection.

9                THE COURT:  It's admitted.

10               (Plaintiffs' Exhibit P48 was admitted into evidence.)

11   BY MR. FINK:

12   Q.      And I take it on Exhibit P48 if you click on the gay

13   and lesbian and bisexual link, that will take you to further

14   subcategories of that subcategory?

15   A.      Yes, sir.

16   Q.      Mr. Hinkle, I've handed you what we've marked as

17   Exhibit P49.  Can you identify what that is for us?

18   A.      Yes, sir.  This is the subcategories within the gay and

19   lesbian and bisexual subcategory.

20   Q.      And so some of these subcategories for the gay,

21   lesbian, and bisexual category include, history is one of them?

22   A.      Yes, sir.

23   Q.      Is one of them law?

24   A.      Yes, sir.

25   Q.      News and media?

1   A.      Yes, sir.

2   Q.      One on politics?

3   A.      Yes, sir.

4   Q.      One on religion and spirituality?

5   A.      Yes, sir.

6           MR. FINK:  Your Honor, I offer into evidence Exhibit

7   P49.

8           MR. MICKES:  No objection.

9           THE COURT:  It's admitted.

10          (Plaintiffs' Exhibit P49 was admitted into evidence.)

11  BY MR. FINK:

12  Q.      Now, earlier we talked about the two subcategories of

13  the society category in DMOZ.org, the gay, lesbian and bisexual

14  subcategory, and the sexuality category.  Did you download the

15  listing of websites in those two subcategories and compare that

16  to the sexuality category of the URL Blacklist?

17  A.      Yes, sir, I did.

18  Q.      Mr. Hinkle, I've handed you what's been marked as

19  Exhibit P54.  Can you identify what that is for us?

20  A.      Yes, sir.  It's the results of my comparison of the

21  society gay and lesbian and bisexual categories in DMOZ, the

22  society sexuality category in DMOZ --

23          COURT REPORTER:  I'm sorry, would you please slow

24  down?

25  A.      I'm sorry.  It's the results of my comparing these two

categories within DMOZ.  The two categories are "Society:  Gay,
lesbian, and bisexual," and the second category is "Society:
Sexuality," with the URL Blacklist sexuality category.

Q.      So it looks like the top of Exhibit P54 you compared
the websites in dmoz.org "Society:  Gay, lesbian, and
bisexual," that category, with the websites included in the
sexuality category of URL Blacklist; is that correct?

A.      Yes, sir, I did.

Q.      Tell me what you found.

A.      I found that all but 18 of the websites were included
in the URL Blacklist sexuality category.

Q.      So over 99 percent of the sites in dmoz.org "Society:
Gay, lesbian, and bisexual" were included in the sexuality
category of URL Blacklist.

A.      Yes, sir.

Q.      And then the second table here in Exhibit P54, this
shows your comparison of the websites in dmoz.org "Society:
Sexuality," that subcategory, with the sexuality category on
URL Blacklist; is that correct?

A.      Yes, sir.

Q.      Can you tell us what you found there?

A.      I found that all but one of the websites was included
in URL Blacklist's sexuality category.

Q.      So 99.8 percent were included.

A.      Yes, sir.

1          MR. FINK:  Your Honor, I offer into evidence Exhibit
2     P54.
3          MR. MICKES:  No objection.
4          THE COURT:  I don't understand it.
5          MR. FINK:  I'll try to help you.
6          THE COURT:  So let's try that again.
7     BY MR. FINK:
8     Q.     So just to back up, you talked earlier about there's a
9     category --
10         THE COURT:  I understood the first one.  I don't
11    understand the second one.
12         MR. FINK:  The second one.  Okay.
13    BY MR. FINK:
14    Q.     Within dmoz.org, the society category, there's a
15    subcategory specifically called sexuality; is that right?
16    A.     Yes, sir.
17    Q.     And you took the websites from that subcategory in
18    dmoz.org.
19    A.     Uh-huh.
20    Q.     Is that correct?
21    A.     Yes, sir.
22    Q.     And according to your chart, that number is 410
23    websites; is that right?
24    A.     Yes, sir.
25    Q.     And then did you take those 410 websites and see which

1    of those are also included in the sexuality category in URL

2    Blacklist?

3    A.    Yes, sir, I did.  99 percent of those websites are

4    included in URL Blacklist's sexuality category.

5    Q.    So is it fair to say that the vast majority of the

6    websites in both the DMOZ gay, lesbian, and bisexual category

7    and the DMOZ sexuality category, that almost all of them are

8    included in the sexuality category of URL Blacklist?

9    A.    Yes, sir, which leads me to draw the conclusion that

10   this is where URL Blacklist is obtaining its data.

11   Q.    And we talked about the sexuality category in URL

12   Blacklist.  Did you do anything to check to see whether it's

13   even effective at blocking sexually explicit sites?

14   A.    Yes, I did, sir.

15   Q.    And tell me what you did to go about that.

16   A.    I did Google searches and identified 500 obviously

17   sexually explicit websites, which we then analyzed with URL

18   Blacklist and CIPAFilter.

19   Q.    I want to step back.  So you took the sexuality

20   blacklist, right?

21   A.    Uh-huh.

22   Q.    Or did you take the entire URL Blacklist to do this?

23   A.    I did both tests.

24   Q.    Okay.  Let's step back because I think we were confused

25   there for a second.

1    The sexuality listing in URL Blacklist, that's a

2  list of thousands of websites; is that correct?

3  A.    Yes, sir.

4  Q.    And did you check those to see whether they, in fact,

5  contained sexually explicit content?

6  A.    Oh.  Yes, sir.

7  Q.    And what did you find?

8  A.    I found that the sexuality category contains only a

9  very small amount of sexually explicit content.

10 Q.    And how did you go about doing that analysis?

11 A.    I loaded the sexuality blacklist into CIPAFilter and

12 had it analyze all the websites in the list to see which ones

13 were sexually explicit.  I also had a human perform a spot

14 check of a 300 website sample from the list -- 500 website

15 sample from the list, excuse me.  Three hundred.

16 Q.    Okay.  Mr. Hinkle, I've handed you what's marked as

17 Exhibit P52.  Can you identify what that is for us?

18 A.    This is the results of my analysis.

19 Q.    Okay.  And then in the first row there's something

20 called CIPAFilter automated analysis.  Is this where you took

21 the websites included in the sexuality category of URL

22 Blacklist and ran that against the CIPAFilter --

23 A.    Yes, sir.

24 Q.    -- to see whether CIPAFilter would block those

25 websites?

1  A.      Yes, sir.

2  Q.      And what was the outcome of that testing?

3  A.      The outcome of that testing was that CIPAFilter

4  identified 2.4 percent of the websites on the sexuality

5  blacklist as sexually explicit.

6  Q.      So CIPAFilter only blocked 2.4 percent of those sites

7  as sexually explicit?

8  A.      Yes, sir.

9  Q.      And then you mentioned you also had a human look at a

10 sampling of these sexually explicit sites.  What was done

11 within that check?

12 A.      Chris Cooper, a fellow engineer, he analyzed a sample

13 of 300 websites selected from the list to determine which ones

14 were sexually explicit, and he found that 7 percent in his

15 opinion were sexually explicit.

16         MR. MICKES:  I'm going to object.  I'm going to

17 object to that as hearsay.

18 BY MR. FINK:

19 Q.      Did Mr. Cooper --

20         THE COURT:  Any objection?  I mean, any response to

21 that?  Sounds like hearsay to me.

22         MR. FINK:  He's testifying as an expert here today

23 and this was done under his direction.  He had a subordinate do

24 this testing.  He was doing a wide variety of testing to

25 prepare for his testimony today.

1          MR. MICKES:  He's testifying as an expert, but he's

2   testifying as an expert what somebody else did and what

3   somebody else told him.  That's hearsay.  I have no way to

4   challenge, I have no way to question this other engineer that

5   he supposedly spoke to.

6          MR. FINK:  Can I introduce foundation, Your Honor?

7          THE COURT:  Yes.

8   BY MR. FINK:

9   Q.     Mr. Hinkle, in the scope of your work, did Mr. Cooper

10  assist you in performing the tasks that you did?

11  A.     Yes, sir.

12  Q.     And in doing this spot check, did you give him

13  direction on what to do?

14  A.     Yes, sir, I gave him explicit instructions.

15  Q.     What did you tell Mr. Cooper to do?

16  A.     I told Mr. Cooper to take an Excel spreadsheet, to load

17  the contents of URL Blacklist into that spreadsheet, the

18  sexuality category.  I told him to generate a randomized column

19  which would allow him to randomly assign a number to every

20  website on the list, and then to sort that spreadsheet and

21  analyze the first 300 results, which would result in analysis

22  of 300 randomly selected samples from the list.

23          I asked him to, in his opinion, evaluate the

24  websites based on whether or not they contained pornographic

25  content and report the results by marking each website as

1   pornographic or nonpornographic.

2          MR. MICKES:  The questions are elucidative, but they

3   don't solve the problem.  He still asked him for his -- said he

4   gave me his opinion.  I told him to do it, but he did it and he

5   gave me his opinion.  That's clearly hearsay.

6          MR. FINK:  He's an expert relying on the work of a

7   subordinate.

8          THE COURT:  Cite me to a rule that talks about that

9   because that's what I was looking for.  I know they can rely on

10  hearsay, but I can't find the rule at this moment that tells me

11  what permits that, and whether this falls within the rule.

12  Here it is.

13         MR. MICKES:  It's kind of hearsay on hearsay because

14  we have his assistant making a decision about what is or what

15  is not pornographic.  We don't know what that is.  He's not

16  here to define that for us.  I can't question him about that.

17  It puts the defendants at a severe disadvantage.

18         THE COURT:  Thank you.  Tell me what his opinion is

19  that is based on these facts.

20   BY MR. FINK:

21   Q.    Mr. Hinkle --

22         MR. FINK:  May I ask the witness for his opinion, or

23  do you want me to tell you?

24         THE COURT:  No, I --

25         MR. FINK:  I think it had better come from the

1  witness.

2   BY MR. FINK:

3   Q.     Mr. Hinkle, what is your opinion based on what

4  Mr. Cooper did in doing his analysis of these 300 websites and

5  finding that 7 percent contained sexually explicit content?

6   A.     My opinion is that URL Blacklist contains between 2.4

7  percent and 7 percent sexually explicit content.

8          MR. FINK:  Your Honor, I see you're troubled by it.

9  I'll withdraw that part of this chart, if that's okay.

10         THE COURT:  It doesn't fit in a normal exception to

11 hearsay.  I suspect it makes no difference, but I will sustain

12 the objection out of an abundance of caution.

13         MR. FINK:  With that, if we could offer -- I would

14 offer Exhibit P52 into evidence with the understanding that the

15 section on human analysis of random samples is excluded.  I

16 would offer just the first row of data on Exhibit P52.

17         THE COURT:  Oh.  You're talking about the filter.

18         MR. FINK:  Yes.

19         THE COURT:  Any objection?

20         MR. MICKES:  No objection.

21         THE COURT:  It's admitted.

22      (Plaintiffs' Exhibit P52 was admitted into evidence.)

23         THE COURT:  As modified.

24  BY MR. FINK:

25  Q.     Now, let's shift subjects, Mr. Hinkle.  And just now we

1    were talking about the sexuality category and whether that

2    really contains sexually explicit content in URL Blacklist.

3              Now I want to talk about the overall URL Blacklist

4    and how effective it is in blocking pornography.  Have you

5    tested the effectiveness of URL Blacklist in blocking sexually

6    explicit websites?

7    A.      Yes, sir, I have.

8    Q.      Can you tell us what you did?

9    A.      I identified a selection of 500 sexually explicit

10   websites that were obviously sexually explicit, and then I

11   analyzed these 500 websites in URL Blacklist to determine its

12   effectiveness.

13   Q.      And did you also run this 500 sexually explicit

14   websites through the CIPAFilter for comparison purposes?

15   A.      Yes, sir, I did.

16   Q.      Mr. Hinkle, can you identify for us what Exhibit P53

17   is?

18   A.      Yes, sir.  It's the results of that analysis.

19   Q.      In Exhibit P53, does that contain a listing of the 500,

20   502 sexually explicit websites that were analyzed?

21   A.      Yes, sir, it does.

22   Q.      And then the, to the right of that, the next column,

23   does that indicate whether or not each of those websites was

24   blocked by URL Blacklist?

25   A.      Yes, sir, it does.

1  Q.      And then the column over from that, does it indicate
2  whether each website is blocked by the CIPAFilter?
3  A.      Yes, sir, it does.
4  Q.      And if it says yes in those columns, that means that
5  those filters blocked that particular website, correct?
6  A.      Yes, sir, it does.
7  Q.      And if it says no and highlighted in red, does that
8  mean that those websites were not blocked by the filters?
9  A.      Yes, sir, it does.
10 Q.      Let's go to the last page of Exhibit P53 where we have
11 summary numbers.  Can you tell us how URL Blacklist did in
12 blocking sexually explicit websites?
13 A.      URL Blacklist failed to block over 30 percent of the
14 websites we tested.
15 Q.      How did CIPAFilter do?
16 A.      CIPAFilter only failed to block 3.2 percent of the
17 websites tested.
18              MR. FINK:  Your Honor, I would offer into evidence
19 Exhibit P53.
20              MR. MICKES:  No objection.
21              THE COURT:  P53 is admitted.
22          (Plaintiffs' Exhibit P53 was admitted into evidence.)
23 BY MR. FINK:
24 Q.      Now, Mr. Hinkle, does the school district have to use
25 URL Blacklist to prevent its students from accessing sexually

1  explicit content on the internet?

2  A.    No, sir, it does not.

3  Q.    It could use a product like CIPAFilter.

4  A.    Yes, sir, it could.

5  Q.    And there's many other products it could use.

6  A.    Yes, sir, absolutely.

7  Q.    And does the school district have to block websites

8  that are supportive of lesbian, gay, bisexual and transgender

9  individuals in order to prevent its students from accessing

10 sexually explicit content on the internet?

11 A.    No, sir, it does not.

12        MR. FINK:  That's all the questions I have, Your

13 Honor.

14        THE COURT:  And for the defendant?

15                    - - -

16              CROSS-EXAMINATION

17 By Mr. Mickes:

18 Q.    Mr. Hinkle.

19 A.    Good morning, sir.

20 Q.    Good morning.  A couple of preliminary questions.  CIPA

21 is the acronym for your company.

22 A.    It's the acronym for the Child Internet Protection Act

23 for which our company was named.

24 Q.    That answers my question, thank you.  And it stands

25 for --

1   A.      The Child Internet Protection Act.

2   Q.      And that is a federal act?

3   A.      Yes, sir.

4   Q.      And what does that federal act require school districts

5   to block?

6   A.      The federal act requires school districts to make an

7   attempt to block sexually explicit pornography, especially

8   child pornography.

9   Q.      Obscenity?

10  A.      Yes, sir.  I'm not aware if that act requires

11  explicitly blocking obscenity, sir.

12          MR. MICKES:  May I approach the witness, Your Honor?

13          THE COURT:  You may.

14  BY MR. MICKES:

15  Q.      Mr. Hinkle, I want to give you a copy of the Act, and

16  I'm directing your attention to page 4 of the lists of material

17  that are required to be blocked by the Child Internet

18  Protection Act.  Do you see the reference?

19  A.      Yes, sir, I do.

20  Q.      Could you share with us what three categories are

21  required to be blocked?

22  A.      The categories are obscene, child pornography, or

23  harmful to minors.

24  Q.      Harmful to minors does not exactly give you clear

25  guidance as to what that is in your opinion, does it?

1   A.      No, sir.

2   Q.      Now, I take it from your testimony that you think your

3   product is better than URL Blacklist.

4   A.      Yes, sir.

5   Q.      And you sell that product in competition with URL

6   Blacklist.

7   A.      Yes, sir.

8   Q.      Okay.  And have you testified in hearings like this

9   about URL Blacklist?

10  A.      No, sir, this is my first.

11  Q.      Okay.  Have you given any presentations advancing your

12  product, CIPA, versus URL Blacklist?

13  A.      No, sir.  URL Blacklist is not generally a competitor

14  we target.  It doesn't have a big enough share of the market to

15  be of interest to us.

16  Q.      Okay.  And you invented the CIPA system.

17  A.      CIPAFilter, yes, sir, I did.

18  Q.      And you are the owner of the company that distributes

19  that?

20  A.      No, sir, I'm just an employee.

21  Q.      Okay.  Did you sell your product to that company?

22  A.      No, sir, I did not.

23  Q.      Gave it to them?

24  A.      No, sir.  I was just an employee of the company.  I

25  pitched the idea to the owner, who chose to hire me to

1  implement the product.  But I don't have any ownership stake,

2  I'm simply an employee of the company.

3  Q.      What's your salary at that company?

4  A.      My salary at that company is between $100,000 and

5  $170,000 per year, depending on the success of the company in

6  any given year.

7  Q.      It depends on how much of the CIPA product you sell,

8  the CIPAFilter.

9  A.      Generally not directly connected, sir.  I get bonuses

10  based upon my performance as a programmer.  Since I'm not a

11  salesperson, generally it's just based upon how management

12  feels about my performance in any particular quarter.

13  Q.      When I listened to your testimony, much of what I heard

14  was comparing URL Blacklist to CIPA or other screening

15  products.  Is that an accurate statement?

16  A.      Yes, sir.

17  Q.      Have you taken the opportunity to determine what

18  filtering system the Camdenton School District uses?

19  A.      My understanding is that they use SquidGuard or

20  DansGuardian.

21  Q.      And what is your understanding based on?

22  A.      My understanding is based on the information I've been

23  presented with in accordance of these proceedings.

24  Q.      And who presented you with that information?

25  A.      The ACLU.

1  Q.    Okay.  So your information about what happens at

2  Camdenton is based on what the ACLU told you happened there.

3  A.    Yes, sir.  And the review of Camdenton's letters.

4  Q.    So you've never been to Camdenton.

5  A.    No, sir, I have not.

6  Q.    And you've never looked at the filtering system

7  directly that Camdenton uses.

8  A.    No, sir, I have not.

9  Q.    So your testimony, if it is accurate, depends upon the

10  accuracy of the information given to you by the ACLU.

11  A.    No, sir.  The information, specifically my analyses of

12  URL Blacklist are dependent on the letter that Camdenton sent

13  to the ACLU where they told us that they use URL Blacklist for

14  their filter.

15  Q.    Did they tell you that there is a, they developed their

16  own -- I'm not a technological person so I'll butcher the

17  word -- their own appliance or their own structure that they

18  use to screen?

19  A.    That's how URL Blacklist is used.  Since URL Blacklist

20  is not software, it's just a blacklist, it must be installed on

21  a piece of software such as DansGuardian or SquidGuard.

22  Q.    Did they tell you, did you learn, or do you know now

23  that they have a customized product that is attached to URL

24  Blacklist?

25  A.    I'm not aware of how they may have customized URL

1  Blacklist.

2  Q.      Okay.  So you're -- that whole list of statistics that

3  you gave with respect to what URL Blacklist and what CIPA or

4  others is based on if they were using purely URL Blacklist; is

5  that correct?

6  A.      As they indicated in their letters.

7  Q.      All right.  Now, what is your understanding of the

8  customized work that was done on the filtering devices at

9  Camdenton School District?

10  A.      I'm not aware of any customization of the filtering

11  devices at the Camdenton School District other than the ability

12  to selectively whitelist specific websites that are requested

13  by students.

14  Q.      When you say to specifically whitelist, so we're

15  talking about the same things, you're talking about a student's

16  ability to unblock a website?

17  A.      I'm talking about the student's ability to request a

18  website be unblocked.

19  Q.      So you're aware that students at Camdenton School

20  District, irrespective of the filtering system, have the

21  ability to unblock specific websites?

22  A.      I'm aware that they have the ability to request that a

23  website be unblocked.

24  Q.      Yes.  And do you know how many websites, how many

25  requests that they had to unblock websites over the past five

1  or six years?

2  A.     No, sir, I'm not aware of how many websites they had to

3  unblock.

4  Q.     And are you aware of how many of those websites were

5  unblocked?

6  A.     No, sir, I'm not aware.

7  Q.     And for every district that your company sells the CIPA

8  filtering system, your company earns a fee.

9  A.     Yes, sir.

10 Q.     And you're telling the court that the fee that's spent

11 for CIPA is better spent than it is for URL Blacklist or one of

12 your competitors?

13 A.     No, sir.

14 Q.     You're not, you're not saying that the money spent on

15 CIPA is better than the money spent on URL Blacklist?

16 A.     My personal opinion is the CIPAFilter is a great

17 product, but that's not what I'm here to testify about here

18 today, sir.

19 Q.     That's not my question.  My question is do you think

20 that your product, CIPA, is a better product than URL

21 Blacklist?

22 A.     Yes, sir, I think that CIPAFilter is a better product

23 than URL Blacklist.

24 Q.     Okay.  Now, you're familiar with how many schools -- I

25 think you said a thousand schools use the CIPA software

1  filtering system?

2  A.      I misspoke.  It's actually a thousand school districts,

3  sir.

4  Q.      Yeah.  I may have misspoke but I thought that's what I

5  said.  I apologize?  Are you aware because you've done all of

6  this research, are you aware of how many school districts use

7  the URL Blacklist?

8  A.      No, sir, I'm not aware.

9  Q.      Okay.  And you're not aware of how many use URL

10 Blacklist that's been customized.

11 A.      No, sir, I'm not aware.

12 Q.      Okay.  And your educational background to be a software

13 developer is what?

14 A.      My background as a software developer, I'm completely

15 self-taught, sir.  I wrote my first commercial program --

16              COURT REPORTER:  I'm sorry.  Could you please slow

17 down?

18 A.      My apologies, ma'am.  I wrote my first commercial

19 software package when I was 16.  I went into the industry

20 full-time right after high school, and I've been working in the

21 industry since.

22 Q.      So you're self-taught.

23 A.      Yes, sir.

24 Q.      Congratulations.  I want to talk to you a little bit

25 about what actually, what actually happens at Camdenton School

1   District.  I believe you testified that you weren't aware that

2   there was a customized filtering system at Camdenton.

3   A.      I'm aware that they have created provisions to allow

4   students to request that websites be unblocked.

5   Q.      Okay.  Are you aware that there's a system on top of

6   URL that prevents things from going into URL?

7   A.      A blacklist?  No, sir, I'm not aware of that.

8   Q.      Okay.  So your testimony this morning would be based on

9   the information that the ACLU has given you.

10  A.      Based on the information provided to them by Camdenton.

11  Q.      Okay.  And are you aware of how many -- I'm going to

12  get this wrong, and I apologize.  Is the correct acronym LGBT?

13  A.      Yes, sir, LGBT.

14  Q.      Okay.  Are you aware of how many LGBT sites have been,

15  are open for students at the Camdenton School District?

16  A.      No, sir, I am not.

17  Q.      So it could be one, it could be five thousand?

18  A.      Yes, sir.

19  Q.      And are you aware of the manner that a student would

20  utilize in order to unblock a site that had been blocked,

21  whether it's LGBT or whether it's St. Louis Cardinals baseball?

22  A.      No, sir, I'm not aware of the procedure for a student

23  to request that a website be unblocked at Camdenton.

24  Q.      And so you're not aware that there's a pop-up on the

25  screen?

1   A.      No, sir.

2   Q.      And you're not aware that there's a process that you

3   can directly appeal to the superintendent?

4   A.      No, sir, I'm not aware.

5   Q.      And you're not aware of the 24-hour turnaround time to

6   consider and unblock a site?

7   A.      No, sir.

8   Q.      I believe there was some testimony that you gave that

9   there were some websites on the LGBT black site, URL black site

10  that was not supportive of LGBT?

11  A.      I'm sorry, sir.  I am aware that there are some

12  pro-LGBT websites on URL Blacklist's sexuality category, and

13  I'm aware that there are some anti-LGBT websites on URL

14  Blacklist's religious category.

15  Q.      But you're not aware of which, if any, of those sites

16  are available at Camdenton High School.

17  A.      No, sir.

18  Q.      You also testified that one of the categories on URL

19  Blacklist is sexuality, and you testified, I believe, about the

20  number of -- based on your study, the number of sexually

21  inappropriate sites that were on there?

22  A.      Yes, sir.

23  Q.      Okay.  Again, because you're not familiar with the

24  Camdenton system, you don't know how many of those systems are

25  open in Camdenton.

1  A.      No, sir.  I do not, would not expect them to whitelist

2  sexually explicit websites.

3          MR. MICKES:  I have no more questions, Your Honor,

4  thank you.  Thank you, Mr. Hinkle.

5          THE WITNESS:  Have a great day, sir.

6          MR. FINK:  Nothing further, Your Honor.

7          THE COURT:  Okay.  Thank you.  You may step down.

8  Any further witnesses for the plaintiff?

9          MR. BLOCK:  Yes, Your Honor, we'd like to call

10  Mr. Hadfield as a witness.

11                          - - -

12                      TIMOTHY HADFIELD,

13  being first duly sworn by the courtroom deputy, testified as

14  follows:

15                          - - -

16                      DIRECT EXAMINATION

17  By Mr. Block:

18  Q.      Good morning, Mr. Hadfield.

19  A.      Good morning.

20  Q.      I'm showing you what's marked Exhibit P14.  Do you

21  recognize this exhibit?

22  A.      I do.

23  Q.      Can you tell us what it is?

24  A.      It was an affidavit in relation to this suit.

25  Q.      And if you turn to, I guess, the fourth page of the

1  exhibit, this is an exhibit to your affidavit; is that correct?

2  A.      Yes.

3  Q.      And as I understand it, these are the minutes of the

4  board meeting at Camdenton on August 30th; is that correct?

5  A.      Yes.

6  Q.      And is this the board meeting where the school district

7  adopted their current unblocking policies?

8  A.      At this meeting, the Board of Education revised policy

9  and administrative procedure.

10  Q.      And you attended this meeting; is that right?

11  A.      Yes.

12  Q.      Okay.  It says down on Roman Numeral IV, it says,

13  "Thirteen district patrons spoke during the public comment

14  section regarding the district's internet usage policies,

15  regulations, and procedures."  Is that your understanding of

16  what occurred that night?

17  A.      That would be my understanding, yes.

18  Q.      And how many of those district patrons supported

19  keeping the current filter in place?

20  A.      Well, we didn't take a poll, but it would be my

21  understanding that that evening that those 13 persons that

22  spoke were supportive of the school district's stance.

23  Q.      And what reasons did they give?

24  A.      Reasons would have been that we support our school

25  district.

1    Q.      Any other reasons?

2    A.      Granted, this has been a little time ago, but vaguely

3    that's what I remember.

4    Q.      Did anyone say that they didn't want their kids to have

5    access to content about homosexuality?

6    A.      I do not recall that specific comment, no.

7    Q.      Do you recall parents demanding that they be given

8    parental notification if a student requests access to one of

9    these sites?

10   A.      I do recall that, yes.

11   Q.      And what did you say in response?

12   A.      The response was that we do have certain federal

13   mandates that we must follow, and we will not discriminate

14   against our students, but at the same time we would protect our

15   students.

16   Q.      But what was your response to the actual question about

17   whether they can be given notification if a student requests

18   that the site be unblocked?

19   A.      That -- at that board meeting we did not have legal

20   counsel, so my response was that that would be something that

21   we would have to look into, but it was my understanding that

22   prior parental consent was not needed.

23   Q.      I'm showing you what's been marked Exhibit P30.  Is

24   that your picture on the cover of this page?

25   A.      Not a very flattering one, but, yes, it is.

1   Q.      And at the top of the page it has the logo of The
2   Reporter.  Are you familiar with this publication?
3   A.      Somewhat.  I have read it once or twice.
4   Q.      Okay.  And have you read this article dated September
5   7th, 2011?
6   A.      Yes, I have read this.
7   Q.      Okay.  So I want to walk you through some of the things
8   in this article, and you can tell me if they're accurate or
9   not.
10  A.      Okay.
11  Q.      If you would turn to page 3, a little bit below the
12  middle hole punch where it says, "Jan Boyce of Sunrise Beach
13  agreed."  Do you see that?
14  A.      Yes.  Yes, Jan Boyce, uh-huh.
15  Q.      Do you remember her speaking at the meeting?
16  A.      Vaguely, I do remember her speaking.
17  Q.      Okay.  And it quotes her here as saying, (quoted as
18  read) "If the parent allows this in the house, that's one
19  thing, but to do it outside the family circle, you usurp the
20  authority of the parents."  Does that accurately capture what
21  she said?
22  A.      To the best of my recollection, it does.
23  Q.      Okay.  And then two, two or three lines down, starts
24  with Hadfield.  It says, "Hadfield confirmed that the district
25  has not forwarded any of these requests to parents in the past,

1  but added that specific procedure can always be revisited and
2  revised at any time."  Did you say that?
3   A.      I did state that the district had not asked for prior
4  parental consent before and that we could come back and visit
5  that at another time, yes.
6   Q.      And then below that, it says Beckett.  Who is Beckett?
7   A.      John Beckett would be a member of our Board of
8  Education.
9   Q.      And here it says, "Beckett said the amended policy may
10  not have gone far enough."  And it quotes him as saying, "I
11  would like parental consent of special requests in our policy."
12  Is that quotation accurate?
13   A.      I do not recall that.
14   Q.      You don't recall him saying he would like to see
15  parental consent added to the policy?
16   A.      I do not recall that, but if it's in the article, I
17  would concur that that could be accurate.
18   Q.      Below that it says, (quoted as read) "Hadfield
19  mentioned the time restraints involved in the district's answer
20  to the lawsuit."  I may have misread that.  (Quoted as read.)
21  "Hadfield mentioned the time restraints involved in the
22  district's answer to the lawsuit.  A response needed to be
23  filed by Thursday, and district's, quote, articulated internet
24  policy was part of that response."
25          Did you say that?

1  A.     I did mention that there were time constraints with

2  motions that needed to be filed.

3  Q.     And below that it says, "The board unanimously approved

4  the amended internet policies, as well as a motion from Beckett

5  to revisit the internet policy and hold the public forum after

6  the conclusion of the lawsuit."  Did that occur?

7  A.     Yes, it did.

8  Q.     And actually, if you go back to the exhibit to your

9  affidavit -- so this is P14, if you turn to the fourth page, at

10  the top it says, motion, move that the board revisit IIAC-R and

11  these other policies, and hold a public forum and take under

12  advisement what the general population would like to see in

13  these policies and procedures.  Is that a part of the minutes

14  reflecting what Mr. Beckett moved for in the article?

15  A.     Yes.

16  Q.     And is there a reason why the minutes don't talk about

17  possible parental notification requirements?

18  A.     If the minutes do not?

19  Q.     Yeah, do you see possible parental notification

20  requirements anywhere in these minutes?

21  A.     No.

22  Q.     Is there a reason why they're left off the minutes?

23  A.     No, not necessarily.

24  Q.     Now, you say that we could revisit the policy to give

25  parental notification at any time.  I guess my first question

1  is why wait until the end of the lawsuit to hold this forum?

2   A.     Basically so that as a district we could focus on the

3  education of our children.

4   Q.     Are you aware that your attorneys have moved to have

5  the lawsuit dismissed based on the policy?

6   A.     I am.

7   Q.     So what would happen if the court said this lawsuit is

8  dismissed based on the policy, and then the board went and

9  changed the policy?

10  A.     I do not believe the board talked about necessarily

11 changing the policy, but to hold a forum to discuss the policy.

12  Q.     To discuss changing the policy.

13  A.     To discuss the policy.

14  Q.     You say that we could add parental notification at any

15 time.  How could you add parental notification if the requests

16 are anonymous?

17  A.     At that point in time with our board meeting and,

18 again, without the input from our attorneys, that would be

19 looked into, but that may not be the appropriate course of

20 action for the district.

21  Q.     Isn't it true that the requests aren't really

22 anonymous?

23  A.     That is not accurate.

24         MR. BLOCK:  Okay.  I'm going to play an audio clip

25 with the court's permission.  And I have --

1          THE COURT:  Is it marked as an exhibit?

2          MR. BLOCK:  It is.  I'm handing up now P thirty --

3    excuse me, Your Honor.  It's P33 and P34, which is a CD of the

4    clip and a transcript.

5          THE COURT:  Any objection?

6          MR. MICKES:  No objection.

7          THE COURT:  It's admitted.

8          (Plaintiffs' Exhibits P33 and P34 were admitted into

9    evidence.)

10   BY MR. BLOCK:

11   Q.    And you can read along with the transcript and tell me

12   if you think it's accurate and if you recognize the voice on

13   the clip.

14          (Playing Plaintiffs' Exhibit P33.)

15   Q.    Do you recognize the voice?

16   A.    I do.

17   Q.    Who is the voice on that clip?

18   A.    Dr. Mickes.

19   Q.    And what do you understand he was referring to in that

20   clip?

21   A.    My take on it would be that Dr. Mickes was referring to

22   our policy of, or the ability for students to open a blocked

23   website.

24   Q.    Isn't it true that when a student logs onto a website

25   and the website is blocked, the school knows that the student

1  attempted to log onto that website; isn't that correct?

2  A.    We would not know specifically what student, no.

3  Q.    You wouldn't know that the student has attempted to

4  access the website and then a popup has appeared?

5  A.    We would know that access to a website was made -- and,

6  again, this is my understanding.  I'm not a techie.

7        That access to a website would be made, but we

8  wouldn't necessarily know what student did that or who did

9  that.

10 Q.    So let's look at the transcript.  When Mr. Mickes said

11 it would involve identifying the student, it's going to involve

12 identifying the student that wants to, you know, open the

13 material, what's he referring to?

14        MR. MICKES:  I'm going to object to the question.

15 He's asking the witness to be in my mind about what I meant

16 when I made that statement.  If he wants to call me as a

17 witness, he certainly can.

18 BY MR. BLOCK:

19 Q.    Did you believe this to be a true statement based on

20 your understanding?

21        MR. MICKES:  Same objection.

22        THE COURT:  Grounds?

23        MR. MICKES:  He's asking this witness what I said

24 and what I meant by what I said.

25        THE COURT:  He may ask if it's true, if he thought

1  it was true.  I'll overrule the objection.

2   A.     So the question is?

3   BY MR. BLOCK:

4   Q.     It is, do you believe this is a true statement?

5   A.     The student would not necessarily be identified, no.

6   Q.     Okay.

7          THE COURT:  So it's not a true statement.  Is that

8   what you're saying?

9          THE WITNESS:  I'm saying it's not totally true, Your

10  Honor.

11  BY MR. BLOCK:

12  Q.     Do you think that all websites discussing LGBT-related

13  issues are sexually explicit?

14  A.     No.

15  Q.     Do you think students should have to ask permission to

16  access LGBT-supported websites?

17  A.     If they're appropriate.

18  Q.     Well, let me just ask the question again.  How about

19  this.  Do you think PFLAG is an appropriate website?

20  A.     Upon review of it -- and I have not had a full review,

21  but upon review of that, yes.

22  Q.     You haven't reviewed PFLAG since this Complaint was

23  filed?

24  A.     Not the whole website, no.

25  Q.     Do you think DignityUSA is an appropriate website?

1   A.      As far as what I've reviewed, yes, but I do not know

2   the whole website either.  So --

3   Q.      So is it your position that before a student should be

4   able to access an LGBT-supported website, the school should

5   first review the website to see if it's appropriate?

6   A.      No, not necessarily.

7   Q.      Okay.  So do you think it's appropriate to require

8   students to ask permission to access an LGBT-supported website?

9   A.      If the website is appropriate.

10  Q.      How would we know if the website is appropriate?

11          THE COURT:  Well, I'm not understanding the answer.

12  The question is do you think it's appropriate for them to have

13  to ask.  Is that correct?

14          MR. BLOCK:  Yes.

15          THE COURT:  So are you saying that if it's

16  appropriate, it's okay for them to ask, but if it's

17  inappropriate they can't even ask?

18          THE WITNESS:  No, I'm not saying that, Your Honor,

19  thank you.  I'm sorry.

20          No, I think there are very appropriate LGBT websites

21  that students would not need to ask for permission to view.

22  BY MR. BLOCK:

23  Q.      But you believe that the LGBT-supported websites in the

24  sexuality filter should not be open to students unless the

25  student first asks and it's reviewed by the school?

1   A.      I do not know all of those websites that are in the

2   sexuality filter.

3   Q.      Do you know all of the websites that are in the news

4   filter?

5   A.      No.

6   Q.      Do you know all of the websites that are in any of the

7   filters?

8   A.      No, I do not.

9   Q.      Why doesn't the school district block all the website

10  filters and require a student to ask permission to access any

11  website?

12          MR. MICKES:  I'm going to object to that.  It simply

13  misstates the facts, it's not in evidence that everything is

14  blocked and you have to unblock every single one, that's not

15  true.

16          THE COURT:  I understand it's not true.  I'm not a

17  jury.  I'm not misled.  He's asking whether it would be

18  appropriate to approach that --

19          MR. MICKES:  I'm sorry, Your Honor, I beg your

20  indulgence, but the statement was it is, and that's not true.

21  It's argumentative.

22          MR. BLOCK:  It was why doesn't, why doesn't.

23          THE COURT:  The quote is, "Why doesn't the school

24  district block all website filters and require a student to ask

25  permission to access any website?"  You may answer the

1  question.

2  A.      I do not know that we would block all of those

3  websites.

4  BY MR. BLOCK:

5  Q.      Why not?

6          THE COURT:  That's the question.

7  A.      Because those websites would be appropriate for

8  students to view.

9  Q.      How do you know they're appropriate for students to

10  review if you haven't reviewed all of the websites in the news

11  filter?

12  A.      Because through our customization filter, they would be

13  deemed appropriate.  But if they were not and they were

14  blocked, a student could ask for access to it.

15  Q.      So you believe that if a website has been placed in the

16  sexuality filter, it is assumed that it's not appropriate until

17  the school has a chance to review it?

18  A.      That would be my understanding.  Unless -- unless,

19  again, the sexuality filter, if we're speaking URL Blacklist,

20  and, again, this is my understanding that we also have a system

21  on top of that URL Blacklist that would not block websites and

22  would block other websites that are not contained within the

23  URL filter.

24  Q.      Do you think it's appropriate for students in the

25  school library to be able to read websites telling them that

1  it's okay to be gay?

2  A.      Do I think that that would be appropriate?

3  Q.      Yes.

4  A.      Yes.

5  Q.      Do you think it's appropriate for students in the

6  school library to read websites telling them that homosexuality

7  is just as good as heterosexuality?

8  A.      Yes.

9  Q.      Do you think it would be appropriate for students to

10  read in the school library websites that conflict with the

11  religious values of their parents?

12  A.      Yes.

13  Q.      Are you aware of any member of the school board

14  expressing concern with students accessing websites saying that

15  it's okay to be gay?

16  A.      Yes.

17  Q.      Can you say what those concerns were and who said them?

18  A.      That as a parent, I would like to have my child not

19  access some of those sites.

20  Q.      And this is a member of the school board?

21  A.      I have heard that, yes.

22  Q.      Firsthand?

23  A.      Yes.

24  Q.      What member of the school board was that?

25  A.      Mr. Beckett.

1  Q.      And that's the same Mr. Beckett that said he would like

2  to add a parental notification requirement to the policy?

3  A.      Correct.

4  Q.      You started working at Camdenton in 2007, right?

5  A.      Yes.

6  Q.      And since you've started working there, has the school

7  ever examined alternative filtering systems?

8  A.      Alternative to URL Blacklist?

9  Q.      Yes.

10 A.      That would be my understanding, yes.

11 Q.      That it has examined?

12 A.      Yes.

13 Q.      And why did the school conclude that the current

14 filtering system is better than the alternatives?

15 A.      I do not know those reasons.

16 Q.      If I could give you a filtering system that had, was

17 identical to your current filtering system, except it did not

18 block LGBT-supported websites, would you take it?

19 A.      Which was identical?

20 Q.      Identical except for that one difference.

21 A.      With the modifications that we've made to our system,

22 identical?

23 Q.      Yes.

24 A.      If those LGBT websites were appropriate, yes, we would.

25 Q.      What if I told you that it would cost an extra $100 a

1 year to have that alternative system, would you take it?

2 A.     I wouldn't see why we wouldn't.

3          MR. BLOCK:  Okay.  All right.  I have no further

4 questions, Your Honor.

5                          - - -

6                    CROSS-EXAMINATION

7 By Mr. Mickes:

8 Q.     There was a question about how many people spoke at

9 that board meeting in Camdenton.  I believe it was in August of

10 2011?

11 A.     Yes.

12 Q.     And do you remember how many people were there

13 approximately that were not employees of the district and not

14 members of the board or invitees?

15 A.     At the board meeting on the 30th, we probably had

16 between 50 and 60 community members attend that board meeting.

17 Q.     How many citizens do you have in Camdenton?

18 A.     District-wide, county-wide in Camdenton we have about

19 50,000 people.

20 Q.     Okay.  So you have 50 or 60 out of 50,000 people that

21 were there.  And is one of the purposes of the board meeting to

22 give everybody an opportunity to voice their opinion?

23 A.     Certainly.

24 Q.     Do you necessarily agree with every opinion that's

25 voiced at those meetings?

1   A.      No, sir.

2   Q.      You testified that there was some discussion about

3   whether parents should be notified if their son or daughter

4   requests that a site be unblocked?

5   A.      Yes.

6   Q.      Did the board take any action to limit or require

7   parental approval before a site was unblocked?

8   A.      No.

9   Q.      Has the board ever taken such action?

10  A.      No.

11  Q.      And it was an idea espoused by one of seven board

12  members?

13  A.      Yes.

14  Q.      Okay.  And you testified at that August meeting of the

15  board that you did not have legal counsel available to give you

16  some assistance on some of these issues; is that correct?

17  A.      That's correct.

18  Q.      And subsequent to that, did you obtain an opinion about

19  getting parental consent?

20  A.      Yes, we did.

21  Q.      And was there any change made to the board's action

22  because of that input?

23  A.      No, there was not.

24  Q.      Now, the items within the sexuality part of the

25  filter -- now I'm talking about the customized aspect of the

1  filter, plus the URL Blacklist.  Am I correct with the

2  statement that the customized process makes assessments, looks

3  at websites and makes decisions before they ever get to URL?

4  A.      That is my understanding.

5  Q.      Okay.  Some sites are marked as white sites and they're

6  open and available to everybody; is that correct?

7  A.      Correct.

8           THE COURT:  Would you hold on a minute?  I want to

9  review this.

10          I want to make sure I understand that.  Somehow

11 there is a human component that looks at the websites before --

12          MR. MICKES:  Yes, ma'am.

13          THE COURT:  -- Blacklist kicks in?

14          MR. MICKES:  It's maybe an easier explanation to say

15 that there's this two-step process.  The first step is the

16 customized process.  In that process a human, it would be one

17 of the -- the net administrator who will testify or one of the

18 three or four employees that works for him, they will look at

19 the sites and they will make a decision of whether it's

20 perfectly fine and it will go on the whitelist.  I keep doing

21 that.  They will make a decision --

22          THE COURT:  So for, before a request is made --

23          MR. MICKES:  Yes.

24          THE COURT:  -- when they're setting the system up,

25 they look at all of the websites that are available in the

1 world and then they decide?

2         MR. MICKES:  Well, I think, Your Honor, they're

3 focusing on websites that there have been some inquiry about

4 because you're right --

5         THE COURT:  So this is just --

6         MR. MICKES:  -- there's hundreds of thousands,

7 there's hundreds of thousands that come online and they

8 couldn't do that.

9         THE COURT:  So just if there's an inquiry, it's

10 customized.

11         MR. MICKES:  And they will look at it and within 24

12 hours they make that decision, it never goes to URL.

13         THE COURT:  If there's an inquiry.

14         MR. MICKES:  Yes.

15         THE COURT:  But otherwise that's the default

16 position.

17         MR. MICKES:  That's correct.  If what happens is

18 we've looked at it and it's something that we haven't cleared

19 before, it would go to URL.  But other than that, that's the

20 first human step of the confirmation process.

21         THE COURT:  Maybe I --

22         MR. MICKES:  It doesn't go right into this computer

23 and the computer spits out black or white.  There's a human

24 element on top of that, and you'll hear testimony from the

25 network administrator that one of the reasons to do that was to

1  reduce the amount of overblockage.

2          THE COURT:  Okay.  So I'll wait until I hear from

3  the technological expert.

4          MR. MICKES:  Great.  Thank you.

5   BY MR. MICKES:

6   Q.     There was a question about whether you had to get

7   permission to unblock -- I don't want to mess up the -- LGBT

8   sites.  Does any site that's blocked, whether it's LGBT or

9   whether it's the Mormon Church or whatever it is, any site

10  that's blocked, the process is the same, isn't it?

11  A.     Yes.

12  Q.     So there's not a special program that says, all LGBT

13  sites have to go through a special process.

14  A.     No, there is no special process.

15  Q.     When a request is made to unblock a closed site, LGBT

16  sites are treated the same way any other blocked site would be;

17  is that correct?

18  A.     Correct.

19          MR. MICKES:  Your Honor, that's all the questions I

20  have for this witness, but I would like to reserve the witness

21  to put on in the defendants' case.

22          THE COURT:  All right.  As you can tell, we're

23  getting very short on time.

24          MR. MICKES:  We hope to save you some time.

25          THE COURT:  Anything further?

1          MR. BLOCK:  Just a housekeeping matter.

2          THE COURT:  Anything further for the witness?

3          MR. BLOCK:  I wanted to introduce into evidence the

4     exhibits that the witness consulted during the hearing that I

5     forgot to move, unless there are any objections.

6          MR. MICKES:  No objection.

7          THE COURT:  You have to list them for my courtroom

8     deputy.  She won't know otherwise.

9          MS. MANGER:  Exhibit P14, Exhibit P30.

10         COURTROOM DEPUTY:  I'm trying to find it on the

11    list.

12         MS. MANGER:  Oh, I'm sorry.  I'll wait.

13         COURTROOM DEPUTY:  I'm sorry.  P14?

14         MS. MANGER:  Exhibit P30.

15         COURTROOM DEPUTY:  All right.

16         MS. MANGER:  Exhibit P33.

17         COURTROOM DEPUTY:  P33 was already admitted.

18         MS. MANGER:  And Exhibit P34.

19         COURTROOM DEPUTY:  It was already admitted.

20         MR. BLOCK:  No further questions, Your Honor.

21         THE COURT:  Anything further?

22         MR. MICKES:  No, Your Honor, I'll reserve.

23         THE COURT:  Thank you.  You may step down.

24         MR. ROTHERT:  Your Honor, plaintiffs have no more

25    witnesses, but we would like to move for admission of the five,

1 for five of the affidavits that were filed with the memorandum

2 and supplemental memorandum.

3          THE COURT:  What are the numbers?

4          MR. ROTHERT:  Yes, they are marked as P22 is the

5 declaration of Jody Huckaby, the Executive Director of PFLAG;

6 P23 is Marianne Duddy-Burke, the Executive Director of Dignity;

7 P24 is the declaration or affidavit of Jason Marsden, Executive

8 Director of the Matthew Shepard Foundation; Exhibit P25 is the

9 declaration of Shane Windmeyer, Executive Director of Campus

10 Pride; and Exhibit P58 is the declaration of Jane Doe.

11          MR. MICKES:  My only objection would be, Your Honor,

12 that these individuals are not here, so I couldn't

13 cross-examine them on these affidavits.  I'm certainly not

14 going to consent.

15          THE COURT:  As I recall from my hearing on Tuesday,

16 affidavits can be considered in a preliminary injunction

17 hearing and, therefore, I will admit them.

18          MR. ROTHERT:  Thank you.

19          (Plaintiffs' Exhibits P22, P23, P24, P25, and P58 were

20 admitted into evidence.)

21          THE COURT:  Okay.  Let's go ahead, we'll take a

22 15-minute break.  I need to give my court reporter some time.

23          (A recess was taken from 10:24 a.m. to 10:39 a.m.)

24          THE COURT:  Defendants, you may call your first

25 witness.

1    MR. MICKES:  Your Honor, prior to calling the first

2 witness, the parties entered into a stipulation that I think is

3 kind of critical at this point.

4         It's four sentences long.  And it begins -- to focus

5 our case back on what happened at Camdenton, this is the only

6 individual.  The other plaintiffs are publishers of websites.

7 This is the only individual that's named.  And this says,

8 plaintiff Jane Doe has never tried to access a website on the

9 Camdenton R-III School District computer which was --

10         THE COURT:  You don't need to read it.  I've already

11 read it.

12         MR. MICKES:  Okay, great.  Thank you, Your Honor.

13 Then I would call Mr. Cowen.

14                         - - -

15                    RANDAL COWEN,

16  being first duly sworn by the courtroom deputy, testified as

17 follows:

18                         - - -

19                  DIRECT EXAMINATION

20  By Mr. Mickes:

21  Q.    Mr. Cowen, would you state your full name for the

22 record, please?

23  A.    Randal Cowen.

24  Q.    And Mr. Cowen, you've been employed by the Camdenton

25 School District since 1999; is that correct?

1    A.    Yes.

2    Q.    And your initial position was that of a technology

3    technician?

4    A.    Yes.

5    Q.    And in 2003 you received a promotion.  And what

6    position were you promoted to?

7    A.    Network Administrator.

8    Q.    And can you briefly for the court describe what your

9    duties are as Network Administrator in the Camdenton School

10   District?

11   A.    As Network Administrator, my duties are to support and

12   maintain the district's technology systems, basically anything

13   networking, computer-wise, television.

14   Q.    Software, hardware?

15   A.    Software, hardware.

16   Q.    Filtering systems?

17   A.    I've explained it in some occasions that anything that

18   takes a battery or plugs into a wall, they call me for help.

19   Q.    And do you supervise any other district employees in

20   carrying out your duties?

21   A.    Yes.

22   Q.    And how many?

23   A.    Four.

24   Q.    And does Camdenton have a filtering system on its

25   internet?

1   A.      Yes, we do.

2   Q.      And how long has that filtering system, a filtering

3   system been in existence in the district?

4   A.      Since before my employment.

5   Q.      And can you tell the court briefly why a filtering

6   system is necessary for your internet?

7   A.      To protect children and minors from any harmful

8   content.

9   Q.      And this is mandated by federal law, CIPA?

10  A.      Yes, sir.

11  Q.      And during the time that you have been a network

12  administrator, have there been changes in the district's

13  filtering system?

14  A.      Yes.

15  Q.      And can you describe for us that transition that the

16  district went through?

17  A.      Initially when I started in '99, we used Novell

18  BorderManager, and we used SurfControl for their content

19  filtering solution.

20          Approximately 2004, I believe it was, we --

21  SurfControl was going to increase their prices for their

22  content filtering solution, and we started looking into

23  alternatives to help maintain that system because sometimes it

24  can be a very complicated and time-consuming system.  We

25  explored options from Darby Works, MOREnet, and Cdoc in Osage

1  Beach, Missouri.

2          And at that time, in 2004, we chose to take on Cdoc

3  as a provider for internet filtering.  And to the best of my

4  knowledge, they had used URL Blacklist.  And after 2004, I

5  believe it was November 2009, our district was growing, and we

6  had requested from MOREnet, Missouri Research and Education

7  Networks, additional bandwidth to support the internet needs.

8  And at that time, the Cdoc solution was not meeting our needs.

9  The appliance was slower than we needed for the bandwidth that

10 we needed for the district, and in some cases it actually did

11 some overblocking and we had no ability to completely bypass

12 the filters in certain times of need.

13          So in 2000 -- in, I would say in March to June of

14 2010, after notifying MOREnet we needed additional bandwidth

15 and after notifying Cdoc that their product was not meeting our

16 needs, we started seeking alternatives again.  And we notified

17 Cdoc that their solution needed some changes.  We reached out

18 to MOREnet to look at their solutions they had.

19 Q.      What is MOREnet, just for the sake of the record?

20 A.      MOREnet is Missouri Research and Education Networks,

21 and it is an extension of MU, I believe --

22 Q.      Okay.

23 A.      -- that provides internet and support to schools and

24 libraries across Missouri.

25 Q.      And at the time that you made that -- what was your

1 ultimate decision that you made in the spring of 2010?

2 A.    In the spring of 2010 our ultimate decision was we had

3 evaluated DeepNines, which was an excellent product, but we

4 wanted something that we could very tightly integrate.  The

5 Cdoc system we were allowed to tightly integrate with our work

6 order system which worked excellent for allowing people to open

7 websites and us to track those requests.  And the DeepNines

8 product and the MOREnet products didn't allow us to do any kind

9 of tight integration work like that.

10        So our ultimate decision was to build our own

11 appliance with our own custom filtering solution that would

12 meet our needs and that we could integrate with other systems.

13 Q.    Okay.  And tell us if you would about how you

14 customized this system and how that interacted in any way with

15 URL Blacklist.

16 A.    The way we customized it is, first of all, the very

17 first thing we did was we created whitelists and blacklists

18 that superseded all of any content filtering mechanisms we

19 would have had in place.

20        If a request had come in that we had been requested

21 to deny, it would hit a blacklist and be immediately kicked out

22 of the rules.  And we also implemented a whitelist that any

23 request that was asked of us to open to the district we could

24 hit that list and immediately open that site to anybody in the

25 district.

1          THE COURT:  Could I interrupt a minute?  When you

2    talk about a request, you're just talking about somebody on a

3    computer somewhere trying to access a website?

4          THE WITNESS:  Yes.

5          THE COURT:  Is that what you mean by the term

6    request?

7          THE WITNESS:  Yes.  The solution we implemented has

8    a request system.  That tight integration that we have, when a

9    person is denied a website, it prompts them with some

10   information that they have been blocked because of one of these

11   categories for these reasons.  And then they have a button that

12   they can click, they click request open, and it's a short form.

13   They just fill out any comments or anything they want, and that

14   request immediately comes to our department, and we can review

15   the site manually and allow it or deny it.

16         THE COURT:  Okay.  But that's after it's been

17   filtered by URLBlacklist.com, then there's a request to access

18   it.

19         THE WITNESS:  Yes.  Yes, ma'am.

20    BY MR. MICKES:

21    Q.     And once a site is looked at by, I guess, human eyes in

22   your department and put on a whitelist, that's it, there's no

23   more, it never goes, never sees URL or doesn't see anything

24   else?

25    A.     That's it, it's immediately kicked out.

1  Q.      You have the ability to override URL if you see a site
2  that they block and you look at it and say, no, there's nothing
3  wrong with this, then it goes on your whitelist, it never sees
4  URL again; is that correct?
5  A.      Can you please repeat that?
6  Q.      Yeah.  If you make a determination, it may be that URL
7  had blocked the site and you make -- and a request is made and
8  then you put human eyes on it and you say there's nothing
9  that's in violation of CIPA, we're going to unblock that, and
10 it goes on your whitelist; is that correct?
11 A.      Yes.
12 Q.      And then after it goes on the whitelist, there's never
13 any review by URL Blacklist again.
14 A.      No.
15 Q.      Now, there's been some questions about that, and I want
16 to make sure we're clear about that.  Obviously -- you know,
17 just tell me, what's your estimate of the number of --
18         THE COURT:  I want to make sure I understand.  So it
19 never goes through the same filtering process, or does it go
20 through two stages, it goes through the blacklist,
21 automatically kicks on to your whitelist, and then comes back
22 in?
23         THE WITNESS:  The way you have to look at it is from
24 a top down, as if you're reading from the top of a page down.
25 And you're looking for a match.  And if you are -- and if you

1  see the word you're looking for at the top of the page and
2  that's our whitelist at the top of the page, it's immediately
3  just going to ignore the rest of the rules and allow the
4  website through.

5          THE COURT:  Okay.  So it doesn't go to the
6  blacklist.

7          THE WITNESS:  It doesn't go down through the rest of
8  the list, no.

9          THE COURT:  But until somebody asks for it to be
10  unblocked, it will be blocked by Blacklist.

11          THE WITNESS:  If it is blocked by URL Blacklist, it
12  will proceed down through all of the rules; and if URL
13  Blacklist has it on one of their blacklists, one of their
14  databases, then, yes, it will be blocked.

15          THE COURT:  I understand now.  Thank you very much.
16  BY MR. MICKES:
17  Q.     Now, approximately how many new websites come online
18  within, say, any normal week?
19  A.     Hundreds of thousands, I would say.
20  Q.     So is there any classification -- strike that.
21         Do you treat requests to unblock homosexual/lesbian
22  sites different than any other sites?
23  A.     No, sir.
24  Q.     And every site is treated the same --
25  A.     Yes.

1  Q.    -- if it's blocked: Violent sites, racial sites, hate

2  speech sites. And then when somebody unblocks it, then you put

3  your eyes on it and make a decision; is that correct?

4  A.    Absolutely.

5  Q.    And homosexuals or related groups are not treated any

6  different in that respect; is that correct?

7  A.    Correct.

8  Q.    Now, once you -- back in 2010 when you put this

9  customized system together, did you evaluate it by running it

10  back through the system?

11  A.    Yes. Actually, we had sent out e-mails near the end of

12  the school year in 2009 that we were going to put filtering

13  boxes in place for temporary portions of time. We wanted to

14  make people aware. Communication has been a big push in our

15  district, and we wanted to communicate that things might be a

16  little different for a temporary point of time.

17         And we had actually implemented the DeepNines

18  product full force into the district. Everybody in the

19  district was operating through that device. And we had also

20  after construction of our box done the exact same procedure,

21  put that in place and allowed everybody to access the internet

22  through that device. And we analyzed it for processer

23  utilization, what load the computer was running on and how much

24  traffic we could flow through the device.

25  Q.    So the school community and the community at large had

1  an opportunity to provide input on your customized project?

2  A.     Yes.

3  Q.     Did you get any complaints or negatives, or was there

4  any negatives about your, when you evaluated your new program?

5  A.     No, not at all.

6  Q.     Okay.  And in implementing your customized filter

7  system, was it your goal to reduce the amount of overblocking

8  that URL sometimes got involved in?

9  A.     Yes.  Our previous solution used not only a blacklist,

10 but it also used keyword and key phrases.  And in my

11 experience, the keyword and key phrase was a very tricky kind

12 of scenario to toy with, and we wanted to reduce that

13 overblocking, so we disabled in our product all keyword and key

14 phrase blocking, and we relied solely on human intervention or

15 URL Blacklist.

16        THE COURT:  And when you say we wanted to prevent

17 overblocking in our product, are you referring to your

18 whitelist?

19        THE WITNESS:  In our solution, the entire solution.

20        THE COURT:  You used the term -- well, it's

21 important for me to understand the difference.

22        So when you say your product, are you saying your

23 whitelist and it goes, it opens up things; or are you saying

24 your whitelist plus your Blacklist, Blacklist.com?  Is your

25 product the whole thing, including Blacklist.com?

1          THE WITNESS:  Yes.

2          THE COURT:  Or when you use -- it is.  Okay.  I just

3  wanted to know what he means when he says our product.

4  BY MR. MICKES:

5  Q.     And as a result of that, using the custom product under

6  the URL, are you unblocking more sites than ever?

7  A.     Yes, we unblock all sorts of sites every day.

8  Q.     And over the past five or six years, approximately how

9  many requests have you had to unblock sites?

10  A.     2000.

11  Q.     And approximately how many of those have been

12  unblocked?

13  A.     I would say 80 percent.

14  Q.     And what can you tell me about the remaining 20

15  percent?

16  A.     The remaining 20 percent are usually advertisements

17  which we block normally, and anything beyond that would just be

18  students being a little goofy and submitting things they

19  probably shouldn't.

20  Q.     Okay.  And what's the problem with advertising?

21  A.     Advertising can sometimes pop up different windows on

22  your system, and the next thing you know you're into a website

23  you didn't intentionally mean to go to.

24  Q.     What categories of material do you block right now?

25  A.     We block several categories.  Some of those are

1   advertisements, pornography, mixed adult, and sexuality.

2   Q.      Okay.  And sexuality is designed to capture material

3   that's not covered by other filters?

4   A.      Yes.

5   Q.      Could you give us some examples of some of the sites

6   that you pick up and block under sexuality that would have gone

7   through the other blocks?

8   A.      Sexuality --

9               THE COURT:  What other blocks?

10              MR. MICKES:  Well, pornography and obscenity.

11  There's three -- CIPA requires blocking of three materials.

12              THE COURT:  Okay.

13              MR. MICKES:  Pornography, obscenity --

14              THE COURT:  Are we talking about blocking through

15  the customized system, which is creating a whitelist versus a

16  blacklist, or are we talking about Blacklist.com?

17              MR. MICKES:  We're talking about maybe a product

18  would be blocked, would not be blocked under the pornography or

19  the obscenity.  And I was asking whether there were any sites

20  that were picked up with the sexuality site, the filter.

21              THE COURT:  Blocked by what?

22              MR. MICKES:  Blocked by -- if it hadn't been through

23  the system before, it would be blocked by URL.

24              THE COURT:  So this is something that had gone

25  through Blacklist and got through?

1          MR. MICKES:  Right.  And was picked up on another

2   filter, and that was my question.

3    BY MR. MICKES:

4    Q.    What kinds of things -- if you could give me a couple

5   of examples of what kind of things that you picked up through

6   your sexuality filter.

7    A.    I believe at the time that we had went through there,

8   the sexuality filter, some material that was not blocked by the

9   other categories, I believe there was imasturbate.com and

10  ipenis or something like that.

11   Q.    Okay.

12          THE COURT:  And how did you -- just kind of explain

13  to me how it came to your attention about those sites and what

14  you did to, in fact, block them.

15          THE WITNESS:  We rely on URL Blacklist to -- our

16  blacklist and whitelist is meant for our customized purposes.

17  For example, a student that is over here playing online poker

18  and not staying on task, a teacher might request through e-mail

19  or however, please block onlinepoker.com.  And then that would

20  be part of our custom filter there.  Blacklist, we're no longer

21  allowing onlinepoker.com.

22          Just like with our whitelist, a teacher may say, I

23  need this particular video from YouTube on mitosis because I'm

24  going to show this in my science class.  We don't globally

25  unlock YouTube because there's other content that could be

1  harmful on YouTube, so we have the ability to unblock that

2  particular one video from YouTube for that classroom.

3          And then whatever does not fall in our black and

4  whitelists, we rely on URL Blacklist's set of filters, and

5  sexuality --

6          THE COURT:  But this was talking about ipenis or

7  some sexually explicit website.  How does that --

8          THE WITNESS:  Those have fallen into URL Blacklist's

9  sexuality category.  They weren't categorized into pornography

10 or any other category.  They were at the time only in

11 sexuality.

12         THE COURT:  Well, how did it come to your attention

13 is what I'm asking you.  How did it come to your attention,

14 that site?

15         THE WITNESS:  We were asked to evaluate what kind of

16 material could slip through if we removed the sexuality filter

17 completely but still allowed the pornography and mixed adult

18 categories to stay in place.

19         THE COURT:  So was this as part of this litigation?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  Go ahead.  I'm just trying to

22 figure out how it came to your attention.

23         MR. MICKES:  Your Honor, it's a little complex.

24 BY MR. MICKES:

25 Q.      Have you taken the opportunity to review white sites or

1  sites that are open to determine the LGBT sites that are open

2  in Camdenton School District?

3  A.    Yes.

4  Q.    And have you prepared just a sample list of those?

5  A.    Yes.

6  Q.    Let me hand you what's been marked as D7.  Would you

7  review that for me, please?

8        Is that an accurate list of the, what you believe to

9  be in your opinion LGBT sites that are open on the Camdenton

10  School District website?

11  A.    Yes.

12        MR. MICKES:  Your Honor, I would like to ask that

13  Defendants' 7 be received.

14        THE COURT:  Any objection?

15        MR. BLOCK:  No, Your Honor.

16        THE COURT:  It's admitted.

17        (Defendants' Exhibit D7 was admitted into evidence.)

18  BY MR. MICKES:

19  Q.    When blocking occurs, the site is blocked and a faculty

20  member or student would like to unblock that, can you tell us

21  how that happens?  How do you go about making the request to

22  unblock?

23  A.    The first thing when they get the block, they're

24  prompted with the text that says they're blocked from this

25  material for these reasons.  And they have a button on that

1  screen which they can click, which then takes them to a short

2  form that they can explain any kind of, or add any kind of

3  comments to why they would want it unblocked.

4  And then after they click submit on that form, it

5  immediately comes to our department for review.  They also have

6  means by e-mailing any one of those --

7  Q.     Let's hold on e-mailing the superintendent and just

8  deal with blocking that goes on the student's website.

9  MR. MICKES:  Your Honor, I give you Defendants'

10  Exhibit No. 1.

11  Q.     Mr. Cowen, giving you Defendants' 1.  Can you identify

12  that?

13  A.     Yes.  This is the message that they get eventually when

14  they hit a site that is blocked.

15  Q.     Okay.  And once that -- when the student wants to

16  request to unblock, where does it go?

17  A.     When they click this request open button, it goes to

18  page 2.

19  Q.     Yes?

20  A.     On which they can add any comments.  And after they

21  click submit, it comes straight to our department for manual

22  review.

23  Q.     Okay.  And manual review is you put your eyes on the

24  request and make a determination whether it's going to be

25  blocked or unblocked; is that correct?

1   A.      Yes.

2   Q.      And the -- there's a place on the second page for a

3   user's name.  Does that require a student or a faculty member

4   to list their name?

5   A.      No, it does not.

6   Q.      What can they list by username?

7   A.      They can list anything they want.  If they wanted to

8   enter 12345, it will accept it.

9   Q.      So you could have any number -- you could choose your

10  dog or you could choose anything you wanted to be your

11  username.

12  A.      Yes.

13  Q.      And regardless of what you put in this block, would you

14  still put the eyes on and make a determination whether it was

15  blocked or unblocked?

16  A.      Yes, we do.

17  Q.      And how would the individual that had made the request

18  to unblock find out if the site had been unblocked?

19  A.      They can either try to visit the site later and the

20  site will be open, or they can visit our website and go to the

21  technology section, and there's a link in there that, my

22  requests, and they could enter their dog's name or 12345,

23  whatever they entered, to review all of the requests they ever

24  submitted.

25  Q.      So the option to waiting and then running it again

1  would be to go on the district's website, technology, put Fido

2  in, and see if it was opened or unopened, correct?

3  A.      Correct.

4  Q.      Mr. Cowen, is Defendants' Exhibit 1, is that an

5  accurate copy of the popup that appears when a student requests

6  that a site be unblocked?

7  A.      Yes.

8          MR. MICKES:  Your Honor, I would like to move that

9  Defendants' Exhibit 1 be received.

10         MR. BLOCK:  No objection.

11         THE COURT:  It's admitted.

12         (Defendants' Exhibit D1 was admitted into evidence.)

13 BY MR. MICKES:

14 Q.      And is there an alternative to using the popup system?

15 A.      Yes.

16 Q.      And what is the alternative?

17 A.      Alternatives that are commonly used in our department

18 is a teacher will just e-mail us requests.  I know there's,

19 they can also make a written request to the superintendent, and

20 we'll review that.

21 Q.      If there's a decision that is made that a faculty

22 member or student's site is unblocked, do they have a provision

23 under board policy to appeal that to the Board Of Education?

24 A.      Restate the question, please?

25 Q.      Yeah.  If a site is requested to be unblocked but a

1 decision is made by your technology group or the superintendent

2 to not unblock it, could they appeal that decision to the Board

3 of Education?

4 A.  Yes.  Our work order system that this works through,

5 they can actually, when they review their requests online, they

6 can add additional comments supporting their request, if

7 needed, and reopen the request.  Or they can, again, write a

8 letter to the superintendent or send us an e-mail.

9 Q.  In your opinion, Mr. Cowen, would there be any problems

10 with eliminating the district's customized sexuality filter?

11 A.  Yes.

12 Q.  And did you make any effort to find out what kind of

13 harm would result?

14 A.  Yes.

15 Q.  What did you do?

16 A.  We temporarily on a test basis in a test environment

17 disabled that sexuality filter to see what kind of content you

18 could receive after those filters were disabled.

19 Q.  And what was the result?

20 A.  Several websites that you could get to instantly.

21    THE COURT:  And the customized system includes

22 Blacklist?

23    THE WITNESS:  Yes, it does.

24    THE COURT:  Okay.

25    MR. MICKES:  I have no further questions.

1                                          - - -

2                              CROSS-EXAMINATION

3    By Mr. Block:

4    Q.      Good morning, Mr. Cowen.

5    A.      Good morning.

6    Q.      I have a question about this D7 that we were looking

7    at.

8    A.      All right.

9    Q.      It's your example of open district websites.  How many

10   of these are on the district's customized whitelist?

11   A.      None of them.

12   Q.      How many?

13   A.      None of them.

14   Q.      So how are they open?

15   A.      They do not match on any of our lists or URL

16   Blacklist's lists.

17   Q.      So if let's say a pornography site happened to not

18   match any of your customized lists or URL Blacklist, that would

19   also be an open site, right?

20   A.      It would be, but we also have technologies in place

21   that we utilize to watch keywords and phrases that are capable

22   of instantly alerting us to any kind of activity like that.  In

23   that case, we can sometimes catch a student instantly and call

24   their teacher immediately.

25   Q.      Okay.  But just so I'm clear, no one at the school

1  district has looked at these sites and said, these are

2  appropriate, I want kids to have access to these LGBT

3  resources, right?

4  A.      Right.

5  Q.      Has anyone asked you to put any LGBT sites onto the

6  whitelist?

7  A.      We had a request come in for Rainbow Domestic Violence.

8  Q.      Do you remember who made that request?

9  A.      The username that was entered was ██████████████.

10  Q.      Actually, I want to complete this line of questions

11  first.

12          Besides that -- so after this lawsuit was filed, did

13  anyone at Camdenton say, take a look at the Complaint, the LGBT

14  websites in the Complaint and if they're okay, put them on the

15  whitelist?

16  A.      Please restate the question.

17  Q.      Sorry.  Since the time that this lawsuit was filed, did

18  anyone from the school say, take a look at the websites listed

19  in the Complaint as examples of LGBT-supported websites and, if

20  they're okay, put them on the whitelist?

21  A.      We had received a letter that listed, I believe, four

22  or five websites that was requested to be opened.  And I

23  believe one of them was opened, and there were three or four

24  that were not opened that we added to our whitelist that will

25  never again be reviewed by URL Blacklist's databases.

1  Q.      Okay.  And so that was in June?

2          THE COURT:  I'm confused.  Back to the first thing,

3  who were these requests from that you're referring to now?

4          THE WITNESS:  The Rainbow Domestic Violence request?

5          THE COURT:  Or any of the others that you just

6  identified.

7          THE WITNESS:  The Rainbow Domestic Violence request

8  originated to the best of my knowledge from a student within

9  the district, and we reviewed that request and opened it.  It

10 was a request that just wanted domestic violence with lesbians

11 and gays.  And --

12         THE COURT:  Then you referred to three or four other

13 requests.

14         THE WITNESS:  I believe before the litigation

15 started, we had received a letter from the ACLU listing four

16 websites -- four or five websites, I'm sorry, I can't remember

17 the exact number -- that they wanted us to open or ensure that

18 were opened.  And one of them at least was opened, and we

19 immediately opened the others.

20         THE COURT:  And the question that was asked is after

21 the lawsuit was filed, but maybe I'm wrong about that.  You go

22 ahead.

23         MR. BLOCK:  That was --

24         THE COURT:  That doesn't seem to answer the

25 question.

1          MR. BLOCK:  Yeah, that was the question.

2    BY MR. BLOCK:

3    Q.      So after the lawsuit, did anyone ask you to add any

4    other LGBT sites to the whitelist?

5    A.      To the whitelist, no.

6          THE COURT:  When you say asked, do you mean -- what

7    do you mean by asked?

8    Q.      Did any Camdenton school official tell you to add other

9    LGBT sites to the list?

10   A.      Beyond the information that we had received through the

11   letter, no, we had no additional requests.

12   Q.      Did any Camdenton school official say, could you flip

13   through the list of sexuality websites, you know, and if you

14   see anything that obviously looks nonsexual, can you just add

15   it to the whitelist?  Did anyone ask you to do that review?

16   A.      No.  I believe I was asked is it possible to go through

17   that.  And, yes, it is possible, but it's a huge list, and it

18   consists of both domains and URLs.

19         THE WITNESS:  Which a URL, Your Honor, is more of a

20   specific site, not just a set of sites.  And to manually review

21   both the URLs and the domain lists for that category alone

22   would consume tons of time.

23         THE COURT:  And category established by whom?  Are

24   you again talking about Blacklist?

25         THE WITNESS:  The sexuality category itself is

1  established by Blacklist, URLBlacklist.com.

2   BY MR. BLOCK:

3   Q.    Do students need a user ID to log onto the internet?

4   A.    No, but they can request one and a teacher can request

5  one for them.

6   Q.    So is it possible to use the internet if you don't have

7  a user ID?

8   A.    Yes.

9   Q.    How do you do that?

10  A.    You just walk up to a computer and begin using the

11  internet.  It opens right up.

12  Q.    And so what's the advantage of having a user ID?

13  A.    The advantage of having a user ID is we can actually

14  target age groups and age appropriateness of content for users.

15 We assume a kindergartner or first grader or second grader is

16 going to sit down at that computer, so we enforce our most

17 stringent rules.

18         When we have seventh or twelfth or eighth grade when

19 it becomes age appropriate, we can put users into groups and

20 allow them more unlimited access.

21  Q.    So if you don't have a user ID, you're in the

22 kindergarten group by default?

23  A.    You're in the most strictest set of rules, yes.

24         MR. BLOCK:  Okay.  I have no further questions, Your

25 Honor.

1          THE COURT:  Redirect?

2          MR. MICKES:  I just have one.

3                         - - -

4                REDIRECT EXAMINATION

5   By Mr. Mickes:

6   Q.     Mr. Cowen, referring to D7, I was a little unclear.

7   This was the exhibit with the LGBT sites.  These are open sites

8   on the Camdenton network?

9   A.     Yes.

10  Q.     Okay.  And a student could access these without --

11  they're not blocked, they could access them anytime they

12  wanted?

13  A.     Correct.

14         MR. MICKES:  That's all.

15         THE COURT:  How do they get open?

16         THE WITNESS:  These do not match on any of the

17  lists, these are open sites.  They have not been categorized by

18  URL Blacklist, and they have not come to our attention as

19  appropriate or inappropriate, they're just out there.

20         THE COURT:  Any further questions by either party?

21         MR. BLOCK:  I have just one question.

22                         - - -

23                RECROSS-EXAMINATION

24  By Mr. Block:

25  Q.     Based on your knowledge of URL Blacklist, where do you

think this website, lgbtbar, what category in URL Blacklist
would you expect lgbtbar to go into once URL Blacklist puts it
in its database?

A.     Well, instantly, being a technology guy, when I see
lgbtbar, the bar, I would say, okay, are we referring to a law
bar, or are we referring to a bar that might have some kind of
pictures or material that would be inappropriate for a second
grader or first grader?

        So I would manually review that site.  And if it was
just a site relating to law, then I would open that if I was
asked to.  But if I was asked by URL Blacklist to attempt to
categorize it, I don't believe that would fit in any of the
categories that they have.

        MR. BLOCK:  No further questions.

        MR. MICKES:  I have one more witness, Your Honor.

        THE COURT:  You may step down.  Thank you very much.
Go ahead and call your witness.

        MR. MICKES:  Mr. Hadfield.

        (Timothy Hadfield was duly sworn by the courtroom
deputy.)

        THE COURT:  Oh.  I have one more question of your
last witness.

        MR. MICKES:  Yes, ma'am.

        THE COURT:  Let's go ahead with this one and then
we'll go back.

1              MR. MICKES:  If you want to talk, ask Mr. Cowen a

2    question now, that's fine.

3              THE COURT:  I would.

4              MR. MICKES:  Mr. Cowen?  Mr. Cowen?  Do you want him

5    to be seated?

6              THE COURT:  Yes.  I apologize.

7              MR. MICKES:  No, that's fine.

8              THE COURT:  I had taken a note about it, and then I

9    was watching the clock.

10             (Witness Randal Cowen re-took the witness stand and

11   testified further as follows:)

12             THE COURT:  When a student goes on Google, can

13   they -- and tries to search for something, will the filter

14   alter the search that they get from Google?

15             THE WITNESS:  No, it does not.

16             THE COURT:  So Google would permit you to identify

17   all of the websites.

18             THE WITNESS:  Yes.

19             THE COURT:  But you could not open the website if it

20   was filtered out.

21             THE WITNESS:  Correct.  You would click on the

22   result, and then you would see Exhibit D1.

23             THE COURT:  So all of the pornography websites will

24   come up on Google.

25             THE WITNESS:  Yes.

1          THE COURT:  You just can't open the website.

2          THE WITNESS:  Correct.

3          THE COURT:  Okay.  Any questions by either party?

4          MR. BLOCK:  No, Your Honor.

5          THE COURT:  You may step down.

6          MR. MICKES:  Thank you.  Mr. Hadfield.  Due to time

7  and he's already been questioned a little bit, we'll try to

8  move through this.

9                         - - -

10                    TIMOTHY HADFIELD,

11  having been previously sworn by the courtroom deputy,

12  testified as follows:

13                         - - -

14                    DIRECT EXAMINATION

15  By Mr. Mickes:

16  Q.     During the time that you've been superintendent of

17  schools or you've worked there as assistant superintendent from

18  2007 to date, have you received any complaints about sites

19  involving gays, homosexuals or lesbians being unfairly blocked?

20  A.     No.

21  Q.     And I discount this lawsuit, but other than this

22  lawsuit.

23  A.     No, sir.

24  Q.     Okay.  Have you had any demands from students or

25  faculty members to block stuff that's on there, complained

1  about what's open to the kids?

2   A.     We may have a request that might come in from a teacher

3  about a site that might be questionable that may go on a

4  blacklist later on, but then that's very, that's not a frequent

5  occurrence.

6   Q.     Would this involve lesbians, gays, LGBTs?

7   A.     No.

8   Q.     Okay.  I think we've had Mr. Cowen take us through this

9  pretty well on how this system works.  In the spring of 2001 --

10  2011, did you receive an inquiry from a Mr. Hill representing

11  himself as associated with the ACLU?

12   A.     Yes.

13   Q.     And did he request information about the filtering

14  system?

15   A.     He did.

16   Q.     And did you prepare a response?

17   A.     Yes, I did.

18   Q.     Would you review that to ensure its accuracy?

19   A.     This is accurate.

20   Q.     Okay.  And No. 2, it looks like he asks for five, asks

21  the status of five websites, and it looks as if one was open

22  and four were blocked.  Is that accurate?

23   A.     Yes.

24   Q.     And the one that was opened, is it It Gets Better

25  Project?

1   A.      Yes.

2   Q.      And to your knowledge, these five, one open and the

3   others closed, are LGBT-type websites?

4   A.      That is my understanding.

5   Q.      And you responded to that May 19, 2011?

6   A.      Yes.

7           MR. MICKES:  Your Honor, I would like to ask that

8   Defendants' Exhibit No. 2 be received.

9           THE COURT:  It's admitted.

10          (Defendants' Exhibit D2 was admitted into evidence.)

11  BY MR. MICKES:

12  Q.      After you received, you responded to Mr. Michael Hill,

13  did you take any action with respect to the four sites that

14  were LGBT sites that were blocked?

15  A.      We -- based on review, we opened those sites.

16  Q.      Okay.  So you went through your, you went through your

17  procedure and opened all of those sites.

18  A.      Correct.

19  Q.      Okay.  Mr. Hill is affiliated with the ACLU?

20  A.      That would be my understanding, yes.

21  Q.      And these sites were unblocked well before the present

22  lawsuit was filed?

23  A.      Yes.

24  Q.      Do you know whether or not the information concerning

25  these websites were being unblocked was communicated to the

1  ACLU?

2  A.     It was communicated.

3  Q.     And the second page at the lower left-hand side, does

4  that indicate that you received a copy of that?

5  A.     Yes.

6  Q.     Okay.  And you've read this letter.  The copy of the

7  letter that you received is an accurate copy?

8  A.     Yes.

9  Q.     And does it indicate to Anthony Rothert, who describes

10  himself as the Legal Director of the American Civil Liberties

11  Union of Eastern Missouri, that this information about

12  unblocking of the sites that they requested was, in fact did

13  happen?

14  A.     Yes.

15         MR. MICKES:  Your Honor, I would like to ask that

16  this, Defendants' Exhibit 3 be received.

17         THE COURT:  It's admitted.

18         (Defendants' Exhibit D3 was admitted into evidence.)

19  BY MR. MICKES:

20  Q.     And, again, this letter was dated June 6, 2011.  That

21  was well before the instant lawsuit that we're here today was

22  filed?

23  A.     Yes.

24  Q.     Now, the popup phase of the unblocking, do you know how

25  long that's been in place?

1  A.      It was my understanding that it's been in place for

2  seven years.

3  Q.      Okay.  And as part of CIPA, the Children's Internet

4  Protection Act, is the district required to develop an internet

5  safety policy?

6  A.      We are.

7  Q.      And does the district have such a policy?

8  A.      We do.

9  Q.      And was it recently modified to include the popup kind

10 of procedure?

11 A.      It was.

12 Q.      Let me hand you what's been marked Policy EHB.  And can

13 you tell the court who develops this policy?

14 A.      Our policies are typically developed by the Missouri

15 School Board Association.  But, again, as a district, you have

16 the ability to modify those policies to make them fit your

17 local needs.

18 Q.      Okay.  And directing your attention to page 4 of 8 of

19 that Policy EHB, does the policy indicate that the district's

20 technology resources are not a public forum for expression of

21 any kind and are considered to be a closed forum to the extent

22 allowed by law?

23 A.      It does.

24 Q.      And that's been a part of your policy since it was

25 provided by the Missouri School Boards Association?

1    A.      That's correct.

2            MR. MICKES:  Your Honor, I would like to offer

3    Defendants' 4.

4            THE COURT:  It's admitted.

5            (Defendants' Exhibit D4 was admitted into evidence.)

6    BY MR. MICKES:

7    Q.      Your policies at Camdenton and with the Missouri School

8    Board Association also have procedures that go with policies;

9    is that correct?

10   A.      That's correct.

11   Q.      Okay.  I'm going to hand you what's been marked as

12   Technology Usage, EHB-AP, and I take it the AP refers to

13   administrative procedure?

14   A.      It does.

15   Q.      And is it an accurate copy of the district's EHB-AP

16   procedure?

17   A.      Yes, it is.

18   Q.      And were there some changes made to that recently?

19   A.      There were.

20   Q.      And those changes are at the bottom of the second to

21   the last page?

22   A.      Yes.

23   Q.      And on into the second?

24   A.      Yes.

25   Q.      And this allows -- this allows, as an alternative to

1  the popup it allows a request to go directly to your office?

2  A.     That is correct.

3  Q.     And it allows for an appeal -- for a dissatisfied staff

4  member or a student, it provides for an appeal to the Board of

5  Education?

6  A.     Yes.

7          MR. MICKES:  Your Honor, I would like to ask that

8  Defendants' No. 5 be received.

9          THE COURT:  It's admitted.

10          (Defendants' Exhibit D5 was admitted into evidence.)

11  BY MR. MICKES:

12  Q.     Let me hand you Policy IIAC-R.  Can you identify that

13  policy for us?

14  A.     This is Policy IIAC-R, Instructional Media

15  Centers/School Libraries/Internet Access, and subtitled

16  Selection and Reconsideration of Materials.

17  Q.     And you've had a policy regarding challenged library

18  material and textbook material for years?

19  A.     For years.

20  Q.     Yeah.  And so the change that you made was to basically

21  incorporate the same language that we talked about in Exhibits

22  D6 and D5 at the bottom to allow a vehicle to appeal to you?

23  A.     We did.

24  Q.     And that was just to be consistent with what we're

25  doing?

1  A.    Yes.

2         MR. MICKES:  And if there's no objections, Your

3  Honor, I'd like to ask that Defendants' 6 be received.

4         THE COURT:  It's admitted.

5         (Defendants' Exhibit D6 was admitted into evidence.)

6  BY MR. MICKES:

7  Q.    And finally, Dr. Hadfield, has any -- has the board or

8  anyone else ever directed you to incorporate separate

9  procedures for unblocking websites related to African

10 Americans?

11 A.    No.

12 Q.    Females?

13 A.    No.

14 Q.    Disabled people?

15 A.    No.

16 Q.    Lesbians, gays, homosexuals?

17 A.    No.

18 Q.    They're all treated the same under your filtering

19 system and unblocking system?

20 A.    Correct.

21 Q.    And have you ever given an order to any of your

22 subordinates to take those kind of discriminatory actions?

23 A.    No.

24        MR. MICKES:  No further questions, Your Honor.

25        THE COURT:  I have a question on these requests.

1  Are they individual?  So if I want to go out, I do a Google

2  search and I want to go out to a site, okay?  That's when the

3  request occurs --

4            THE WITNESS:  Yes.

5            THE COURT:  -- to open it.

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  Is there a process by which you could

8  simply request that all of the sites, for example, that relate

9  to gay, lesbian, and bisexuals that are in the society section

10 of the DMOZ could be opened?

11           THE WITNESS:  I believe a request could be made for

12 that.

13           THE COURT:  But not through your automated system.

14           THE WITNESS:  I believe in the comment section that

15 if that was put in there that that would be taken into

16 consideration, yes.

17           THE COURT:  So in your automated system, somebody

18 could go in and request that.

19           THE WITNESS:  They could, or they could request it

20 in --

21           THE COURT:  In other words, a mass opening of

22 material, as opposed to the opening of a single website.

23           THE WITNESS:  I believe that the popup would deal

24 with the specific website.  But under the comment section, they

25 could put if you were talking about --

1          THE COURT:  You could put anything in the comment

2    section, but it's designed to deal with a specific website.

3          THE WITNESS:  Yes.

4          THE COURT:  Any questions by --

5          MR. MICKES:  No, Your Honor.

6          MR. BLOCK:  I have some questions, Your Honor.

7                        - - -

8                   CROSS-EXAMINATION

9    By Mr. Block:

10   Q.    At the end of your direct testimony, Mr. Hadfield, you

11   said that the district treats the unblocking procedures for

12   LGBT people and African Americans and women the same, right?

13   A.    Yes.

14   Q.    Is there a category in URL Blacklist that blocks all

15   material that's supportive of African Americans?

16   A.    I do not know that.

17   Q.    Is there a category in URL Blacklist that blocks all

18   materials supportive of women?

19   A.    I do not know that.

20   Q.    There's another issue I wanted to clear up, which is

21   that we looked at Exhibit D2, which is the letter you sent to

22   Mr. Hill in response to the Sunshine Act request.  And you

23   talked before about how, according to the June 6th letter, four

24   of these websites were then opened up.  Do you remember that?

25   A.    I do remember that.

1   Q.      But isn't it true that on May 19th after you wrote this

2   letter, you didn't take any steps to have those sites opened up

3   at that date, right?

4   A.      That's correct.

5   Q.      Isn't it true that you received a letter from the ACLU

6   on May 24th that asked for those sites to be opened up?

7   A.      I was sent a letter to the best of my recollection

8   that, yes, there were four websites that were identified.

9   Q.      Handing you Exhibit P18.  Is this the letter?

10  A.      Yes.

11          MR. BLOCK:  I move for it to be admitted.

12          MR. MICKES:  Sure.

13          THE COURT:  It is admitted, P18.

14          (Plaintiffs' Exhibit P18 was admitted into evidence.)

15  BY MR. BLOCK:

16  Q.      If you go to page 3 of the letter, do you see these

17  bullet materials, these six bullet points?

18  A.      I do.

19  Q.      And do you recall reading that, being informed that the

20  websites from the American Psychiatric Association and American

21  Academy of Pediatrics were blocked?

22  A.      Yes.

23  Q.      Do you recall the third bullet point that information

24  about don't ask don't tell is blocked?

25  A.      Yes.

1  Q.    Do you recall information from the CDC and NIH?

2  A.    Yes.

3  Q.    Okay.  And you recall all of the stuff in the next two

4  bullet points too, to save time; is that right?

5  A.    I do.

6  Q.    When you received this letter, did you take any steps

7  to have any of these websites unblocked?

8  A.    I did not.

9  Q.    Handing you Exhibit P19, do you recognize this

10 document?

11 A.    I do.

12 Q.    And at the bottom, that's your CC, right, a copy was

13 given to superintendent Tim Hadfield, right?

14 A.    Yes, sir.

15           MR. BLOCK:  I move to have this entered, submitted.

16           MR. MICKES:  Sure.

17           THE COURT:  Admitted, 19.

18        (Plaintiffs' Exhibit P19 was admitted into evidence.)

19 BY MR. BLOCK:

20 Q.    And this response was sent after consultation with you,

21 right?

22 A.    Yes.

23 Q.    And you got a copy of this response after it was sent.

24 Does it say anything there about any websites at all being

25 unblocked?

1  A.      I do not see any.

2  Q.      Had you made a decision to unblock any websites at that

3  time?

4  A.      No.

5  Q.      Isn't it true that you received a second letter from

6  the ACLU on May 31st, 2011?

7  A.      I believe that's accurate, yes.

8  Q.      And isn't it true that only after that second letter

9  did you finally decide to unblock those four specific websites?

10 A.      I do not recall that, but that could be accurate, yes.

11 Q.      But didn't take any other steps to make sure that

12 other LGBT-supportive information would be unblocked; is that

13 correct?

14 A.      That would be correct.

15         MR. BLOCK:  That's all the questions I have.

16                        - - -

17                 REDIRECT EXAMINATION

18 By Mr. Mickes:

19 Q.      All of the websites that, LGBT that were requested by

20 the ACLU to unblock were put through the system; is that

21 correct?

22 A.      Yes.

23 Q.      And all of them were unblocked; is that correct?

24 A.      I believe the --

25 Q.      One was already unblocked.

1    A.      One was already unblocked, and the others requested

2  were unblocked.

3    Q.      And the letter dated June 6th, 2011, from my colleague,

4  Miss Helfrich, confirmed to the ACLU that these sites had been

5  unblocked; is that correct?

6    A.      Correct.

7    Q.      Had they made any other requests that LGBT sites be

8  unblocked prior to this litigation?

9    A.      Not that I'm aware of.

10    Q.      Prior to, at that time, or since that time, has any

11  student requested that a LGBT site be, student or parent, be

12  removed?

13    A.      No.

14    Q.      During that time, did you have a student ask if she

15  could have, they could start a gay, lesbian, straight, a

16  gay/straight club at Camdenton High School, were you contacted

17  about that?

18    A.      I was.

19    Q.      What was your response?

20    A.      That we would need to treat that organization like we

21  would any other organization at Camdenton High School.

22    Q.      So you have no problems with having a gay/straight

23  alliance club at Camdenton High School?

24    A.      No.

25              MR. MICKES:  That's all.

1          MR. BLOCK:  No questions.

2          THE COURT:  I want to make sure I understand.  It's

3    the policy of the school district, then, to not make any

4    changes unless they're specifically requested to by site.

5          THE WITNESS:  Are you talking any changes to the

6    filtering system?

7          THE COURT:  If it came to your attention that the

8    program wasn't working in a way and a lot of websites were not

9    getting through that were not in the category that you were

10   concerned about, is it your position that until somebody asks

11   you to do something, you will not do something; or are you

12   independently looking at these things and making decisions as

13   to whether or not things should be opened up?

14         THE WITNESS:  Normally the requests would come from

15   a student or a staff member, so, yes.

16         THE COURT:  So absent that, you don't do anything.

17         THE WITNESS:  It would be very rare, Your Honor.

18         THE COURT:  Has it happened?

19         THE WITNESS:  I think probably our technology

20   department would be better served to answer that question.  To

21   my knowledge, I do not know if we've been doing that.

22         THE COURT:  You're the policy maker.

23         THE WITNESS:  I am the policy maker, yes, ma'am.

24         THE COURT:  Any other questions?

25         MR. MICKES:  Just one.

1                          - - -

2                FURTHER REDIRECT EXAMINATION

3   By Mr. Mickes:

4   Q.      You may not have been here when Mr. Cowen, or paying

5   attention when Mr. Cowen talked about the number of new

6   websites that come in on a weekly basis.  He talked about that

7   being hundreds of thousands.

8           Do you have any capacity in the staffing, whether

9   you're the policy maker or not, to have, put eyes on hundreds

10  of thousands every week to determine whether they should be

11  opened or not?

12  A.      Certainly not.  I think we would be in more of the

13  opening-internet-website business than the

14  education-of-children business.

15  Q.      Camdenton School District is a local public education

16  association that's operated by a public board that's voted by

17  the community?

18  A.      Yes.

19  Q.      Okay.  And so when we respond to the community, when

20  they request it open, we take a look at that.  But is there any

21  possible way you could look at hundreds of thousands of

22  websites every week?

23  A.      I do not believe so.

24  Q.      Is there anything in your website -- we've been over

25  this before, but it keeps coming up.

1          Is there anything in your customized process that

2 separates out LGBT websites for special treatment from any

3 other group?

4 A.     No.

5 Q.     Okay.  So anybody that wants an LGBT site or any other

6 site that's closed opened, hits it and the popup, and within 24

7 hours it's open or they get a decision; is that correct?

8 A.     That's correct.  Plus there are hundreds, if not

9 thousands, of LGBT websites that are already opened.

10 Q.    How many students at Camdenton High School?

11 A.    Camdenton High School --

12 Q.    Camdenton School District.

13 A.    4200.

14 Q.    4200.  And how many employees?

15 A.    About 650.

16 Q.    So you have about 2000 people out there who are sources

17 if they want information that they can request it and it will

18 be processed through your policy which was recommended by the

19 Missouri School Board Association; is that correct?

20 A.    That's correct.

21          MR. MICKES:  I have nothing further.

22          THE COURT:  Do you try to build efficiencies into

23 your system?

24          THE WITNESS:  I believe we do, yes.

25          THE COURT:  Any other questions?

1          MR. BLOCK:  No, Your Honor.

2          THE COURT:  You may step down.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right.  I have a criminal matter

5    that I need to take up now.  You'll have to wait until I'm

6    finished with it.  Court is in recess.

7          (A recess was taken from 11:40 a.m. to 11:56 a.m.)

8          THE COURT:  I apologize for the delay.  I believe

9    that the only thing left is argument?

10          MR. ROTHERT:  Yes.

11          THE COURT:  Plaintiffs may begin.

12          MR. BLOCK:  Thank you, Your Honor.  Before turning

13    to the merits, I just want to quickly put to rest this issue of

14    Jane Doe's standing.

15          It's important to emphasize that the defendants have

16    not found a single book censorship case saying that in order to

17    challenge censorship a student has to seek out the materials

18    before they were censored or has to request access to the

19    blocked information before challenging the censorship in court.

20          THE COURT:  But does that assume that there is

21    censorship?

22          MR. BLOCK:  Yes, it does.

23          THE COURT:  In other words, that the intent of the

24    school district is to prevent students from having access to

25    this material.

1          MR. BLOCK:  Yes, Your Honor, as a matter of the

2     merits.  But as the matter of standing, the cases are really

3     striking that, for example, in the case versus Unified School

4     District --

5          THE COURT:  I see what you're saying, that for

6     standing they don't have to show that.

7          MR. BLOCK:  That's right.  And, in fact, there are

8     examples of books being removed that had been on the library

9     shelves for ten years and never checked out once, but students

10    in the school district still had standing to challenge the

11    removal.

12         And the reason why that's the case and the reason

13    why there's no exhaustion requirement in these circumstances is

14    that restricting access itself imposes an unconstitutional

15    stigma on the ability to access fully protected ideas.  And I

16    think the Eighth Circuit's decision in Pratt says this

17    extremely clearly.

18         The Eighth Circuit says, (quoted as read) "The

19    symbolic effect of removing these films from the curriculum is

20    more significant than the resulting limitation of access to the

21    story.  The board has used its official power to perform an act

22    clearly indicating that the ideas contained in the film are

23    unacceptable and should not be discussed or considered.  This

24    message is not lost on students, and its chilling effect is

25    obvious."  And I think that has direct application to this

1  case.

2          THE COURT:  But if they aren't removing it because

3  of content, if it's content neutral.

4          MR. BLOCK:  Yes, Your Honor.  So in terms of the

5  merits, the motivation of the school district is important, but

6  you don't need direct evidence of an admission that the

7  materials are being censored because of dislike of the ideas.

8          It turns out we have some direct evidence in this

9  case from Mr. Hadley (sic) reporting on the views of at least

10  one school member, but, you know, the cases are clear that you

11  can infer the unconstitutional intent based on the objective

12  circumstances.

13          And Pratt, again, is a great example.  The school

14  board in Pratt gave no explanation for removing the films.

15  Some parents had complained, there was an open meeting, and the

16  school board took a vote.  There was no other explanation at

17  all.  And the court said that those facts were sufficient to

18  establish a prima facie case that the material was being

19  removed in order to suppress ideas.

20          THE COURT:  But they have presented evidence that

21  it's not to suppress ideas.

22          MR. BLOCK:  Well, I think we need to be clear.  The

23  burden is on them.  I think we have put forward enough

24  objective evidence to establish the prima facie case.  The

25  burden is on them to then come forward with enough evidence to

1  show a substantial and reasonable reason for doing the

2  censorship.  And if they're unable to meet that burden, then I

3  think --

4          THE COURT:  But you're assuming censorship.

5          MR. BLOCK:  Yes, I'm defining censorship as

6  motivated in part by desire to suppress the ideas contained in

7  the materials, yes.  So I think that there's enough objective

8  evidence in this case in order for a reasonable fact finder to

9  make that inference.  And that evidence -- I can list this off.

10          First of all, the clear facially obvious viewpoint

11 discrimination of this filter is itself powerful evidence that

12 the filter is doing what the school intends.  A second piece of

13 powerful evidence --

14          THE COURT:  Let me ask you a question.  For you to

15 win, do I need to find that the school district, when they

16 implemented this system, intended to prevent access to a robust

17 selection of gay and lesbian websites?

18          MR. BLOCK:  Absolutely not, Your Honor.  If this

19 were a damages claim for censorship that occurred in the past,

20 then you may well have.  This is a claim for injunctive relief

21 going forward.

22          The school's -- what's important now is the school's

23 state of mind in choosing to continue with this filtering

24 software without any rational reason for doing so.  The only

25 reason the school has given is that they need to comply with

CIPA. That is the absolutely only reason. And the evidence is
uncontested that there are other ways to comply with CIPA and
that there are other filtering systems that do just as good or
a better job at complying with CIPA than this system does.

So it's a very fair inference to make that if the
only reason the school is giving for keeping this filtering
system is completely nonsensical, I'm at a loss as to what the
legitimate motivation could be.

THE COURT: What if they just don't want to do it
because you asked them to do it?

MR. BLOCK: I don't think that would be a legitimate
motivation. I don't think suppressing ideas to spite an
outside organization is a constitutional motivation.

And I think it's important that over and over in our
papers, and going back to the Complaint, we've said there's no
reason why the school can't use a viewpoint neutral system, and
they have never given any response to that. They over and over
again say CIPA, CIPA, CIPA, and that just does not justify the
viewpoint-based censorship in this case. Viewpoint censorship
is the cardinal sin of the First Amendment, and if you're going
to engage in that, you need a very good justification for doing
so.

THE COURT: Tell me your evidence of viewpoint bias.

MR. BLOCK: So in addition to the objective evidence
that I think is obvious from looking at the filter itself --

 1          THE COURT:  Wait a second.  It's obvious -- you're

 2    saying that Blacklist intentionally is doing this?

 3          MR. BLOCK:  I'm saying the school has intentionally

 4    chosen to continue with a system that they know does this.  And

 5    I think that they're happy with it, and they would rather keep

 6    it than fix it.  And I think there's a lot of evidence that if

 7    they try to fix it, they'd get some backlash from the

 8    community, and that's very much informing their decisions here.

 9          You had the local Tea Party swarm two consecutive

10    school board meetings demanding not only that this be censored,

11    but that if information is requested to be unblocked that the

12    parents be notified of that.  And you had calls by the head of

13    that group to vote out these two school board members in an

14    upcoming election if their demands for parental notification

15    weren't accepted.

16          I also think that in some ways the amicus briefs

17    filed by ADF are good corroboration that this isn't haphazard

18    or random suppression of LGBT viewpoints.  It aligns with a

19    pattern that many groups have advocated in the past that, a

20    pattern of wanting to suppress nonsexual LGBT content, such as

21    GLSTN or GSA Campaign or PFLAG, and to tar that content by

22    associating it with pornography.

23          And, you know, I think whatever the motivations of

24    the founders of URL Blacklist, they definitely made a

25    viewpoint-based decision that gay and lesbian and sexuality are

1  two categories that go together.  And, you know, it could be,

2  whatever biases are motivating that decision, they're

3  definitely there.  I don't think that -- it's unconstitutional

4  to act on those biases, whether or not you necessarily are

5  consciously aware that you're acting on it.  They're making a

6  deliberate decision to lump these categories.

7            THE COURT:  I may have missed this, but is there

8  evidence that heterosexual behavior is filtered out as well

9  from Blacklist.org, or is it just homosexuality that's put in a

10  sexuality context?

11            MR. BLOCK:  Yes.  The sexuality category of DMOZ

12  includes heterosexual practices.  And they don't include

13  monogamous practices, they include stuff like swinging or other

14  fetishes or sort of, you know, alternative sexualities.  And

15  those sort of alternative or subjectively deviant sexual

16  practices are grouped together with a separate category for gay

17  and lesbian.

18            THE COURT:  Okay.  You've lost me again, and perhaps

19  I didn't follow this.  DMOZ is not Blacklist.

20            MR. BLOCK:  That's correct.

21            THE COURT:  DMOZ is a volunteer organization that

22  categorizes these things.

23            MR. BLOCK:  Yes.

24            THE COURT:  So my question was about Blacklist.  How

25  does Blacklist deal with heterosexuality?

1          MR. BLOCK:  So some heterosexual practices are
2   included in Blacklist's sexuality category if they were
3   included in DMOZ's sexuality category.
4          THE COURT:  Oh, okay.
5          MR. BLOCK:  There's also, you know, heterosexual
6   practices are included in pornography or sometimes in adult.
7   But I think, you know, the flaw here is saying the comparison
8   for PFLAG is a heterosexual sex website.  The comparison for
9   PFLAG is Parents and Friends of Ex-Gays, and I think the
10  comparison is even starker when you get to LGBT religious
11  organizations like Dignity.  I think it is -- and these are
12  listed in our --
13         THE COURT:  So those sites are not blocked.
14         MR. BLOCK:  Those sites are blocked in the sexuality
15  category.  If you are an LGBT religious organization like
16  DignityUSA or Evangelicals Concerned or the other religious
17  organizations listed in our Complaint, you are not put in the
18  religion category if you are on Blacklist.  You are, because
19  you advocate acceptance of LGBT people, you are put in the
20  sexuality category.  So you can compare Dignity to Knights of
21  Columbus, which is all about what --
22         THE COURT:  And what I was trying to figure out is
23  does Blacklist put Knights of Columbus in the nonsexual
24  category, even when they're talking about sexual issues?
25         MR. BLOCK:  Absolutely.  Sexual issues in terms of

1   are people born gay, is homosexuality a sin, is it a dangerous

2   lifestyle that's likely to cause you to get AIDS, you know, can

3   I change my sexual orientation, all of that is under religion.

4   And it's true for Family Research Council, it's true for

5   Knights of Columbus.  And it also becomes stark in the context

6   of political campaigns.  You could have websites for and

7   against specific issues, but the site that is anti, vote yes on

8   Prop 8 gets put in religion, and vote no on Prop 8 gets put in

9   LGBT.  So I think it's an extremely stark example of viewpoint

10  discrimination.

11          And in terms of inferring intent, I think you would

12  expect if someone doesn't, isn't happy with that viewpoint

13  discrimination, you would expect that when they're alerted to

14  it, they would actually do something about it.  You know,

15  the -- it was mentioned in the briefs that we've written

16  letters to other schools about sometimes the school has

17  misconfigured their filtering software.  Like, for example,

18  Blue Coat has an LGBT category that's nonsexual, but some

19  schools have mistakenly activated it.

20          We've had dozens and dozens and dozens of schools

21  once they're contacted by us fix the problem.  This is the only

22  school we've sued.  And so this sort of adamant, I want to

23  continue this viewpoint discrimination in the face of all

24  common sense, actually, I think that is a powerful indicator of

25  unconstitutional motivation here.

1      Unless there are any other questions --

2          THE COURT:  How do you address the issue that the
3   burden should be on the student or a third party to ask website
4   by website for it to be opened?

5          MR. BLOCK:  Well, defendants themselves have said it
6   would be so burdensome to comb through URL Blacklist and find
7   accepting, LGBT-supportive websites.  So it's too burdensome
8   for the school, but apparently it's not too burdensome for the
9   student?  We're going to have a student, a 13-year-old or
10  14-year-old kid who is trying to find suicide resources comb
11  through it?

12         And their other response is, well, there are the
13  found 40 websites that have not yet been categorized by URL
14  Blacklist and, therefore, are not yet blocked by the sexuality
15  filter.  And the idea that a student is supposed to continue
16  trying to click on sites until they stumble upon this site that
17  just happens to have slipped through I don't think cures the
18  burden either.  Even if it did cure the burden, there's still
19  the unconstitutional stigma also.

20         In the Harry Potter book case, a student challenged
21  the parent notification requirement, even though that student
22  had her parents' written permission and could check out the
23  book anytime she wanted, but the court still said there's an
24  unconstitutional stigma here on fully protected ideas, and that
25  itself is a violation of the First Amendment.

1          THE COURT:  Okay.

2          MR. BLOCK:  If there are no further questions.

3          MR. MICKES:  Thank you, Your Honor.  I want to

4   address the standing issue first.  In spite of the -- I thought

5   the statements directed from the bench that these cases that

6   were all cited were taking cases, they were censorship cases,

7   they were cases that were taken out of a library, they were

8   cases that were taken off a supplemental reading list.

9          This is not a taking case.  There's no evidence

10  whatsoever that LGBT or anybody else's websites are blocked and

11  taken off and you can't access them in any way.  In fact, the

12  evidence, even with the, even -- we had a list two pages long

13  of LGBT sites that are open.  We had four sites, five sites

14  that were requested prior to the litigation to be unblocked.

15  One of those already unblocked.

16         THE COURT:  So if you had, if you had 50 sites that

17  you could access Republican candidates and 200,000 that you

18  couldn't, are you saying that would not be censorship?

19         MR. MICKES:  I think if the intent, if the intent

20  was to discriminate against a group because of their feelings,

21  I think you could make that argument, but there's no evidence

22  whatsoever of any intent to block lesbian and gay sites.  In

23  fact, every one at the, every one that was brought up by the

24  ACLU was unblocked.  There was a list two pages long of

25  unblocked.

1          Jane Doe didn't request that any site was unblocked.

2    In order to have standing, the law is pretty clear.  It says

3    that Jane Doe has to have suffered an injury in fact, a

4    concrete and particularized, actual or imminent, not

5    conjectural or hypothetical.  This is all conjectural or

6    hypothetical.  She didn't do anything.

7          THE COURT:  I don't want to -- I do want to

8    interrupt because otherwise I won't get my questions answered.

9          You were contacted about problems with the website,

10   about the use of Blacklist.

11         MR. MICKES:  We were contacted about perceptions of

12   problems with the website.

13         THE COURT:  Okay.  You were contacted by

14   organizations --

15         MR. MICKES:  The ACLU.

16         THE COURT:  -- about a concern that whatever

17   filtering device you were using was discriminating of gay and

18   lesbian sites --

19         MR. MICKES:  That's correct.

20         THE COURT:  -- is that correct?  And that was before

21   the lawsuit.

22         MR. MICKES:  That was before the lawsuit.

23         THE COURT:  So if you are aware of it and do nothing

24   about it, is that censorship?  Is that sufficient evidence of

25   censorship to give standing?  Because that would have occurred

1  before the lawsuit was filed.

2          MR. MICKES:  It is not, and it's not for these

3  reasons, Your Honor.

4          THE COURT:  Tell me why.

5          MR. MICKES:  No. 1, they had four, five sites that

6  they requested.  One was already unblocked before the request

7  came, four were unblocked after the request.  Now, if we were

8  to say that --

9          THE COURT:  Well, maybe I'm missing something.  And

10 I'm concerned that I don't understand the facts.  There were

11 letters asking to unblock certain sites.

12         MR. MICKES:  Yes.

13         THE COURT:  And that's what you've been talking

14 about.

15         MR. MICKES:  Yes.

16         THE COURT:  I thought that before the lawsuit, they

17 contacted you and said there was something wrong with

18 Blacklist, that Blacklist was operating in a way that

19 discriminated against gay and lesbian sites.  Am I incorrect or

20 correct in that?

21         MR. MICKES:  I think they certainly suggested that

22 we use different filtering systems.  They did not like URL,

23 they felt it was discriminatory.  But I would say this, Your

24 Honor.

25         THE COURT:  And that occurred before the lawsuit was

1  filed.

2        MR. MICKES:  That occurred before the lawsuit.

3        THE COURT:  Okay.

4        MR. MICKES:  And we took that under consideration.

5  They contacted legal counsel.  We looked at the issues, we

6  talked to our technology people.  We went through the

7  technology people, the technology people said, we believe with

8  our customized system there is no discrimination, every group

9  is treated the same.  Just because the ACLU or some other

10 liberal group says, hey, you know, I don't like what you're

11 doing, you've got to change that and if we don't change it,

12 then somehow we're showing discrimination, that's not the law.

13 That would be crazy.  And --

14        THE COURT:  Unless the failure to change could be

15 interpreted as discrimination.  Clearly just asking can't be

16 enough, but the failure -- what I'm trying to figure out is

17 what the legal test is for purposes of understanding.

18        MR. MICKES:  If I have a group that says, I think

19 that you guys, you block recreational use of marijuana and it's

20 discriminatory and you need to take these sites down because

21 there are certain areas, certain parts of the country where

22 medicinal marijuana is legal and is used and we say we're not

23 going to do that, does that mean that we're censoring that,

24 illegally censoring?  I guess censoring from just saying we're

25 not going to put it on, but that's not illegal censoring.

1          THE COURT:  If it occurred before the lawsuit, then
2     the question is does the person have standing to even find out
3     whether legally you are censoring something.
4          MR. MICKES:  Well, clearly this lawsuit was filed by
5     four website producers.  That was before -- Jane Doe was a
6     last-minute add.  And clearly corporations that purvey websites
7     have no standing at all because if they had standing, every
8     publisher that we don't use has standing to sue us, every
9     vendor that we don't use.
10          So there's no standing.  The only standing that is
11    possible is Jane Doe.  And Jane Doe is a last-minute add.  I
12    wanted to take her deposition, and they said, oh, we'll
13    stipulate that she's never done, she's never made any requests,
14    she's never done this, she's never done anything.  The law says
15    you have to have a particularized harm.  And what the ACLU did
16    with their letter four or five months earlier doesn't change
17    fact one.  It just doesn't.  There's no standing in this case,
18    or hasn't been standing.
19          We were prepared to file a motion to dismiss because
20    the four purveyors of websites didn't have standing, and while
21    we were talking to the board, you know, we got, Jane Doe got
22    popped in.  Then I tried to take her deposition to find out
23    what her harm was, and we get the stipulation that she's not
24    been harmed at all.
25          If you look at the standards about particularized

1  harm, you can't bootstrap that on the back of a letter that
2  ACLU sent.  ACLU is very proud of it, every school district
3  that they sent this letter to caved in.  Well, you know, I
4  guess that's something to be proud of if you belong to that
5  organization, but every --
6          THE COURT:  What about this Harry Potter case?  If,
7  in fact, the court were to conclude that there was evidence of
8  censorship prior to the filing of the lawsuit, how would you
9  distinguish the Harry Potter case?
10          MR. MICKES:  I think the Harry Potter case is a
11  censorship case.  I don't see this as a censorship case.  They
12  haven't been denied access to anything.  Any student --
13          THE COURT:  I understand that, but that wasn't my
14  question.  My question was, what if I found that it was a
15  discriminatory viewpoint-based censorship prior to the lawsuit,
16  would there then be standing?
17          MR. MICKES:  No.
18          THE COURT:  And why not?
19          MR. MICKES:  Because there's not a particularized
20  harm --
21          THE COURT:  How do you distinguish the Harry Potter
22  case?
23          MR. MICKES:  There's not a particularized harm to
24  that particular student.  She hasn't asked for access to Harry
25  Potter.  She hasn't asked for access to anything.

1          THE COURT:  So in the Harry Potter case, she had

2   asked for it --

3          MR. MICKES:  It's my understanding, Your Honor.

4          THE COURT:  -- and had been denied.

5          MR.  MICKES:  I'm not a Harry Potter fan, but that's

6   my understanding.  In all the cases that were cited by counsel,

7   they were all great cases except that they were all taking

8   cases.  This is not a taking case.  Any student or any faculty

9   member can go online and hit any website that he or she wants.

10  And if it's blocked there's an immediate request.  I would

11  suggest --

12         THE COURT:  If you're assuming that that makes it

13  not censorship, that --

14         MR. MICKES:  I firmly do.

15         THE COURT:  -- would undermine -- don't interrupt

16  me.  I only get to interrupt you.  That would undermine your

17  standing argument.

18         MR. MICKES:  I would say this, Your Honor.  I think

19  that if -- the case that controls this case is the U.S. Supreme

20  Court, the American Library Association case.  And Justice

21  Stevens -- I know it's dicta, but Justice Stevens was talking

22  about this very same issue.  And he said if there is a process

23  in place to get review and get a prompt decision on that

24  blocked site, there's no case.  That's what he said, and that's

25  what the Supreme Court said.

1          And this dealt with the Library Association, and
2    they didn't have a standing issue because they have a whole
3    bunch of individuals along with the Library Association.
4    That's a different case here, but the legal principles are
5    exactly the same.

6          THE COURT:  So if I block all the Republican sites,
7    as well as someone can ask for permission to have access to a
8    Republican site, that doesn't make it censorship.

9          MR. MICKES:  I think it makes it censorship, Your
10   Honor.  And if that's what we were talking about here, I
11   wouldn't be standing here and arguing in front of you.  We have
12   two pages of LGBT sites that are open, any student has the
13   ability.  The scenario that I understand you to be setting for
14   me is that it's all Democrats or it's all Republicans and none
15   of the other and no matter what you do you can't get anything
16   up.  There's no evidence of, there's no evidence at all of that
17   in this case.

18         After we got done with the standing argument,
19   everything that I heard after the standing argument was
20   conjecture about what counsel thought the facts were or thought
21   the testimony was.  None of that was there any testimony on.
22   The two experts admitted they had no idea, never been to
23   Camdenton, had no idea how their system worked at all, but they
24   went on and talked about that.  That testimony is minimally
25   valuable, but we went on and we talked about it as if, you

know, that's testimony and we just started making stuff up as
we wanted that wasn't, there was no testimony at all.

      THE COURT:  Is it correct that everything goes
through Blacklist.com before it goes to your -- assuming you
started from -- let me make sure I understand the facts.

      When you first start, you have Blacklist.com.

      MR. MICKES:  Yes.

      THE COURT:  Then you develop independently a
blacklist and a whitelist that's customized based upon
inquiries that you have.

      MR. MICKES:  Yes.

      THE COURT:  Is that correct?

      MR. MICKES:  That is correct, Your Honor.  That's my
understanding, anyway.

      THE COURT:  So until there's an inquiry, it's
blocked.

      MR. MICKES:  Right.

      THE COURT:  Okay.

      MR. MICKES:  And we have evidence that, Mr. Cowen
testified that there had been over 2000 inquiries, and 80
percent of those had been open.

      THE COURT:  How many come online every day or every
week?

      MR. MICKES:  He testified that several hundred
thousand, and that's the problem that we have.  I am such a

 1  technological disaster.  I can't get on there.  But I asked

 2  him, I said, could you do this manually as they come on?  And

 3  he said, I would have to hire a couple hundred people, and

 4  that's all they would do.

 5          I am disappointed that the school district has been

 6  attacked because when the ACLU sends a nasty letter they don't

 7  cave in and do what they want them to do.  They stand up and

 8  say, you know, we're going to do what's right.  And by God,

 9  they do have a right to do that.  They cite one board member.

10  Well, Your Honor knows there's seven board members, and I would

11  like to say out of the 300 districts that we work with, all

12  2100 are, you know, rocket scientists who always act

13  rationally, but that's not the case.  But because one person

14  says something, it's one person's opinion, and until the board

15  acts it doesn't mean anything.

16          And the board did act.  The board says, no, we're

17  not going to do, we're not going to require that before we open

18  the site we get parental permission, we're not going to do

19  that.  So to hold Mr. Beckett up as some kind of boogeyman,

20  he's one person.

21          THE COURT:  Do you have any legal things that you

22  want to talk about?

23          MR. MICKES:  I thought I'd been doing that.  I've

24  just kind of been voicing -- I apologize, Your Honor, but --

25  it's clearly, there's no standing here.  If this was a, if

1   there was any evidence at all other than pure conjecture from

2   counsel in his closing argument that there was, we discriminate

3   against LGBTs, I asked that question.  I was the only one that

4   asked that question.  I asked it over and over and over and

5   over again.  I got the same answer.  All of the sides are

6   treated the same.  And that's -- I appreciate your indulgence

7   in listening to me ramble.  Thank you, Your Honor.

8           THE COURT:  A minute.

9           MR. BLOCK:  Okay.  I'll just be very, very quick.

10  Just in addition to the viewpoint, I think you heard from

11  Mr. Mickes right here that I think the fact that this letter

12  came from the ACLU as opposed to another organization and

13  people find it politically convenient to say we're standing up

14  to the ACLU by censoring this material I think is additional

15  evidence of viewpoint.

16          THE COURT:  I want to know from you, though,

17  prior -- if no letter had ever been sent, would Jane Doe or

18  anybody else have standing to challenge the school district?

19  And if so, what would be the basis?

20          MR. BLOCK:  If the district had no knowledge of this

21  and it was occurring by accident, I think someone would have

22  standing.  I think they would lose on the merits because it was

23  occurring by accident.

24          THE COURT:  Why would they have standing?  That's

25  what I'm trying to understand.

1          MR. BLOCK:  Right.  Well, you know, I think

2     obviously, the injury fact inquiry folds into standing.  So I

3     think that to the extent that you can project ahead and say I'm

4     not going to find ultimately that there's no injury, then you

5     would be denied standing.  The court could also view this as

6     more distinct inquiries.  In terms of, in terms of there were

7     just two --

8          THE COURT:  I guess, do you have to if you're a

9     student ask for it and be denied it before you have standing to

10    challenge the practice?

11         MR. BLOCK:  Absolutely not.  There's not a single

12    case involving book removals in which any student asked for it

13    and was denied it.  The school just voted, we're taking away

14    this book.  The idea that a student previously had to have made

15    a request and exhausted their remedies before the school

16    doesn't cure that, and it certainly doesn't cure the viewpoint

17    discrimination issue here.

18         THE COURT:  What was the viewpoint discrimination if

19    nobody has ever asked them to do anything and they're not aware

20    that, in fact, it's filtering out gay and lesbian stuff?  And

21    there's no evidence here that before you asked, there was any

22    evidence that they knew it was filtering out gay and lesbian

23    stuff.

24         MR. BLOCK:  Right.  So I think if someone, I don't

25    think there would be a claim if they had no idea this was

1    occurring.  And so I guess the first student that filed, at

2    that time, you know, filed a complaint and says this is

3    occurring, you know, there would have been no claim for

4    retrospective relief whatsoever.  I think the next day or the

5    next week or the next month when the next student files and

6    they're on notice about it, if they continue to do it going

7    forward, there is a claim for injunctive relief at that point.

8              THE COURT:  All right.  Anything else?

9              MR. BLOCK:  No, that's okay, Your Honor.  Thanks.

10             MR. MICKES:  I just have one thing, Your Honor.  The

11   ACLU may not be my favorite organization, but to say that

12   that's evidence, because somebody doesn't agree with the ACLU

13   that's evidence of discrimination, and the comparison I made

14   was that we get letters from groups, school districts get

15   letters from groups all the time.  They have to sift through

16   those letters and make the decisions that they think are

17   appropriate for their community with the assistance of counsel.

18   And that's all that happened here, and the fact that the letter

19   came from the ACLU and not the John Birch Society doesn't make

20   any difference at all.  That's the way we treat it.  Thanks,

21   Your Honor.

22             THE COURT:  Have you all tried to settle your case?

23   Have you thought that maybe you could go through some kind of

24   mediation process and try to get your case settled?  Would that

25   be helpful to the parties?

1      MR. MICKES:  Well, Your Honor, we did offer to, if

2   there were specific sites that were a problem, we would unblock

3   those.  If there are groups of sites, we'll unblock groups of

4   sites.  Yeah, that's fine.

5      THE COURT:  So if, for example, this DMOZ, dmoz.org,

6   you would be willing to unblock all of the sites that are

7   listed under society and gay and lesbian?

8      MR. MICKES:  It certainly is a suggestion.  The

9   superintendent is sitting right here.  We'll certainly look at

10  that, Your Honor.

11     THE COURT:  But would it be helpful for you to work

12  with a mediator to talk with that?

13     MR. MICKES:  I don't -- with all due respect, Your

14  Honor, I've been doing this a long time.  I don't think so.  I

15  mediate most of my cases.  I really don't think so.  I think

16  this is something the district has to work through.  And I

17  think they have a good system, and I think there's ways,

18  there's ways that they can improve the system, and I think

19  they're certainly willing to do that.

20     But I would with due respect ask you to carefully

21  consider the American Library Association Supreme Court case

22  that deals with this.

23     THE COURT:  We will consider all the law.  Court's

24  in recess.

25     (Hearing adjourned.)

1                              - - -

2                           CERTIFICATE

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7    November 14, 2011

8                              /s/_____
                               Kathleen M. Wirt, RDR, CRR
9                              U.S. Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25