# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| PARENTS, FAMILIES, AND FRIENDS OF LESBIANS AND GAYS, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 2:11-cv-04212 |
| CAMDENTON R-III SCHOOL DISTRICT, et al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Pending before the Court is Plaintiff Parents, Families, and Friends of Lesbians and Gays's ("PFLAG"), and others', Motion for Preliminary Injunction [Doc. #6] pursuant to Federal Rule of Civil Procedure 65(a). PFLAG claims that Defendant Camdenton School District, and others, implemented internet filtering software that systematically blocks websites expressing a positive viewpoint toward lesbian, gay, bisexual, and transgender ("LGBT") individuals, in violation of PFLAG's freedom of expression under the First Amendment. The Court held a hearing on October 27, 2011. For the following reasons, the Court GRANTS the motion.

## I.      Background

Plaintiffs are PFLAG, DignityUSA, the Matthew Shepard Foundation, and Campus Pride–all publishers of websites that provide supportive resources directed at

1

LGBT youth.  Jane Doe, a student at Camdenton school district proceeding under a pseudonym, is also a Plaintiff.  Defendants are Camdenton School District and Timothy Hadfield, as Superintendent of Camdenton School District.

Camdenton uses a custom internet-filter system based around a free product called URL Blacklist.  URL Blacklist comprises several "filters" – lists of blocked websites arranged by subject matter – each of which network administrators can enable or disable to control the subject matter that their network users can access on the internet. Camdenton's internet-filter system enables the following URL Blacklist filters: advertisements, pornography, mixed adult, and sexuality.  Camdenton claims that it uses the URL Blacklist to comply with the Children's Internet Protection Act's ("CIPA's"). This requires schools to protect children using school computers from viewing visual depictions that are obscene, child pornography, or harmful to minors.  47 U.S.C. § 254(h)(6)(B)(i).

Camdenton also claims that its computer system is customized because its IT staff has manually created white lists and black lists to open or close certain websites. However, the URL Blacklist program is the default filter blocking all URL Blacklist sites until Camdenton's staff intervenes.  So Camdenton's customization is only triggered once a student or school official asks to open or close a specific website.  Otherwise, the URL Blacklist controls a student's access to the internet. However, once a website is put on the white list by Camdenton, the URL Blacklist filter no longer controls and access is automatic thereafter.

Camdenton has two procedures in place by which a student can request access to a website that is blocked by a URL Blacklist filter. The first is to send an email to the school superintendent requesting permission to access the website. The second is through a request template presented to the user each time the user tries to access a blocked website. This template has a space for a username and a space for any comments. Camdenton responds to these requests by manually checking the requested site for appropriateness and then granting or denying access within twenty-four hours of the request. During the five or six years this procedure has been in place, Camdenton has received around 2,000 requests, and has granted around 80% of them. (Tr. 95).

PFLAG asserts that this system, as currently configured, systematically burdens websites expressing a positive viewpoint toward LGBT individuals. PFLAG requests: "An injunction prohibiting Defendants from continuing to use Internet filtering software that blocks access to LGBT-supportive viewpoints while permitting access to anti-LGBT viewpoints." [Doc. # 1 at 35].

## II. Findings of Fact

The Court finds the following facts for purposes of this motion. These facts are not binding at trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). But evidence received during the hearing for preliminary injunction "that would be admissible at trial becomes part of the trial record and need not be repeated at trial." FED. R. CIV. P. 65(a)(2).

### A. The Court Finds That URL Blacklist Discriminates Against Websites

3

**That Express a Positive View Toward LGBT Individuals**

The Court finds that URL Blacklist systematically blocks websites that express a positive view point toward LGBT issues.

The URL Blacklist website states that it compiles its lists of blacklisted internet domain names from other websites. The one website that URL Blacklist explicitly states that it draws from is dmoz.org. DMOZ is a volunteer-compiled directory of the highest quality informational websites, organized by subject matter. DMOZ is not designed for the purpose of blacklisting websites. DMOZ contains a "society" category of websites that contains a subcategory labeled "sexuality" and a separate subcategory labeled "gay, lesbian, and bisexual." The "gay, lesbian, and bisexual" subcategory has sub-sub-categories such as "history," "law," "media," "politics," and "religion and spirituality." The Court finds that URL Blacklist drew its list of blocked websites for its "sexuality" filter from both the websites in DMOZ's "sexuality" subcategory and the websites in DMOZ's "gay, lesbian, and bisexual" subcategory. Over 99% of the websites included in DMOZ's "sexuality" subcategory appear in URL Blacklist's "sexuality" filter. (Tr. 43). Over 99% of the websites included in DMOZ's "gay, lesbian, and bisexual" subcategory appear in URL Blacklists's "sexuality" filter. (Tr. 43).

Sexuality filters are normally used to filter out pornographic material, but the URL Blacklist filter has the affect of filtering out positive material about LGBT issues as well as pornographic material. PFLAG has identified forty-one websites blocked by URL

Blacklist's "sexuality" filter that express a positive viewpoint toward LGBT individuals. (Tr. 33). PFLAG tested these forty-one websites on five different internet filter systems designed to help schools comply with CIPA. None of these five filter systems blocked any of these forty-one websites as prohibited by CIPA. (Tr. 34-35). On the other hand, URL Blacklist generally categorizes websites expressing a negative view toward LGBT individuals in its "religion" category, and does not block them with its "sexuality" filter. (Tr. 37). Thus, URL Blacklist systematically allows access to websites expressing a negative viewpoint toward LGBT individuals by categorizing them as "religion", but filters out positive viewpoints toward LGBT issues by categorizing them as "sexuality".

The Court's finding of viewpoint discrimination is not undermined by Camdenton's small list of websites expressing a positive view toward LGBT individuals that are currently "open," or not blocked by any of URL Blacklist's filters. (Tr. 99). First, Camdenton has not presented any evidence of the informational quality of the sites left open by URL Blacklist. In contrast, PFLAG has demonstrated that URL Blacklist, through its manipulation of DMOZ categories, systematically targets the highest-quality informational sites that express a positive viewpoint toward LGBT individuals. Second, Camdenton's list of open websites does not refute PFLAG's evidence that when URL Blacklist assigns a category to websites, it assigns websites expressing a positive view toward LGBT individuals to its "sexuality" category, which Camdenton blocks, while assigning websites expressing a negative view toward LGBT individuals to its "religion" category, which Camdenton does not block. In fact, the record reflects that when a

5

website identified as religious – such as Evangelicals Concerned – expresses a positive viewpoint toward LGBT individuals, URL Blacklist categorizes that website in its "sexuality" filter, rather than its "religion" filter.  (Tr. 136); [Doc. # 1 at 15].  Third, Camdenton's list of "open" websites could just as easily be explained by URL Blacklist's general ineffectiveness at identifying and categorizing some websites.  The record supports this interpretation because when tested on a random sample of 500 sexually explicit websites, URL Blacklist's sexuality filter categorized thirty percent of them as "open," even though they were sexually explicit. (Tr. 52).  In contrast, CIPAFilter, an internet filter designed to help schools comply with CIPA, only failed to block 3.2% of these sites.  (Tr. 52).  Thus, although URL Blacklist allows access to some websites expressing a positive view toward LGBT individuals, whether by design or by error, it is clear that URL Blacklist systematically burdens access to this viewpoint, especially with regard to the highest quality information on the internet as defined by the industry standard DMOZ.

   **B.    The Court Finds That by Continuing to use URL Blacklist, Despite Notice that URL Blacklist Discriminates Based on Viewpoint, Camdenton has Itself Intentionally Discriminated Based on Viewpoint**

       The Court finds Camdenton intended to discriminate based on viewpoint because Camdenton continues to use URL Blacklist despite being given notice by the ACLU of URL Blacklist's viewpoint-discriminatory effects.  The ACLU sent two letters to Camdenton officials explaining that URL Blacklist's "sexuality" filter systematically blocks websites that express a positive view toward LGBT individuals and that are not

6

prohibited by CIPA. (Tr. 122-24). Although Camdenton agreed after the second letter to unblock four such websites that were specifically identified by the ACLU in those letters, Superintended Hadfield testified at the hearing that he "didn't take any other steps to make sure that other LGBT-supportive information would be unblocked..." (Tr. 124).

The Court's conclusion is based in part on the demonstrated inability of URL Blacklist's "sexuality" filter to effectively filter out content prohibited by CIPA, that is, visual depictions that are obscene, child pornography, or harmful to minors. This is important because Camdenton does not assert an interest in protecting its students from websites expressing a positive view toward LGBT individuals. Rather, Camdenton only asserts an interest in protecting its students from content prohibited by CIPA. Thus, Camdenton's continued use of URL Blacklist, which does not effectively block content prohibited by CIPA, suggests an ulterior motive. David Hinkle, the developer of CIPAFilter–an internet filter system designed to assist school districts in complying with CIPA while maximizing student access to otherwise-appropriate websites–found that CIPAFilter only deemed 2.4% of the websites in URL Blacklist's "sexuality" filter to be prohibited by CIPA. (Tr. 47). Further, when Mr. Hinkle tested 500 CIPA-prohibited websites on both internet filter systems, he found that URL Blacklist's "sexuality" filter failed to block over 30% of CIPA prohibited sites, whereas CIPAFilter failed to block only 3.2% of the CIPA prohibited sites. (Tr. 52). Thus, CIPAFilter and its competitors are much more effective than URL Blacklist at achieving Camdenton's stated goal of complying with CIPA, and do so without burdening websites that express a positive

7

viewpoint toward LGBT individuals. Camdenton's continued use of URL Blacklist in light of this demonstrated information shows an intent to discriminate based on viewpoint.

Camdenton's continued use of URL Blacklist likewise suggests an intent to discriminate based on viewpoint because URL Blacklist does not comply with professional standards of librarianship. Dr. Stripling, the Director of School Library Services in New York City, testified at the hearing that URL Blacklist failed to meet professional standards for several reasons. First, URL Blacklist lacks clear criteria for categorizing websites. (Tr. 10). Second, URL Blacklist lacks credibility because it does not disclose the names or qualifications of the people making its categorization judgments. (Tr. 10). In fact, the creator of URL Blacklist operates under the pseudonym "Dr. Guardian" out of a small residence in the United Kingdom countryside. (Tr. 26-27). Third, Dr. Stripling did not find URL Blacklist to be viewpoint-neutral. (Tr. 11). Dr. Stripling also testified that Camdenton's system of unblocking sites on an individual basis does not bring its system into compliance with professional standards. This, because students "can't know what sites are unavailable if they're blocked," because of the stigmatizing effect on information when students must specifically request access to it, and because of the negative effect on a school community of burdening alternative viewpoints. (Tr. 11-12).

Finally, the record contains direct evidence that Camdenton intended to discriminate based on viewpoint. Superintended Hadfield agreed at the hearing that

school board member John Beckett has expressed "concern with students accessing websites saying it's okay to be gay." (Tr. 76). At a public school board meeting, Mr. Beckett stated that "the amended policy may not have gone far enough," and that he would like to require parental consent before allowing students to access these sites. (Tr. 67). Superintendent Hadfield also testified that thirteen individuals from the community spoke at a public meeting and that all thirteen "were supportive of the school district's stance" on keeping the current filter in place. (Tr. 64). This, despite the ACLU's warnings that the current system discriminated based on viewpoint. One such parent remarked: "If the parent allows this in the house, that's one thing, but to do it outside the family circle, you usurp the authority of the parents." (Tr. 66). These statements are direct evidence that Camdenton continued to use URL Blacklist, despite it being ineffective and falling below professional standards, out of an intent to continue to burden websites expressing a positive viewpoint toward LGBT individuals.

> **3.** **The Court Finds That Camdenton's Internet-Filter System Stigmatizes, or at Least Burdens, Websites Expressing a Positive View Toward LGBT Individuals, Despite Its Procedure for Requesting That Individual Websites be Unblocked**

First, it is not clear that Camdenton's process for requesting that a website be opened is truly anonymous. In order to submit a request, students must fill out a form that pops up whenever they attempt to access a blocked site. There is a space on the request form for students to include their "Username." Camdenton's Network Administrator, Randal Cowen, testified at the hearing that students could enter any information they

want in this space, such as their dog's name or a number, and their request would be processed. (Tr. 101). But the form itself appears to require, or at least encourage, students to enter a username that is a derivation of their real name:

> Please use your Novell Username Below. (Example: jdoe for John Doe, otherwise you will not receive email responses!)

Exh. D1 at 2.

Further, Mr. Cowan testified that students could visit a website where they could enter the "username" they had entered on the request form and see the status of all requests made under that username. (Tr. 101). But a student would have to enter the same username every time they made a request to take advantage of this system. Thus, if Camdenton became aware of the identity of a student using a computer when any single request was made, Camdenton would be aware of all the requests ever made by that student. Camdenton could become aware of which student made a particular request either through faculty monitoring of which student was present at a computer at a given time, or by encouraging students to sign on to computers using a user ID. In fact, Mr. Cowan testified that unless students sign on using a user ID assigned to them by the school, they will be limited to the strictest set of internet filters, designed for kindergartners. (Tr. at 108). There is little doubt that Camdenton can trace any student with a user ID to every request made by that student if it elects to do so. Finally, Camdenton's counsel has publicly stated that Camdenton's unblocking process would "involve identifying the student who wants to...open the material," although Hadfield

testified that Camdenton's counsel's statement was "not totally true."  Exh. P33; (Tr. 70-72).

Second, for the reasons discussed immediately above, some students will likely perceive Camdenton's unblocking process as not anonymous and be deterred from using it for that reason.  Thus, even if Camdenton's process for requesting that a website be opened is, in fact, anonymous, it still stigmatizes websites expressing a positive viewpoint toward LGBT individuals.  This finding is supported by Plaintiff Jane Doe's testimony in her affidavit that she is "afraid" that requesting to have a site unblocked "will draw attention to [her] and make [her] the subject of further taunting."  [Doc. # 28-2 at 2].

Third, even if Camdenton's unblocking process is, in fact, anonymous and is perceived by students as such, it still unnecessarily stigmatizes and burdens a single viewpoint on LGBT issues.  Dr. Stripling testified that when a student is required to ask permission to access information, "even if it's anonymous that still the student feels stigmatized, that he's less than worthy, and the information that he's seeking is less than worthy."  (Tr. 11).  Further, Camdenton's internet-filter system is viewpoint discriminatory by design, so the unblocking process burdens only one viewpoint on LGBT issues by imposing a twenty-four hour wait and the risk of exposing one's identity only on access to information expressing the discriminated-against viewpoint.  Thus, students may be deterred from accessing websites expressing a positive view toward LGBT individuals either by the inconvenience of having to wait twenty-four hours for access or by the stigma of knowing that viewpoint has been singled out as less worthy by

11

the school district and the community.

## II. Discussion

Courts weigh the following factors when considering a plaintiff's motion for preliminary injunction: (1) whether the plaintiff is likely to succeed on the merits, (2) whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of equities tips in the plaintiff's favor, and (4) whether an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

### A.    Whether Plaintiffs Are Likely to Succeed on the Merits

#### 1.    Likelihood of Success Needed

A party seeking a preliminary injunction regarding the implementation of anything but a "duly enacted state statute" must demonstrate a "fair chance" that it will succeed on the merits, "meaning something less than fifty percent." *Planned Parenthood v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008). The Eighth Circuit requires a more rigorous showing, that the movant is "likely to prevail on the merits," when challenging a duly enacted state statute because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic process are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 732 (citation omitted).

Camdenton argues its case under the assumption that the "likely to prevail" standard applies, but does not address PFLAG's argument that the "fair chance" standard applies. The Court concludes that PFLAG must only show a fair chance of success on the

12

merits because a school board's selection of an internet filter does not appear to "represent[] the full play of the democratic process." *Planned Parenthood v. Rounds*, 530 F.3d 724, 733, n.6 (8th Cir. 2008) (internal quotes omitted). The Court also notes that the difference is not dispositive in this case, because the Court also finds PFLAG "likely to prevail" on the merits of its claim.

### 2. Standing

In order to meet Article III standing requirements, a plaintiff must show that she suffered "injury-in-fact," that is, injury that is concrete and particularized, as well as actual or imminent. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Camdenton argues that neither the organizational Plaintiffs nor the student Plaintiffs meet this requirement. The Court is not persuaded by these arguments.

### a. Standing of Organizational Plaintiffs

Camdenton argues that the organizational Plaintiffs have no standing because they do not have a constitutional right ensuring that their websites reach students in a school library. Camdenton, in making this argument, relies heavily on the Supreme Court's holding in *ALA* that public libraries are not public forums. *United States v. Am. Library Ass'n ("ALA")*, 539 U.S. 194, 207 (2003) (plurality opinion). But PFLAG correctly argues that the state violates the First Amendment right of speakers when it denies them access to even a non-public forum if the state does so based on the speakers' viewpoint. *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985). Because this is precisely what the organizational Plaintiffs in this claim allege, those Plaintiffs

13

have standing to bring this suit.

Camdenton also appears to argue that the right to challenge decisions regarding school-library materials is a right that belongs exclusively to the students. This argument is unpersuasive. Camdenton has not pointed to an analogous case that excludes web-publisher plaintiffs on standing grounds. In *ALA*, the plurality reached the merits of a claim by plaintiffs, some of whom were website publishers who challenged the filtering out of their websites from the non-public forum of library internet "collections." *ALA*, 539 U.S. at 201-02. Thus, Camdenton is incorrect that website publishers cannot have standing to make such challenges.

Camdenton also argues that the organizational Plaintiffs lack standing because they cannot show injury in fact. Specifically, Camdenton argues that PFLAG has not alleged that any student has attempted to access the organizational Plaintiffs' websites, as would be required to confer standing. Camdenton also argues that "there is not even a minimal guarantee that any student will ever seek access" to the organizational Plaintiffs' websites. [Doc. # 34 at 10-11]. Camdenton's argument is not persuasive. First, the injury claimed by organizational Plaintiffs is their exclusion on the basis of viewpoint, which logically exists independent of students' desire to access the excluded resource. Regardless, Plaintiff Jane Doe, a student at Camdenton, has testified: "I want to be able to access information...but I am prevented from doing so by the software blocking sites on the Internet." [Doc. # 28-2]. The most natural conclusion to draw from this statement is that Jane Doe would have accessed the organizational Plaintiffs' websites but for her

14

knowledge that such websites were blocked. It is not reasonable to require that a student actually try to access a website that they know to be blocked in order for the website's publisher to be able to bring suit. This conclusion draws support from Camdenton's inability to identify precedent that would support its proposition, such as, for example, a book removal case discussing a requirement that a student request a book they knew to be removed as a condition of bringing suit. The Court finds that Camdenton's actions have, in fact, prevented the organizational Plaintiffs from reaching at least one student. Accordingly, the Court finds that the injury that PFLAG alleges is both concrete and actual, and the organizational Plaintiffs have standing to bring this suit.

### b.     Standing of Jane Doe

Even if the organizational Plaintiffs did not have standing to sue, the lawsuit would still proceed because Jane Doe, a Camdenton student, also has standing to sue. Camdenton argues that Jane Doe lacks standing because she has not alleged any particular website that she wished to access, has attempted to access, or for which she has petitioned to gain access. But this argument only demonstrates the breadth of Jane Doe's injury. Camdenton's filter system deterred Jane Doe from even trying to access in her school library, websites expressing a positive viewpoint toward LGBT individuals, because she knew they were blocked. Camdenton's system thus chilled Jane Doe's search for information on that viewpoint. The Eighth Circuit has recognized this type of broader, stigmatic injury:

The symbolic effect of removing the films from the curriculum is

> more significant than the resulting limitation of access to the story. The board has used its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered. This message is not lost on students and teachers, and its chilling effect is obvious.

*Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 779 (8th Cir. 1982); *see also Bd. of Ed., Island Trees Un. Free Sch. Dist. No.26 v. Pico*, 457 U.S. 853, 870 (1982) (plurality opinion).

Camdenton argues that Jane Doe does not have standing to sue because Camdenton's filter system allows access to some websites expressing a positive viewpoint toward LGBT individuals. Camdenton appears to argue that because an attempt by Jane Doe to access any particular website expressing a positive viewpoint toward LGBT individuals might be successful, her injury is too speculative to satisfy Article III requirements. This argument also fails in light of the Eighth Circuit's statement in *Pratt* that the stigmatizing effect of condemning an idea by limiting access to it is more significant than the actual limitation of access. *See Pratt*, 670 F.2d at 779. This stigmatization is not speculative because it necessarily follows from Camdenton's viewpoint discrimination, which the Court has already found. That stigmatization is further evidenced by Jane Doe's testimony that she is afraid to access school websites expressing a positive viewpoint toward LGBT individuals.

        **c.**      **Effect of Camdenton's Unblocking Procedure on Standing**

Finally, Camdenton argues that its system allowing students to request that sites be unblocked renders PFLAG's injuries too hypothetical to satisfy standing requirements

and also moots the lawsuit.  Camdenton argues that in order to have standing, Jane Doe would have had to exhaust her remedies by requesting access to a site and being denied under that system.  This argument does not defeat standing for the organizational Plaintiffs because Camdenton's act of filtering the organizational Plaintiffs' websites based on viewpoint stigmatized a particular viewpoint.  This is an injury by itself, regardless of whether students are eventually able to access any particular website expressing the discriminated-against viewpoint.  *See Pratt*,  670 F.2d at 779.

As for the effect of Camdenton's procedure for unblocking a website on Jane Doe's standing, the Court is aware of two cases dealing with such a procedure–neither of which supports Camdenton's argument.  In the first such case, *ALA*, the plurality considered the effects of an unblocking procedure in its discussion on the merits, but never indicated that the procedure was an obstacle to standing.  539 U.S. at 209.  Because standing is a threshold question, this suggests that the existence of such a procedure is not a bar to standing.  In the second such case, *Counts*, the Western District of Arkansas considered the effect on standing of a school library's decision to only allow students to check out copies of the book Harry Potter with the assistance of a librarian and with a letter of parental permission on file.  *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d. 996, 999 (W.D. Ark. 2003).  The *Counts* court found concrete injury, relying for that finding both on the stigmatization of the book–that students seen reading the book would be known to be reading a book disapproved of by the school–as well as the extra burdens of having to receive parental permission and librarian assistance to access the book.  *Id.*

17

The *Counts* court also rejected the defendant school district's argument that the lawsuit was not ripe because the lawsuit was filed during summer break and, thus, the student plaintiffs could not have filed parental notes and requested librarian assistance in accessing the book before filing the lawsuit. *Id*. The court observed that "this is not a case where administrative exhaustion or development of the record is called for." *Id.*

The Court finds the reasoning in *Counts* both persuasive and consistent with the plurality decision in *ALA*. It would strain common sense for the Court to allow Camdenton to create a procedure, burdening only one viewpoint in a debate, and then require administrative exhaustion before a federal Court could consider the merits of the challenge. Such an approach would chill speech in a viewpoint-discriminatory fashion, which is the antithesis of the First Amendment.

This is especially true where the record supports a finding that the procedure to be exhausted stigmatizes protected speech. Although Camdenton argues that its procedure cannot stigmatize speech because it is anonymous, the Court has found that students will likely fear that Camdenton's unblocking procedure will not protect their anonymity. Thus, Jane Doe's testimony that she is "afraid" that requesting to have a site unblocked "will draw attention to [her] and make [her] the subject of further taunting" is justified. [Doc. # 28-2 at 2]. This fear is similar to that in *Roe v. City of New York*, where the court found a plaintiff's fear of arrest for attending a needle exchange reasonable, and also considered, for standing purposes, "that the fear itself cause[d] a distinct and palpable injury" by decreasing the use of needle exchanges and increasing the transmission of

18

diseases. 151 F. Supp. 2d 495, 506 (S.D. N.Y. 2001). Jane Doe's alleged injury to her First Amendment interest to receive information is sufficiently concrete and actual despite Camdenton's unblocking procedure and despite Jane Doe's failure to exhaust that procedure.

### d. Applicability of Censorship Cases

Camdenton also claimed at oral argument that the censorship cases cited by the ACLU in support of standing are inapplicable to this case because they all involved the removal of a book previously included in a library collection. Camdenton apparently argues that the Court should extend *ALA*'s holding – that libraries do not violate the First Amendment by filtering out the subject of pornography from their patrons' internet access – to the facts of this case and deny standing. But even if *ALA* were on all fours with this case, it would not aid Camdenton's argument because the Supreme Court in *ALA* reached the merits of the claim before it. Thus, to the extent this case is analogous to *ALA*, it suggests that the Court should reach the merits of this case as well.

Regardless, the injury alleged in this case is more analogous to the injury in book-removal censorship cases than to the injury in *ALA*. The Supreme Court in *ALA* did not deal with viewpoint discrimination, but rather considered a librarian's decision to "exclude certain categories of content." *ALA*, 539 U.S. at 194. Thus, the plaintiffs in *ALA* could only allege the injury of denial of access to a particular subject. But here, the Court has found viewpoint discrimination. Thus, the Plaintiffs in this case claim both the denial of access to a particular viewpoint and the stigmatic effect of the state endorsing a

19

particular viewpoint over the other.  The Eighth Circuit made clear in *Pratt* that this second, stigmatic injury is "more significant."  *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 779 (8th Cir. 1982).  For all of these reasons, PFLAG likely has standing to bring its claim in federal court.

### 3.    The Merits of PFLAG's Claim

Camdenton's internet access system in its library is neither a traditional nor a designated public forum.  *United States v. Am. Library Ass'n ("ALA")*, 539 U.S. 194, 205 (2003) (plurality opinion) (internal quotes omitted).  It is a nonpublic form.  "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and viewpoint neutral."  *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985).  But "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."  *Id.*  Federal courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).  Because the Court has found that Camdenton's internet filter system discriminates based on viewpoint, that system is invalid unless Camdenton can demonstrate that is narrowly designed to serve a compelling state interest.  *See Brown v. Entm't. Merch. Ass'n*, 131 S. Ct. 2729, 2738 (2011).

Alternatively, Camdenton's decision to deny its students access to websites

20

expressing a positive viewpoint toward LGBT individuals could be analyzed under the "right to receive information and ideas." *Bd. of Ed., Island Trees Un. Free Sch. Dist. No.26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). ("[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Id.* at 866). "[School districts] possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner." *Id.* at 870. Because the Court has found that Camdenton's internet-filter system discriminates based on viewpoint, that system must be struck down unless Camdenton can demonstrate that allowing access to websites expressing a positive viewpoint toward LGBT individuals would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 509 (1969); *see also Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 761 (8th Cir. 2008) (applying *Tinker*).

PFLAG is likely to succeed in challenging Camdenton's internet-filter policy under either form of exacting scrutiny. First, Camdenton has repeatedly said that its goal is not to protect its students from websites expressing a positive view toward LGBT individuals, or that such websites interfere with the requirements of appropriate discipline. Rather, Camdenton has argued that its internet-filter system does not discriminate based on viewpoint. The Court has found otherwise. Thus, Camdenton's only possible governmental objective is compliance with CIPA; i.e, protecting its students

from viewing, on school computers, images that are obscene, child pornography, or harmful to minors. The Court assumes that this interest is a compelling one, but Camdenton's internet-filter system is not narrowly tailored to achieve that interest. Rather, the record clearly demonstrates that Camdenton could either use a product like CIPAFilter or reconfigure its own system to achieve viewpoint neutrality, and that doing so would maintain, if not increase, its effectiveness at blocking CIPA-regulated content. As shown by the evidence, URL Blacklist failed to block out 30 per cent of material forbidden by CIPA. Indeed, this evidence supports the Court's conclusion that Camdenton has continued to use the URL Blacklist as its primary filter because it discriminates against websites that discuss LGBT from a positive viewpoint.

Camdenton appears to argue that because it has in place a system for requesting that websites be unblocked, its internet-filter system is narrowly tailored to its interest in complying with CIPA. But the Court has explained elsewhere that Camdenton's unblocking procedure, as currently configured, burdens a particular viewpoint and thus has a stigmatizing effect. It is thus distinguishable from the unblocking system that the plurality in *ALA* found to be effective at curing the overbreadth of an internet filter in public libraries. 539 U.S. at 209. Because the plaintiffs in *ALA* did not allege that public libraries would filter out websites based on any particular viewpoint on the front end, the unblocking procedure employed there did not burden or stigmatize any particular viewpoint on the back end. Thus, the *ALA* court's analysis of the unblocking procedure in that case does not apply to the unblocking procedure in this case, and Camdenton's

internet filtering system is not narrowly tailored.

Camdenton argues that because this case involves the filtering out of websites, rather than the removal of books, that the Court should apply the "reasonableness" standard of *ALA* rather than the more exacting scrutiny applied in *Pico* and *Pratt*.[1]  But Camdenton's argument misinterprets these cases.  The plurality in *ALA* held that where a library decides to "exclude certain categories of content" from its internet "collection" by using internet filters, that decision need only be reasonable in light of its "traditional role in identifying suitable and worthwhile material."  *ALA*, 539 U.S. at 208.  The plurality thus upheld the right of libraries under the First Amendment to use an internet filter to exclude the subject of pornography from its collection.  *Id.*  The district court in *ALA* engaged in reasoning similar to that of Camdenton when it "reasoned that a public library enjoys less discretion in deciding which Internet materials to make available than in making book selections."  *Id.* at 207-08.  But the Supreme Court did "not find this distinction constitutionally relevant," and instead reasoned:

> Most libraries already exclude pornography from their print collections because they deem it inappropriate for inclusion.  We do not subject these decisions to heightened scrutiny; it would make little sense to treat libraries' judgments to block online pornography any differently, when these judgments are made for just the same reason.

*Id.* at 208.  This language makes clear that it is the intention and effect of a library's

---

[1]Because Camdenton consistently asserts that it does not discriminate based on viewpoint, it is unclear whether Camdenton would argue that *ALA* should provide the standard for this case despite the Court having found viewpoint discrimination.  Because Camdenton's counsel at oral argument insisted that this is not a book "taking" or classic censorship case and that *ALA* controls, the Court addresses the following argument.  (Tr. 145).

decision that controls the analysis, and not the medium of the resource nor whether the decision can be characterized as an addition or removal.

This conclusion is consistent with the plurality decision in *Pico*. There, having earlier noted that "the action before us does not involve the *acquisition* of books," 457 U.S. at 862 (emphasis in original), the plurality later noted that:

> nothing in our decision today affects in any way the discretion of a local school board to *add* to the libraries of their schools. Because we are concerned in this case with the suppression of ideas, our holding today affects only the discretion to *remove* books. In brief, we hold that the local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. Such purposes stand inescapably condemned by our precedents.

*Id*. at 871-72 (emphasis in original) (internal quotes and citations omitted). In *Pico*, the parties did not allege that the addition of a book amounted to viewpoint discrimination, but here the Court has found that Camdenton, by continuing to use URL Blacklist as currently configured, has sought to prescribe what shall be orthodox in matters of opinion. According to the plurality in *Pico*, it is that purpose that violates the First Amendment.

Thus, if the Court were examining a decision by Camdenton to exclude all resources on the *subject* of LGBT issues, whether by employing an internet filter or by book selection or removal, the Court would examine that decision under the standard articulated in *ALA*. But because here, the Court is examining Camdenton's decision to exclude websites expressing a *viewpoint* that is positive toward LGBT individuals, the

24

Court must examine the decision under the exacting scrutiny of *Pico* and *Pratt*.

Finally, even if the Court were to examine Camdenton's decision under the standard of *ALA*, PFLAG would likely prevail on the merits. Camdenton has not argued that its decision to systematically block access to websites expressing a positive viewpoint toward LGBT individuals is reasonable in light of a librarian's "traditional role in identifying suitable and worthwhile material." Rather, Camdenton has consistently denied that it discriminates on the basis of viewpoint. Because the Court has found otherwise, PFLAG is likely to succeed on the merits of its claim.

## B.   Whether PFLAG Will Suffer Irreparable Harm if Camdenton is not Enjoined

Injunctive relief in the federal courts is based on the threat of irreparable harm and the inadequacy of legal remedies. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Court has found PFLAG likely to succeed on the merits of its First Amendment claim, and thus a preliminary injunction will prevent irreparable harm to PFLAG.

## C.   Whether the Balance of Hardships Tips in PFLAG's Favor

The balance of hardships tips in PFLAG's favor. The Court's failure to enjoin Camdenton's internet-filter system, as currently configured, will lead to an ongoing violation of the First Amendment rights of website publishers and students. Camdenton

25

argues that requiring it to disable its "sexuality" filter will expose children to pornography and bring Camdenton into noncompliance with CIPA.  But PFLAG does not ask that Camdenton merely disable its "sexuality" filter.  Rather, PFLAG requests: "An injunction prohibiting Defendants from continuing to use Internet filtering software that blocks access to LGBT-supportive viewpoints while permitting access to anti-LGBT viewpoints."  [Doc. # 1 at 35].

The record reflects several viewpoint-neutral options that would allow Camdenton to continue its compliance with CIPA.  For example, Camdenton could reconfigure its system, such as by adding to its white list all websites in DMOZ's "gay, lesbian, and bisexual" subcategory that would not be regulated by CIPA.  Camdenton has presented no evidence that this would be a hardship.  Or Camdenton could employ one of the many filter services suggested by PFLAG that effectively filter pornography without discriminating based on viewpoint.  Although such a service would presumably cost more than Camdenton's URL Blacklist implementation, Camdenton has not presented evidence that this cost would be overly burdensome on Camdenton's financial resources.  In fact, the record reflects that a thousand school districts currently employ CIPAFilter alone, which suggests that the cost of these products would not be overly burdensome on Camdenton.  (Tr. 60).  Further, the record indicates that Camdenton's adoption of one of these services would substantially improve its ability to shield children materials prohibited by CIPA.  Any small increase in price should be justified if Camdenton is concerned about filtering out pornographic material.  The balance of hardships thus

26

weighs in favor of PFLAG.

**D.     Whether an Injunction is in the Public Interest**

"[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008).  Viewpoint discrimination by a state actor is antithetical to the First Amendment, one of our country's most cherished constitutional rights.  Enjoining this action is thus in the public interest.

**III.     Conclusion**

For the foregoing reasons, the Court finds that PFLAG has established the requirements necessary for a preliminary injunction on its claim under the First Amendment of the U.S. Constitution.  Accordingly, it is hereby ORDERED that Plaintiffs' Motion for Preliminary Injunction [Doc. #6] is GRANTED.  The Court orders Camdenton to discontinue, within 30 days,  its internet-filter system as currently configured, and any new system selected must not discriminate against websites expressing a positive viewpoint toward LGBT individuals.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  February 15, 2012
Jefferson City, Missouri